1  ROBERT BORRELLE (SBN 295640)
2  Robert.Borrelle@disabilityrightsca.org
   LINDSAY APPELL (SBN 330296)
3  Lindsay.Appell@disabilityrightsca.org
4  DISABILITY RIGHTS CALIFORNIA
   350 South Bixel Street, Suite 290
5  Los Angeles, CA  90017
   Tel.: (213) 213-8000
6  Fax: (213) 213-8001
7
8  *Attorneys for Plaintiffs*
   (Additional Counsel Listed on Next Page)
9
10              UNITED STATES DISTRICT COURT
11              CENTRAL DISTRICT OF CALIFORNIA

12  C.B., by and through his *guardians ad litem* W.B. and B.T.,

13

14                      Plaintiffs,

15  v.

16  MORENO VALLEY UNIFIED
    SCHOOL DISTRICT; MARTINREX
17  KEDZIORA, in his official capacity as
    Moreno Valley Unified School District
18  Superintendent; DARRYL SCOTT;
    SCOTT WALKER; DEMETRIUS
19  OWENS; MANUEL ARELLANO;
    COUNTY OF RIVERSIDE;
20  RIVERSIDE COUNTY SHERIFF'S
21  DEPARTMENT; CHAD BIANCO, in
    his official capacity as Riverside County
22  Sheriff; DEPUTY SHERIFF NORMA
    LOZA; and DOES 1-10.
23

24

25                      Defendants.

26

27

28

Case No. 5:21-cv-00194

**COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF**

1)  Unreasonable Seizure and Excessive Force (42 U.S.C. § 1983)
2)  *Monell* Claim (42 U.S.C. § 1983)
3)  Title II of the ADA (42 U.S.C. § 12132)
4)  Section 504 of the Rehabilitation Act (29 U.S.C. § 794)
5)  California Gov't Code § 11135
6)  California Civil Code § 51 *et seq.*
7)  Art. I, § 7(a) and Art. IV, § 16(a) of the California Constitution
8)  Intentional Infliction of Emotional Distress
9)  False Imprisonment
10) Battery
11) Assault
12) Negligent Supervision

Demand for Jury Trial

## **LIST OF ADDITIONAL ATTORNEYS**

MARONEL BARAJAS (SBN 242044)
MB@barajasriveralaw.com
ANNA RIVERA (SBN 239601)
AR@barajasriveralaw.com
BARAJAS & RIVERA, APC
1440 N. Harbor Blvd. Suite 900
Fullerton, CA 92835
Tel: (714) 443-0096
Fax: (714) 443-0096

CLAUDIA CENTER, SBN 158255
ccenter@dredf.org
MALHAR SHAH, SBN 318588
mshah@dredf.org
DISABILITY RIGHTS EDUCATION & DEFENSE FUND
3075 Adeline St #210
Berkeley, CA 94703
Tel.: (510) 644-2555
Fax: (510) 841-8645

*Attorneys for Plaintiff*

**INTRODUCTION**

1.       Plaintiff C.B., a minor, by and through his *guardians ad litem* W.B. and B.T. ("Plaintiff" or "C.B."), brings this action for injunctive relief and damages against the Moreno Valley Unified School District ("District" or "Moreno Valley USD"), District Superintendent Martinrex Kedziora, the County of Riverside ("County"), the Riverside County Sheriff's Department ("Sheriff's Department"), Riverside County Sheriff Chad Bianco, and various individuals for harms resulting from at least four violent handcuffings at his middle school campuses. C.B. alleges that Defendants' actions, inactions, policies, practices, customs and procedures violated and continue to violate his rights under the U.S. Constitution, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 *et seq.*, state civil rights laws, and common law torts.

2.       C.B. further alleges that the District, Sheriff's Department, and County partner to operate a discipline system that discriminates against students with disabilities and Black students, including Black disabled students. The District employs its own Campus Security Officers (CSOs) and contracts with the Sheriff's Department to provide School Resource Officers (SROs) at District schools. The District calls on CSOs and SROs (together, "school police officers") to respond with physical force to minor and/or disability-related behaviors that could be managed by teachers or administrators with less harmful methods, such as crisis intervention, de-escalation, patience, communication, and waiting.

3.       C.B. is a Black student with disabilities residing within the boundary of the District. School police officers tackled and handcuffed C.B. in response to his disability-related behaviors at least four separate times over a less than four-month span in 2019. At the time of the handcuffings, C.B. was between ten and eleven years old, stood about four feet, eight inches, and weighed about seventy pounds. In at least one incident the school police officers simultaneously shackled

his wrists and ankles.

4.     School police officer body camera footage captured part of the third mechanical restraint, which occurred on October 8, 2019. The officers entered C.B.'s special education classroom to investigate an allegation that he threw a rock the day before. C.B. sat with his head down on his desk while the school police officers questioned him. Within ninety seconds of their arrival, the officers physically pulled C.B. from his desk by his arms and shoulders, pushed him with force to the ground, and handcuffed him. One officer pinned his knee in C.B.'s back while another officer placed him in handcuffs.

5.     As a result of Defendants' unnecessary and excessive physical and mechanical restraints, C.B. has suffered and continues to suffer severe emotional distress, mental anguish, pain, humiliation, and exacerbation of his disabilities. His parents have secured therapy services to help him cope with the trauma caused by these incidents.

6.     On information and belief, Defendants were and are on notice that interactions with school police officers trigger and exacerbate C.B.'s disabilities and cause emotional distress. Nevertheless, the District continues to request and direct school police officers to respond to C.B.'s minor and/or disability-related behaviors, unnecessarily escalating matters. By way of example, in a meeting with C.B.'s parents, Defendant District stated that it could not implement a policy at all times of exhausting less intrusive methods before calling officers. Further, school police officers responded and continue to respond with excessive physical force during each interaction with C.B.

7.     On information and belief, and as evidenced by the at least four handcuffings of C.B., the District fails to sufficiently train its teachers, administrators, and other non-school police officer staff on using alternatives to law enforcement to respond to minor and/or disability-related behaviors. The District's law enforcement referral data demonstrates its excessive and

disproportionate reliance on school police officers. The District refers students to law enforcement at a significantly higher rate than comparable districts in the state. Moreover, while Black students make up about 14% of total District enrollment, they are nearly 30% of District referrals to law enforcement. The District's rate of referring Black students to law enforcement is more than 2.5 times its rate of referring non-Black students to law enforcement.

8.      The injuries suffered by C.B. at the hands of SROs were also the product of Defendant Sheriff's Department's and County's handcuffing policies and practices and failures to train and supervise its staff. The pattern of unlawful or excessive restraint and handcuffing in response to C.B.'s minor and/or disability-related behavior constitutes deliberate indifference to his constitutional rights.

9.      Defendants have practices, policies, and/or customs of willful failure to adequately report, document, investigate, and/or respond to, complaints of unnecessary mechanical and other physical restraints of students, which has caused C.B. to suffer constitutional injuries as a result, and has compounded the harms suffered by C.B. By way of example, Defendants have failed to provide any meaningful information regarding what transpired in the four incidents, despite C.B.'s parents' repeated requests. Defendants have abdicated their responsibility to train, supervise, and discipline their employees by failing to adequately report, document, investigate and/or respond to complaints of unlawful or excessive force.

10.      Plaintiff seeks monetary damages and injunctive and declaratory relief for ongoing violations of his rights, including an order that Defendants cease the involvement of school police officers in low-level student misbehaviors and instead provide C.B. and similarly situated students with reasonable modifications and positive supports and services.

**JURISDICTION AND VENUE**

11.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. The same actions and omissions that form the basis

of Plaintiff's federal claims, form the basis of his California state law claims. Thus, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

12.     Venue is proper in the Central District of California, Eastern Division, because Plaintiff resides in, and Defendants operate and perform official duties in, Riverside County. A substantial part of the events, acts, and omissions giving rise to the claims also occurred in Riverside County. 28 U.S.C. § 1391(b).

**PARTIES**

**A. Plaintiff**

13.     Plaintiff C.B. is a Black, twelve-year-old boy with disabilities in the seventh grade. At the time of the events described herein, C.B. was between ten and eleven years old, approximately seventy pounds, and in the sixth grade. He appears by and through his parents and *guardians ad litem* W.B. and B.T.

14.     Presently, and at all times relevant to this action, C.B. was and is a qualified individual with a disability within the meaning of all applicable statutes including the Americans with Disabilities Act, Section 504, and California Government Code § 12926. C.B. has diagnoses of Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD), disabilities that make it difficult for him to regulate his emotions, maintain focus, communicate, and comply promptly with directions. C.B., at all times relevant to this action, received special education services.[1] C.B.'s parents suspect that he may have additional undiagnosed emotional and behavioral disabilities, some of which resulted from or were exacerbated by his interactions with law enforcement.

---

[1] Through this complaint, C.B. does not challenge the adequacy of his Individualized Education Program (IEP) or allege Defendants violated the Individuals with Disabilities Education Act (IDEA). All references to his IEP, IEP team meetings, or special education classroom herein are for background purposes, e.g., to support his status as a qualified individual with disabilities, establish Defendants' knowledge of his disabilities, and provide evidence that Defendants discriminated against him by handcuffing him for disability-related behaviors.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

15.     Presently, and at all times relevant to this action, C.B. was and is a resident of Moreno Valley, Riverside County, California.

16.     Presently, and at all times relevant to this action, C.B. was a student at Landmark Middle School or Mountain View Middle School within the school district boundary of Moreno Valley USD.

**B. Defendants**

### *Moreno Valley USD*

17.     Defendant Moreno Valley USD is a public school district organized and existing under the laws of the State of California, with the capacity to sue and be sued. The District is located in the County of Riverside. It receives federal and state funding to educate students. The District has a student population of 32,299, making it the twenty-fifth most populous school district in California.[2]

18.     The District is a public entity for purposes of Title II of the ADA and receives both state and federal assistance such that it is subject to Section 504 and California Government Code § 11135. The District is a business establishment for purposes of the Unruh Civil Rights Act, California Civil Code § 51 *et seq.*

19.     The District is the owner, operator, or lessor/lessee of Landmark and Mountain View Middle Schools. It is responsible for promulgating policies and procedures at those schools. The District is sued in its own right and on the basis of the acts and/or omissions of its officials, agents and employees, including those associated with its CSO Program. Under law, including California Government Code § 815(a), the District is liable for the unlawful tortious acts hereinafter complained of, including those violating state law and committed by any District entity or employee acting within the course and scope of their employment.

20.     The District created and operates its CSO Program. The District contracts with the County of Riverside and/or its Sheriff's Department to provide

---

[2] California Department of Education, *Largest & Smallest Public School Districts* – CalEdFacts (Jul. 9, 2020), https://www.cde.ca.gov/ds/sd/cb/ceflargesmalldist.asp.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

SROs on its middle school and high school campuses.

### Superintendent Martinrex Kedziora

21.     Defendant Martinrex Kedziora is the Superintendent of the Moreno Valley USD. As Superintendent, Defendant Kedziora has authority, oversight, and control of the District's schools and facilities, including the policies, practices, procedures, programs, trainings, activities, services and employees of said schools. Defendant Kedziora is responsible for the daily operations of the District, including operation of the CSO program, and he is responsible for ensuring that District schools and employees/staff comply with anti-discrimination laws, as well as for ensuring compliance with state and federal laws.

22.     Defendant Martinrex Kedziora is sued in his official capacity for prospective relief.

### Darryl Scott

23.     Defendant Darryl Scott is the District's Director of Safety and Security. Defendant Scott was or is employed by the District. As the District's Director of Safety and Security, Defendant Scott is responsible for the supervision of the CSO Program under the direction of Superintendent Kedziora.

24.     Defendant Scott directed and/or participated substantially in the events described herein against C.B., and/or knew of the acts of his subordinates and failed to act to prevent them as required by law. Defendant Scott is sued in his individual capacity for damages.

### Scott Walker

25.     Defendant Scott Walker is the former principal of Landmark Middle School. As principal, Defendant Walker had authority and control over Landmark Middle School's programs and facilities, including policies, practices, procedures, programs, activities, services, training, and employees of Landmark Middle School. As principal, he was responsible for ensuring that Landmark Middle School complies with state and federal law.

26.     Defendant Walker directed and/or participated substantially in the events described herein against C.B., and/or knew of the acts of his subordinates and failed to act to prevent them as required by law. He is sued in his individual capacity for damages.

### *Manuel Arellano*

27.     Defendant Manuel Arellano is or was a CSO employed by Moreno Valley USD and assigned to its schools. Defendant Arellano was responsible for and/or participated substantially in the events described herein against C.B. Defendant Arellano is sued in his individual capacity for damages.

### *Demetrius Owens*

28.     Defendant Demetrius Owens is or was a CSO employed by Moreno Valley USD and assigned to its schools. Defendant Owens was responsible for and/or participated substantially in the events described herein against C.B. Defendant Owens is sued in his individual capacity for damages.

### *County of Riverside*

29.     Defendant County is an incorporated municipality organized and existing under the laws of the State of California and wholly located within the State of California. The District contracts with the County and/or its Sheriff's Department to operate an SRO program on its campuses.

30.     At all relevant times, Defendant County had the power and authority to adopt policies and prescribe rules, regulations, and practices affecting the operation of the Sheriff's Department, and particularly the Sheriff's Department's SRO Program operating on the campuses of the Moreno Valley USD, and its tactics, methods, practices, policies, training, and customs regarding the use of force, personnel supervision, and meaningful records review and maintenance.

### *Riverside County Sheriff's Department*

31.     Defendant Sheriff's Department is an operating department of the County. The District contracts with the County and/or the Sheriff's Department to

9

operate an SRO program on its campuses.

32. On information and belief, SROs are employees of the Sheriff's Department, unlike CSOs who are employees of the District. Under law including California Government Code § 815(a), the Sheriff's Department is liable for any and all unlawful tortious acts hereinafter complained of, including those in violation of state law and committed by the Sheriff's Department entity and its employees acting within the course and scope of their employment.

### *Sheriff Chad Bianco*

33. Defendant Sheriff Chad Bianco is and was, at all times relevant to this action, the Sheriff for Riverside County. He is a policymaker for the Sheriff's Department. He is sued in his official capacity.

### *Deputy Sheriff Norma Loza*

34. Defendant Norma Loza is a Riverside County Deputy Sheriff. She is or was an SRO assigned to Moreno Valley USD schools. Defendant Loza was responsible for and/or participated substantially in the events described herein against C.B. In doing the acts alleged herein, she acted within the scope of her employment and under the color of state law. Defendant Loza is sued in her individual capacity for damages.

### *DOES 1-10*

35. Plaintiff is ignorant of the true names or capacities of those defendants named DOES 1 through 10. He therefore sues said defendants by fictitious names.

36. Plaintiff is informed and believes that these Defendants may also be responsible for the acts and omissions claimed herein. For example, on information and belief, an SRO with the last name Toscano and a CSO with the last name King participated substantially in the events described herein against C.B.

37. Plaintiff is informed and believes that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, franchiser, franchisee, lessor, lessee, joint venture,

parent, subsidiary, affiliate, related entity, partner and/or associate, or such similar capacity of each of the other Defendants, and was at all times, acting and performing, or failing to act or perform, within the course and scope of such similar aforementioned capacities, and with the authorization, consent, permission or ratification of each of the other Defendants, and is personally responsible in some matter for the acts and omissions of the other Defendants in proximately causing the violations and damages complained of herein, and have participated, directed, and have ostensibly and/or directly approved or ratified each of the acts or omissions of each of the other Defendants, as herein described. Plaintiff will seek leave to amend when the true names, capacities, connections, and responsibilities of Defendants DOES 1 through 10, inclusive are ascertained.

38.     Hereinafter, references to "Defendants" shall include Paragraphs 17-38, inclusive, above.

**PLAINTIFF COMPLIED WITH GOVERNMENT CLAIM REQUIREMENT**
*(with respect to damages under California State law)*

39.     Plaintiff complied with the California Government Claims Act (also known as the Tort Claims Act), California Government Code § 900 *et seq*. On July 15, 2020, Plaintiff filed an administrative tort claim pursuant to California Government Code § 910 *et seq.* with Defendants Moreno Valley USD, County, Sheriff's Department, Sheriff Chad Bianco, Superintendent Kedziora, Director Scott, Principal Walker, CSO Arellano, CSO Owens, and Deputy Loza, notifying Defendants of claims that are now set forth herein.[3] Plaintiff's claim stated that the claim was timely as to all events, but also included an application for leave to file a late claim, to the extent any such claims were required.

40.     On August 10, 2020, Defendant Moreno Valley USD rejected Plaintiff's claim by way of letter. Similarly, on August 6, 2020, Defendant County

---

[3] A true and correct copy of Plaintiff's tort claim is incorporated by reference as Plaintiff's Exhibit 1, and will be filed separately under seal with this Court.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

rejected Plaintiff's claim by way of letter. On November 13, 2020, Plaintiff sought clarification of these Defendants' purported rejection of Plaintiff's application to present a late claim. Defendant Moreno Valley USD did not respond to Plaintiff's request for clarification.

41.     On November 25, 2020, the County provided written letter directing Plaintiff to file a late claim petition pursuant to California Government Code § 946.6. Petitioner filed that petition in Riverside County Superior Court on February 2, 2021, naming the District, County, and Sheriff's Department.

42.     Defendant Sheriff's Department failed to reply to Plaintiff's claim and, by operation of law, Plaintiff's claim was rejected on August 29, 2020. On November 13, 2020, Plaintiff sought clarification of Defendant Sheriff's Department's purported rejection of Plaintiff's application to present a late claim. Defendant Sheriff's Department did not respond to Plaintiff's request for clarification.

43.     Plaintiff has thus complied with the requirements of Government Code Section 910, *et seq.*

## STATEMENT OF FACTS

### A. Racial and Disability Disparities in School Policing and Restraint
### *Increased Police Presence in America's Schools*

44.     In recent decades, school districts have drastically expanded school police programs.[4] Instead of addressing student behaviors by providing positive supports or through administrative discipline, school administrators now call the police.[5] The addition of police officers in schools has not made schools safer and instead has increased the criminalization of minor and/or disability-related

---

[4] In 1975, just 1% of schools placed police officers on campus, as compared to nearly half of schools today. This expansion was primarily driven by readily available federal funding for SRO programs, rather than an actual need for increased police presence. *See, e.g.*, Amir Whitaker, et al., AMERICAN CIVIL LIBERTIES UNION, COPS AND NO COUNSELORS: HOW THE LACK OF MENTAL HEALTH STAFF IS HARMING STUDENTS (2019), https://www.aclu.org/sites/default/files/field_document/030419-acluschooldisciplinereport.pdf.
[5] *Id.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

behaviors.[6]

45.     As school districts have expanded school police programs, they have failed to fund behavioral and mental health supports. For instance, around fourteen million students in the United States attend schools patrolled by police but entirely lacking in counselors, nurses, psychologists, or social workers.[7]

46.     Increased police presence in schools has had a disproportionate impact on students with disabilities and Black students. According to the U.S. Department of Education's 2015-16 Civil Rights Data Collection Survey,[8] students with disabilities represent just 12% of the student population nationally but 28% of all students referred to law enforcement[9] or arrested at school. Black students make up 15% of student enrollment nationally but 31% of students referred to law enforcement or arrested at school.

47.     These disparities are also present in the national data on mechanical restraints,[10] the category capturing handcuffings. According to the 2017-18 Civil Rights Data Collection survey,[11] students with disabilities again make up about 12% of the student population nationally but 41% of all students subjected to mechanical restraints. Black students represent 18% of all students with disabilities nationally, but 34% of those put in mechanical restraints.

48.     Police presence and contact have grave, lifelong consequences for students. Multiple studies demonstrate that police contact causes and exacerbates

---

[6] *Id.*; *see also* Emily K. Weisburst, *Patrolling Public Schools: The Impact of Funding for School Police on Student Discipline and Long-Term Education Outcomes*, 38 J. OF POLICY ANALYSIS & MANAGEMENT 338 (2019) (finding that federal grants placing police on school campuses increased sanctions for low-level offenses, particularly for Black students, and decreased high school graduation rates).

[7] Whitaker, *supra* note 4.

[8] U.S. Dept. of Educ., *2015-16 Civil Rights Data Collection: School Climate and Safety* (May 2019), https://www2.ed.gov/about/offices/list/ocr/docs/school-climate-and-safety.pdf.

[9] The Civil Rights Data Collection defines law enforcement referral as "[A]ction[s] by which a student is reported to any law enforcement agency or official, including a school police unit, for an incident that occurs on school grounds, during school-related events, or while taking school transportation, regardless of whether official action is taken." *See id.* at p. 3.

[10] The Civil Rights Data Collection uses the same definition of "mechanical restraint" as California state law: "The use of a device or equipment to restrict a pupil's freedom of movement." Cal. Educ. Code § 49005.1(d)(1).

[11] U.S. Dept. of Educ., *2017-18 Civil Rights Data Collection: The Use of Restraint and Seclusion on Children with Disabilities in K-12 Schools* (Oct. 2020), https://www2.ed.gov/about/offices/list/ocr/docs/restraint-and-seclusion.pdf.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

mental health disabilities, especially trauma and anxiety.[12] Youth are particularly vulnerable to heightened emotional distress when they experience intrusive police stops.[13] Districts that are overpoliced and under-resourced thus subject their students to traumatic police contact, while simultaneously leaving them without mental health resources to process these events.

49.     Police contact causes even greater harm when accompanied by physical force. The U.S. Government Accountability Office ("GAO") has explained that even if no physical injury is sustained, children who are restrained can be severely traumatized as a result.[14] Students are too anxious, frightened, or angry to focus on and fully participate in classroom activities. When an individual is exposed to trauma, especially in the form of repeated traumatic stress of an extreme traumatic event, the brain becomes over-sensitized to any potential stimulus that might cue a threat. The individual thus perceives ordinary encounters as threatening ones, triggering a "fight or flight" or dissociative response.[15]

50.     Dissociative responses impair a student's attention, organization, comprehension, memory, and trust, all necessary for the acquisition of academic skills. Thus, childhood trauma is linked to poor academic outcomes, including failure to reach proficiency in core subjects and/or to graduate from high school. Exposure to trauma causes challenges with emotional self-regulation – including aggression, disproportionate reactivity, impulsivity, distractibility, or withdrawal and avoidance – that disrupt the learning environment and frequently lead to

---

[12] *See, e.g.*, Amanda Geller *et al.*, *Aggressive Policing and the Mental Health of Young Urban Men*, 104 AM. J. PUBLIC HEALTH 2321 (2014) (studying young men's experiences of police encounters and finding that men who reported more police contact also reported more trauma and anxiety symptoms, indicating a need for less invasive tactics); Dylan B. Jackson *et al.*, *Police Stops Among At-Risk Youth: Repercussions for Mental Health*, 65 J. ADOLESCENT HEALTH 627 (2019) (finding that youth who were stopped more often by police officers were more likely to report emotional trauma).

[13] Jackson *et al.*, *supra* note 12.

[14] *See* U.S. Gov't Accountability Office, GAO-09-719T, Testimony before the Committee on Education and Labor, House of Representatives: Seclusions and Restraints, Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers p.1, 8 (May 19, 2009), https://www.gao.gov/products/GAO-09-719T.

[15] Perry et al., *Childhood Trauma, The Neurobiology of Adaptation, and "Use-dependent" Development of the Brain: How "States" Become "Traits"* 16 INFANT MENT. HEALTH J. 271, 277-79 (1995) http://media.wix.com/ugd/29cec4_4951bdf3fb444a62b01f2da71e4a4cae.pdf.

exclusionary school discipline measures or absence from school. Thus, police presence, contact, and use of force are not only traumatizing, but also counter-productive to creating a safe school environment that is conducive to learning.

### *California's Movement Away from School Policing*

51.     School districts and other programs for children and youth throughout California have begun to incorporate behavioral supports, trauma-informed approaches, Restorative Justice practices, access to mental health services, and other positive strategies to focus on addressing the root causes of student behaviors and minimizing involvement with the juvenile justice system.

52.     Schools in California are reviewing and addressing racial and disability disparities in discipline to ensure students of color and students with disabilities, including disabled students of color, like C.B., are not disproportionately subject to police referrals and restraints as compared with their similarly situated peers. For these reasons, several large school districts, including Oakland Unified School District and Sacramento City Unified School District, have abolished their SRO programs completely.[16]

53.     Moreno Valley USD is not one of these districts. Following the murder of George Floyd, a coalition of Riverside County community groups organized to abolish the District's SRO program. On July 23, 2020, the District's Board conducted a "Study Session" to gather community input regarding the SRO program. During this Session, the Board received almost fifty public comments, with nearly all speakers urging the Board to abolish the SRO program and reinvest its $1.3 million-dollar budget in mental health supports, Restorative Justice, culturally relevant curricula, and other non-police programming. Many speakers specifically cited the officers' abuse of C.B. as reason to make these changes. The Board, however, did not abolish the SRO program.

---

[16] Nicole Karlis, *Oakland is at the Forefront of a National Movement to Abolish Police from K-12 Schools*, SALON (June 30, 2020, 11:52 PM), https://www.salon.com/2020/06/30/oakland-is-at-the-forefront-of-a-national-movement-to-ban-police-from-k-12-schools/.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

## B. Moreno Valley USD's Campus Security Officer Program

54.     On information and belief, the District established its CSO Program pursuant to the School Security Department provisions in California Education Code § 38000 *et seq*. Defendant Scott supervises the CSO Program as Director of Safety and Security under the direction of Defendant Kedziora. *See* Cal. Educ. Code § 38000(a).

55.     On information and belief, CSOs are employees of the District.

56.     According to the District's position description,[17] a CSO, under the general direction of the Director of Safety and Security, "supervises, monitors, and controls" school campuses and "enforces the rules and regulations governing student behavior." Expected duties include "physically restrain[ing] persons involved in crimes, rights, or other acts of violence." The position also requires CSOs to receive ongoing trainings on the use of pepper spray and tasers, suggesting that the District considers use of force to be essential to the CSOs' role.

57.     The CSOs wear police-style uniforms and are issued metal handcuffs. On information and belief, CSOs also carry pepper spray and tasers.

58.     On information and belief, the District's CSO Program has no written policies and/or procedures. CSOs instead take verbal orders from Director Scott.

59.     State law governs the use of restraint, including mechanical restraint, in schools. Cal. Educ. Code § 49005 *et seq.* Staff may only use restraint in an emergency and not for the purpose of coercion, discipline, convenience, or retaliation. Cal. Educ. Code § 49005.2. They may not place a pupil in a facedown position with the pupil's hands held or restrained behind the pupil's back. Cal. Educ. Code § 49005.8(a)(5).

60.     District policy implementing these state laws prohibits its staff, including CSOs, from using restraints that employ a device, material, or objects

---

[17] Moreno Valley USD Human Resources Division, *Position Title: Campus Security Officer I* (Oct. 17, 2017), https://4.files.edl.io/af25/09/04/18/173822-651104c9-971a-47b6-ba39-362fd1900e5b.pdf.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

that simultaneously immobilize all four extremities.[18] The same District policy only allows its staff, including CSOs, to use restraint if they have received a certification in Crisis Prevention Intervention (CPI).

## C. The District's School Resource Officer Program

### Relationship Between the District and Sheriff's Department

61.     The District maintains an SRO program through a "Law Enforcement Services Agreement" with the Sheriff's Department and/or County. The agreement, effective July 1, 2018, to June 30, 2021, specifies that the Sheriff's Department will provide nine SROs to the District, three of whom serve the middle school campuses and six of whom serve the high school campuses. The total cost of the three-year contract is $4.3 million, which includes the full cost of the SROs' salaries. On information and belief, the District funds the Agreement almost entirely through Local Control Funding Formula Supplemental and Concentration Funds.

62.     On information and belief, the SROs are employees of the Sheriff's Department and/or County of Riverside.

63.     According to the contract, the SROs are sworn law enforcement officers whose duties include patrolling and investigating crimes on Moreno Valley USD campuses, facilitating conversations between students and their parents, and serving as a liaison at elementary school sites.

### Department Policies Governing Body Camera Footage

64.     Under a 2016 directive, the Sheriff's Department requires its officers to create body camera recordings of "any law enforcement action where there is reason to believe it would be appropriate and valuable to record the event." This includes citizen contacts and detentions.

65.     If an officer fails to initiate the recording of an event when required,

---

[18] Moreno Valley USD, *MVUSD SELPA Handbook* at p. 6-4 (Aug. 26, 2020), https://4.files.edl.io/460c/08/26/20/224843-47f1cf94-84cd-47e4-8a31-5c07ab6ef4b2.pdf.

17

the officer must document the reasons for the failure in a subsequent report or memorandum. Further, officers may not terminate the body camera recording until the conclusion of the encounter, "unless tactical or practical reasons dictate otherwise." Even then, the officer must reinitiate the recording as soon as possible and document the reasons for early termination in a report.

### Sheriff's Department Policies on Restraint and Handcuffing

66.     The Sheriff's Department Standards Manual ("Manual") sets out the standards for when officers may handcuff youth. Policy 306.2.3 directs officers not to handcuff youth under age fourteen "unless he/she is suspected of a dangerous felony or when the deputy has a reasonable suspicion that the juvenile may resist, attempt escape, injure him/herself, injure the deputy, or damage property."

67.     Policy 324.9 further specifies that officers may not handcuff status offenders or children age eleven or younger unless they are "combative or threatening." The Policy does not guide officers as to how to decide whether a child meets the standard of being "combative or threatening." This standard is susceptible to implicit and explicit racial biases, since officers are more likely to view ambiguous or disability-related behavior as "combative and threatening" when shown by Black students rather than white students.[19]

68.     The Manual does not require, or even encourage, officers to use crisis communication or other non-violent alternatives to restraint, particularly for students with disabilities.

### D. Facts Regarding Plaintiff C.B.

69.     C.B. is a student of Defendant Moreno Valley USD and is in the seventh grade at Mountain View Middle School. C.B. has been on a remote learning model for school since on or about March 16, 2020, due to the Covid-19

---

[19] *See* Kurt Hugenberg & Galen V. Bodenhausen, *Facing Prejudice: Implicit Prejudice and the Perception of Racial Threat*, 14 PSYCHOL. SCIENCE 640, 643 (Nov. 2003), https://www.frontiersin.org/articles/10.3389/fpsyg.2017.00519/full; Anthony Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L. REV. 155, 222-24 & n.337 (2005) (citing studies that show "people will assign different significance to identical actions depending on the actors' race.").

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

shutdown. At the time of the incidents described herein, C.B. was between ten and eleven years old and enrolled in the sixth grade.

70.     C.B. is an engaging and bright twelve-year-old boy who loves playing basketball, fishing competitively and with his father, playing video games, and spending time with his family. C.B. is intelligent and enjoys learning, showing particular aptitude in mathematics. He and his parents hope that he will one day attend college and pursue a career about which he is passionate.

71.     C.B. has diagnoses of Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD), disabilities that make it difficult for him to regulate his emotions, maintain focus, communicate, and comply promptly with directions. C.B.'s parents suspect that he may have additional undiagnosed emotional and behavioral disabilities, some of which resulted from or were exacerbated by his interactions with law enforcement.

72.     C.B. enrolled in the District in May 2019 after attending other school districts in Los Angeles and Riverside Counties. Staff never handcuffed C.B. in his prior school districts. Since C.B. enrolled in the District, CSOs and SROs handcuffed him at least four times in less than four months, as detailed below.

***Mechanical Restraint No. 1: On or about August 21, 2019, school police officers handcuffed C.B. for conduct resulting from his disabilities.***

73.     C.B. had been a student at Landmark Middle School ("Landmark") for less than one month, when on or about August 21, 2019, school police officers handcuffed him.

74.     That day, then-Landmark Assistant Principal Pedro Gutierrez called C.B.'s mother, B.T., to tell her to pick him up from school early because he was "acting up." On information and belief, C.B. was exhibiting behaviors caused by his disability.

75.     When C.B.'s mother arrived at Landmark, Mr. Gutierrez told her that school police officers had handcuffed C.B. The officers had removed the handcuffs

before she arrived. Mr. Gutierrez told C.B.'s mother that he instructed officers to remove the handcuffs because he believed that handcuffing C.B. was "totally unacceptable," or words to that effect. Other than this statement, Mr. Gutierrez did not provide C.B.'s mother with any further information regarding the handcuffing.

76. Contrary to District policy, the District did not document the mechanical restraint in an Incident Report. As a result, Plaintiff cannot state the names of the school police officers who handcuffed him. He believes this information is solely in the hands of Defendants.

77. On information and belief, the District did not document the incident or adequately investigate, train, supervise, or discipline the staff involved.

***Mechanical Restraint No. 2: On August 26, 2019, school police officers shackled C.B.'s hands and ankles for conduct resulting from his disabilities.***

78. Five days later, on August 26, 2019, District CSOs handcuffed and leg-cuffed C.B. at Landmark.

79. That day, Mr. Gutierrez directed CSO Demetrius Owens to bring C.B. to the office for a meeting. CSO Owens' witness statement does not describe a reason for this meeting. According to a behavior log drafted by C.B.'s teacher, Mr. Proprofsky, C.B. had disrupted class earlier in the day by cursing and ripping paper. Plaintiff suspects that the meeting with Mr. Gutierrez was related to his alleged disruptive behavior in class – which took place approximately three hours before Mr. Gutierrez summoned him to his office. Again, these behaviors were caused by his disabilities.

80. CSO Owens, CSO King,[20] and then-Landmark Assistant Principal Kamilah O'Connor found C.B. on the playground. All three directed C.B. to leave the playground and go to the office. C.B. verbally refused and started to exhibit conduct related to his disabilities, including an inability to self-regulate or express himself. He allegedly clenched his fists and began breathing heavily. CSO King

---

[20] CSO King's witness statement does not include his/her/their first name.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

and CSO Owens responded by dragging C.B. by his arms to a seclusion room.

81.    Then-Landmark Principal Scott Walker joined CSOs Owens and King in the seclusion room. Surrounded by three much larger adults in the seclusion room, C.B. began experiencing and externalizing emotions of fear, anxiety, and frustration. He began pulling away, pushing, and swinging with his arms in an attempt to free himself from the room. C.B. was not acting out physically before the CSOs physically dragged him to the seclusion room.

82.    Principal Walker directed CSO King and CSO Owens to handcuff C.B. At the time, C.B. was four feet, eight inches tall and approximately seventy pounds. The CSOs placed C.B. in a physical hold, tackled him to the floor, and forced him into District-issued metal cuffs. The CSOs pulled C.B. up from the ground and attempted to sit him in a chair. Now handcuffed in a seclusion room and surrounded by three adults, C.B. became even more upset and distressed. Unable to regulate his emotions due to his disabilities, he began flailing his legs.

83.    Principal Walker then directed CSO King and CSO Owens to place separate handcuffs on C.B.'s ankles. The CSOs then immediately and simultaneously shackled C.B.'s hands and ankles with metal cuffs. C.B. remained shackled in this manner for an unknown period of time.

84.    The District suspended C.B. from school that day and his aunt came to pick him up. She was concerned and confused to find C.B. sitting in the fetal position against the wall of the seclusion room. His aunt observed that C.B.'s arms were hugging his knees and his head was down. C.B. was not wearing a shirt, which had come off during the CSOs' interaction with him. A desk was blocking the door to the seclusion room. C.B. and his aunt helped school staff clean up the seclusion room, and then she took him home.

85.    No District staff told C.B.'s aunt that CSOs had physically tackled C.B. and then handcuffed and leg-cuffed him. District staff never told C.B.'s parents of the incident either.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

86.     Defendants' actions, *inter alia*, violated District policies prohibiting staff from using mechanical restraints that simultaneously immobilize all four extremities.

87.     The District also failed to provide an Incident Report to C.B.'s parents. In November 2019, counsel made a request to the District for a full and complete copy of C.B.'s educational records. Only after counsel received the records did C.B.'s parents learn that the CSOs shackled C.B.'s hands and ankles. The District provided C.B. with CSO King's and CSO Owens' witness statements, which were missing at least two pages. Further, the District did not provide a witness statement from Principal Walker. The District has not responded to counsel's January 2020 follow-up request for the missing pages.

88.     On information and belief, the District did not document the incident or adequately investigate, train, supervise, or discipline the staff involved.

### Mechanical Restraint No. 3: On October 8, 2019, school police officers tackled and handcuffed C.B. while pressing a knee into his back

89.     On October 7, 2019, C.B. allegedly threw a rock in the general direction of CSO Manuel Arellano. No one from the District informed C.B.'s parents about this incident on the day that it allegedly occurred. According to a police report dated October 8, 2019, sometime after school hours on October 7, 2019, an unidentified District staff member requested that Deputy Norma Loza intervene and "investigate" the alleged rock throwing incident.[21]

90.     On October 8, Deputy Loza and CSO Arellano arrived at C.B.'s special education classroom to investigate the alleged rock-throwing from the day before. At no time prior to involving the CSOs and SROs did anyone with the District attempt to arrange a meeting with C.B. with his parents present.

---

[21] On information and belief, the unidentified District staff member is CSO Arellano. The police report states an individual (name redacted) contacted Deputy Loza on October 7, 2019, and alleged that C.B. threw a rock in his direction earlier that day. Separately, on October 7, 2019, CSO Arellano added a behavior log entry in C.B.'s pupil file alleging he threw the rock. No one created a log entry documenting the restraints on October 8, 2019.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

91.     Unlike the other incidents where school police officers handcuffed C.B., Deputy Loza's body camera partially captured the October 8, 2019, incident.[22] At C.B.'s counsel's request, the Sheriff's Department produced a video that is approximately eight minutes long. On information and belief, Deputy Loza shut off her body camera before the incident concluded, violating Sheriff's Department policy and leaving the remaining hour of the incident unfilmed.

92.     Based on the review of the available Department footage, immediately upon entering C.B.'s classroom, Deputy Loza directed the teacher (name unknown) to remove the other students from the classroom. This left C.B. alone with Deputy Loza and CSO Arellano. C.B. sat motionless at his desk with his head down.

93.     Deputy Loza stood over C.B. and said, "You're going to go to the office, no matter what. Either you go, cooperating, or I'm going to take you to the office." Neither Deputy Loza nor CSO Arellano explained why they were asking him to go to the office. C.B. kept his head down and quietly said he was not going. For thirty seconds, Deputy Loza repeated different variations of "do you understand you are going to the office?" but never explained why. C.B. remained completely still, repeating that he was not going at a barely audible volume.



**Body Camera Image: C.B. sits with his head down while Deputy Loza demands he go to the office**

---

[22] A true and correct copy of the October 8, 2019, body camera footage is incorporated by reference as Plaintiff's Exhibit 2. Plaintiff will fill Exhibit 2 separately under seal with this Court.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

94.     After less than ninety seconds, Deputy Loza grabbed the back of C.B.'s sweatshirt and physically pulled him out of his seat. She then passed C.B. to CSO Arellano. While CSO Arellano twisted the four foot, eight inch boy's wrists behind his back to try and force handcuffs on him, Deputy Loza repeated, "You are going to the office." Again, consistent with his disabilities and behavior that they had seen him exhibit before, C.B. swore and stated that he was not going. The officers then tackled C.B., pinned him to the ground, and pressed him face down into the floor. He screamed out in pain: "Ow! My knee!" CSO Arellano then dug his own knee into C.B.'s back, and Deputy Loza placed him in handcuffs. Neither officer spoke to C.B. about his legal rights.



*Body Camera Image: CSO Arellano puts his knee into C.B.'s back while Deputy Loza places C.B. in handcuffs*

95.     The Sheriff's Department footage also shows that while the two officers pinned C.B. on the ground, Deputy Loza threatened him by stating that if he moved then the handcuffs were "going to get tight on [him]." While C.B.'s hands are out of frame, a distinct clicking can be heard on video for about thirty seconds, as Deputy Loza presumably followed through with her threat and tightened C.B.'s handcuffs. C.B. wiggled on his stomach briefly and swore,

behavior consistent with his disabilities and of being physically and mechanically restrained and having handcuffs tightened. He then laid still on the ground, facedown and handcuffed. Deputy Loza radioed an unknown person and stated: "I have one juvenile detained. He's being uncooperative."

96.     The Sheriff's Department footage then shows Deputy Loza and CSO Arellano pulling C.B. to his feet and pushing him towards the classroom door, while C.B. squirmed and cried out to be let go. The officers again physically forced C.B. face down onto the floor. Another CSO then arrived (the "second CSO").[23] The second CSO told C.B. that he should "relax." At one point while CSO Arellano held C.B. facedown, Deputy Loza stood over him and accused him of kicking. The video does not show C.B. kicking anyone in frame.

97.     The officers surrounded C.B. and held him face-down on the floor for almost two minutes. The video shows Deputy Loza, CSO Arellano, and the second



*2019/10/08  11:53:25 GMT - 7*

**Body Camera Image: Unknown CSO twists C.B.'s leg and pushes it into the ground. CSO Arellano and Deputy Loza are to the left holding C.B. down.**

---

[23] On information and belief, the second CSO was Demetrius Owens. CSO Arellano is heard on video using his radio to ask someone he refers to as "Owens" to come assist in the classroom. About thirty seconds later, the video shows the second CSO entering the classroom. Owens was a CSO assigned to Landmark at the time of the incident. He also handcuffed C.B. on August 26, 2019, along with CSO King.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

CSO pull him up to a seated position on the floor. Still handcuffed, C.B. cried out as CSO Arellano pressed down on his shoulders. The second CSO also held C.B. down. The video shows this person twisting C.B.'s leg and using both arms and his body weight to press C.B.'s calf into the ground.

98.   C.B. was visibly in pain and cried, "Let me go! Let me go!" While immobilizing C.B.'s hands, shoulders, and leg, the two male CSOs repeated: "If you calm down, we calm down. You calm down, we calm down." C.B. – a child with known behavioral and emotional disabilities – was  unable to "calm down" while handcuffed and restrained by three officers.

99.   The Sheriff's Department footage then shows two unidentified district staff arriving, but neither took any steps to intervene. One radioed for Principal Walker to come to the classroom, but could not reach him. CSO Arellano directed her to leave the room and find Mr. Walker. All the while, C.B. remained handcuffed, immobilized on the floor. Deputy Loza stood over him, and threatened to take him to the police station if he did not calm down.

100.   After two more minutes, the video shows the second CSO releasing C.B.'s leg from his hold. The three officers then pulled C.B. into a standing position, and C.B. cried out in apparent pain. Deputy Loza said that a fourth officer, her partner, would be arriving to help them escort C.B. off campus to an awaiting police car. At that point, the body camera footage abruptly ends.

101.   Deputy Loza and her partner, Deputy Toscano,[24] later placed C.B. in the back of a police car. By that time, given the events that had just occurred and were continuing to occur, C.B. was experiencing worsening trauma. While locked in the back seat, C.B. reportedly stated: "I wish I was dead." At times the deputies left C.B. alone in the locked car.

102.   While locked and handcuffed in the police car, C.B. managed to use his cell phone to call his mother. C.B.'s mother recalls that he repeatedly screamed,

---

[24] Deputy Loza's police report does not include Deputy Toscano's first name.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

"Tell them to let me go!" before the phone hung up. C.B.'s mother was afraid and confused; no one from the school had contacted her about these events. When C.B.'s mother called her son back, Deputy Loza answered the phone. C.B.'s mother told Deputy Loza that she was on her way to pick C.B. up from school. Deputy Loza responded that it was too late; the ambulance was coming to pick him up. However, C.B. remained in the back of the police car for nearly an hour before an ambulance arrived. During this time, other students passing by saw C.B. handcuffed in the back of the police car.

103.   At approximately 12:55 pm, the ambulance took C.B. from Landmark to Riverside's Emergency Treatment Service facility for a 5585 evaluation.[25] At the time of hospitalization, the treating psychiatrist, Dr. Alexander Tsang, and treating therapist, Shirlee Lyons, noted that C.B. presented as "selectively mute." His distress began to decrease once his mother arrived, and they discharged him that day at around 4:00 pm. C.B. spent over half a day handcuffed, held in a police car, transported by ambulance, and psychiatrically hospitalized.

104.   Days after this incident, Landmark staff handed B.T. a notice of suspension, which mentioned the alleged rock throwing incident from October 7, but not the October 8 use of physical and mechanical restraints.

105.   C.B.'s mother asked staff to provide her with more information about the school police officers restraining, handcuffing, and holding her son in a police car. Staff told C.B.'s mother that they had no information about the incident. Based on information and belief, the District failed to properly document and/or report this incident. Contrary to its own documentation and reporting procedures, the District has failed to provide C.B.'s parents with any documentation related to the October 8, 2019, restraint, handcuffing, detention, or hospitalization. To date, the District has failed to produce any written Incident Reports from its staff related to

---

[25] Under California Welfare & Institutions Code Section 5585, officers may temporarily place a minor in a psychiatric facility where probable cause supports that "as a result of mental disorder" the minor is: (1) a danger to themselves or others or "gravely disabled"; and (2) "voluntary treatment is not available."

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

this handcuffing, even after multiple requests by counsel. Plaintiff presumes based on this reasonable investigation that none exist.

106.   The Sheriff's Department similarly failed to comply with its own documentation procedures. On information and belief, Deputy Loza turned off her body camera before the incident ended, against Sheriff's Department policy. Also against Sheriff's Department policy, Deputy Loza did not document her reasons for turning off her camera in a report or memorandum. In addition, despite requests from counsel, the Sheriff's Department has not produced all body camera footage from Deputy Loza for this incident. Also, on information and belief, Deputy Toscano did not create a police report or body camera footage for this incident and/or the Sheriff's Department did not produce these records.

107.   The SROs violated their own Policies 306.2.3 and 324.9 when they handcuffed C.B., who was eleven years old at the time and not combative, threatening, or suspected of committing any crimes.

108.   Again, on information and belief, Defendants Moreno Valley USD and Sheriff's Department did not document the incident or adequately investigate, train, supervise, or discipline the staff involved.

***Mechanical Restraint No. 4: On December 9, 2019, school police officers handcuffed C.B. while he was already physically restrained for exhibiting disability-related behaviors.***

109.   After their son was restrained, handcuffed, locked in a police car, and sent for an involuntary psychiatric hold while at Landmark, C.B. and his parents were afraid for his safety and no longer wanted him to return to the same school.

110.   After the October 8, 2019, incident, C.B.'s parents made the difficult decision to keep C.B. at home rather than subject him to further discrimination, harm and repeated constitutional injuries. He remained at home without any schooling for approximately five weeks. Desperate for another option, C.B.'s parents obtained an intra-district transfer permit so that C.B. could attend

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

Mountain View Middle School ("Mountain View"). The move forced C.B. to, among other things, leave his friends and social networks behind.

111.   On December 9, 2019, shortly after starting at Mountain View, Deputy Loza again handcuffed C.B. after he had a disagreement with a classmate. C.B. allegedly pulled a classmate's chair out from under him. The classmate then shoved C.B. The two children pushed each other a few times, and the teacher intervened to break it up. Unable to regulate his emotions effectively, C.B. pushed his teacher and began to throw classroom items.

112.   The teacher cleared the classroom and called for CSOs and SROs to respond. CSO Juan Ramirez and CSO Kristopher Woodside arrived first and, almost immediately, physically restrained C.B., who was displaying disability-related behaviors. CSO Woodside restrained C.B. on the ground.

113.   Deputy Loza arrived next about fifteen minutes later. Contrary to Sheriff's Department protocols, Deputy Loza did not turn on her body camera and later failed to report why she did not turn it on, despite Department procedures mandating otherwise. When Deputy Loza arrived, CSOs Ramirez and Woodside were still physically restraining C.B. Without attempting to deescalate the situation or address C.B.'s disability-related behaviors, Deputy Loza handcuffed C.B.

114.   After handcuffing C.B., Deputy Loza transported him to the Moreno Valley Police Station. While the police held C.B. at the station, Deputy Loza decided to refer C.B. to the Emergency Treatment Services Center (ETS) for a 5585 evaluation and requested an ambulance transport. Before the ambulance got to the police station to transport C.B., his mother arrived and asked to take her son home. But Deputy Loza refused. Instead, C.B's mother watched the officers escort her son outside the back of the police station building and into the ambulance.

115.   The ambulance transported C.B. to the ETS Center. According to the official police report, an unidentified person restrained C.B. to the gurney during the ride. Hours later, C.B. finally reunited with his mother and received his

discharge. This traumatic episode, which involved handcuffing, detention in a police station, physical restraint on an ambulance gurney, and a psychiatric hospitalization referral, lasted, in total, around three hours.

116.   The District later initiated expulsion proceedings against C.B. based on the initial incident with his classmate at school. On December 20, 2019, the Individualized Education Program ("IEP") team met for a Manifestation Determination Review, a procedure required under federal law before expelling a student with a disability. The IEP team determined that C.B.'s behaviors – the same behaviors he had exhibited many times before and in each of the prior handcuffing incidents – were in fact caused by his disabilities, including ADHD and ODD. The IEP team's determination nullified the pending expulsion charges.

117.   On information and belief, Defendants Moreno Valley USD and Sheriff's Department did not document the incident or adequately investigate, train, supervise or discipline the staff involved.

### D. Facts Regarding Systemic Discrimination

#### *Racial and Disability Disparities in Moreno Valley USD*

118.   C.B.'s experience highlights systemic discrimination within Moreno Valley USD. The District refers its students to law enforcement at a much higher rate than other large California school districts. In 2017-18, as reported to the Civil Rights Data Collection, the District referred 2,108 students to police or about 6.3 per 100 students. By comparison, the Los Angeles Unified School District referred just 1 student per 100. Nearby Riverside Unified School District referred just 3 students per *1,000*.

119.   The District refers Black students to law enforcement at dramatically higher rates than non-Black students. In 2017-18, as reported to the Civil Rights Data Collection, Black students were 13.7% of the District's student population but 29% of referrals to law enforcement. The District's law enforcement referral rate for Black students is 13.5 per 100 students, more than 2.5 times its referral rate

for non-Black students (5.2 per 100 students).

120.    The District's referral rate of Black students to law enforcement is exponentially higher than the referral rates for Black students in similarly sized districts in the state:



121.    The Sheriff's Department's school arrest data further show that Black students are more likely to be arrested and arrested for non-violent offenses than their non-Black peers. Of Black students arrested on campus, 78% were arrested for non-violent offenses, compared to 63% of non-Black students arrested on campus. Similarly, 46% of Black students arrested on campus are arrested for the most minor offense – being out of class during school hours – while only 37% of non-Black students are arrested for this offense.

122.    Related to the disproportionate representation of Black students in law enforcement referrals and arrests is the fact that the District disproportionately restrains Black students. Per the Civil Rights Data Collection, Black students make up 37% of all students restrained, almost three times their representation in the District. The District also disproportionately restrains students with disabilities.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

Students with disabilities make up 61% of all students restrained, over 3.5 times their representation in the District.

### *Defendants' Discriminatory Policies, Practices, and Procedures*

123.   The high rates of law enforcement referrals result from Defendants' various policies, practices and procedures that allow and even encourage school police officer involvement in low-level and disability-related behaviors, even for incidents that occurred on days prior – like C.B.'s act of throwing a rock. Teachers or administrators could handle these incidents instead.

124.   For example, the aforementioned "Law Enforcement Services Agreement" between the District and Sheriff's Department that establishes the SRO program does not prohibit SROs from intervening in minor school discipline incidents. It does not outline when SROs may use restraints or handcuffs. It does not describe applicable legal protections for students with disabilities, including the requirement to provide reasonable modifications in police encounters. It does not provide for alternatives to physical restraint.

125.   The Sheriff's Department Policies grant SROs broad authority to intervene in incidents involving students, even where the student has committed no crime. Policy SRU-003 authorizes SROs to "counsel" students who are "about to engage" in criminal misconduct. This policy further allows officers to search students with only "reasonable suspicion" that the student has violated a school rule, regardless of whether there is a basis for believing that the student has violated a law or is carrying weapons or contraband. The policy allows SROs to "stop, question, interview, and take police action without the prior authorization of the principal." Policy SRU-004 further authorizes SROs to stop, question, detain, and cite students simply for being out of class during school hours.

126.   Another example is the District's 2019-20 Secondary Sequential Discipline Standard (the "Standard"), a document that dictates the "consequences" and "interventions" to violations of the student code of conduct. The Standard

authorizes, and at times requires, school staff to refer students to law enforcement in situations where California law does not.

127.   For instance, California Education Code § 48902 mandates school staff refer students to law enforcement in only limited circumstances involving major offenses (e.g., assault with a firearm). But the Standard *requires* District staff to refer students to law enforcement in many additional circumstances, including such minor infractions as vandalism or possession of a lighter.

128.   The Standard also gives staff discretion to refer students to law enforcement for other non-criminal, low-level offenses that can be handled through the administrative discipline system or by providing supports and reasonable modifications. The Standard does not guide staff as to how to exercise their discretion in referring students to law enforcement, nor does it explain why staff might refer some students but not others.

129.   On information and belief, the District does not provide any training to its staff on how to exercise their law enforcement referral discretion, including on whether the student conduct is the result of disabilities, whether such referral will exacerbate students' disabilities or contribute to racial disparities, and alternatives to referrals.

130.   On information and belief, the Sheriff's Department has failed to properly train SROs on interacting with students with disabilities. On information and belief, the Sheriff's Department has also failed to properly train SROs to abstain from intervening in incidents involving minor and/or disability-related behaviors. The SROs' treatment of C.B. shows that SROs are not appropriately trained on how to interact with students with disabilities and when to refuse to intervene in on-campus incidents.

***Failure to Document Mechanical Restraints and Use of Force Incidents***

131.   C.B.'s experiences also reveal Defendants' pervasive failures to accurately document incidents of restraint and use of force, and to promptly notify

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

parents of such incidents. This practice of general applicability, *inter alia*, discriminates against students with disabilities who may not be able to explain what happened to them because of impaired communication abilities, trauma, or other disability-related reasons.

132.   The District's own restraint policies, *supra note 18*, require "all personnel" who assist in a restraint to complete their own "Incident Report" and submit it to District administrators for their review. But as described above, the District and its staff routinely violated this policy by failing to complete an Incident Report for every single one of C.B.'s handcuffings. C.B.'s parents still do not know the full extent of the CSOs' use of force and any injuries C.B. sustained. C.B. was, and still is, unable to fully discuss or describe these traumatic events.

133.   Further, under District Board Policy 5145.11, administrators must attempt to contact the parent before allowing law enforcement to question a student. Administrators must make further attempts to contact the student's parent before allowing law enforcement to remove a student from campus. If an SRO arrests or removes a student from campus, both Policy SRU-003 and Administrative Regulation 5145.11 require the SRO to inform the school administrator and sign the "Removal of Student from Campus" form. In C.B.'s case, the District administrator failed to create this form or make any attempt to contact C.B.'s parents in three of the four known incidents.

134.   On information and belief, Defendants District, Kedziora, and Scott are aware that CSOs violate state law and District policies by unnecessarily restraining students, including disabled students, Black students, and Black disabled students, and by failing to document and report restraints and resulting student injuries to parents, but take no steps to investigate or discipline the CSOs.

135.   The Sheriff's Department and County have failed to provide all documentation of the cuffings of C.B. involving SROs. Further, contrary to Sheriff's Department protocols, Deputy Loza turned off her body camera early

during the October 8, 2019, use of force incident. She failed to turn it on at all during the cuffing on December 9, 2019, and did not submit the required report explaining why.

136.   On information and belief, the Sheriff's Department, Sheriff Bianco, and County are aware that SROs violate internal policies by failing to properly document use of force incidents in writing or on body camera, but fail to investigate or discipline these SROs.

## FIRST CLAIM FOR RELIEF

**Unreasonable Seizure and Excessive Force in Violation of the Fourth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. § 1983**

***(Defendants Scott, Walker, Loza, Owens, Arellano, Does 1-10)***

137.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

138.   The Fourth Amendment of the U.S. Constitution protects Plaintiff C.B. against unreasonable seizures and excessive force. The Fourteenth Amendment of the U.S. Constitution extends this protection to the states.

139.   Whether a seizure is unreasonable and unconstitutional depends upon the totality of the circumstances.

140.   Defendants' actions described herein constituted a seizure that was objectively unreasonable under the totality of the circumstances, in violation of the Fourth Amendment of the United States Constitution.

141.   The seizures of Plaintiff C.B. were unreasonable in light of the totality of the circumstances, including but not limited to:

   a.   C.B.'s age, size, and disabilities, including his limited ability to impose physical harms on others and limited ability to form criminal intent;

   b.   That C.B. was exhibiting behavior typical of school-age children and/or related to his disabilities while at his middle school;

c.  That C.B. did not actively resist school officer intervention or attempt to flee;

d.  The length of the time between the alleged behaviors and the seizures (e.g., the third incident occurred more than twenty-four hours after the disciplinary incident involving C.B.);

e.  That the handcuffing incidents violated District and SRO policies and state law governing physical and mechanical restraints;

f.  The length of time of the handcuffing; and

g.  The trauma of the handcuffing and restraint techniques, including from officers simultaneously shackling C.B.'s wrists and ankles and digging a knee into his back while pinning him facedown.

142.   By engaging in the acts described herein, Defendants Scott, Loza, Walker, Owens, Arellano, and Does 1-10, acting under color of state law and with deliberate indifference, violated C.B.'s rights under the U.S. Constitution to be free from unreasonable seizures and excessive force.

143.   Defendants Walker and Scott are liable as supervisors because the actions described herein constituted culpable action or inaction in the training, supervision, and control of subordinates, acquiescence in the constitutional deprivation after a complaint/incidents was made/occurred, and showed a reckless or callous indifference to C.B.'s rights.

144.   The right of C.B. to be free from unreasonable seizures and excessive force as described herein was clearly established in law at the time of the incidents alleged. As a proximate result of Defendants' unreasonable seizure and use of excessive force, C.B. has suffered and continues to suffer severe emotional distress, pain, humiliation and exacerbation of his disabilities. C.B. continues to experience fear, distrust, and anxiety regarding law enforcement officers.

145.   C.B. is entitled to damages, injunctive and declaratory relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## **SECOND CLAIM FOR RELIEF**

### *Monell* **Claim, 42 U.S.C. § 1983**

### *(Defendants County of Riverside and Riverside County Sheriff's Department)*

146.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

147.   Defendants County of Riverside and Sheriff's Department maintain and implement the following unconstitutional policies, practices, and/or customs:

   a.   A policy, practice, and/or custom of SRO intervention in minor misconduct typical of school-age children and/or related to their disabilities;

   b.   A policy, practice, and/or custom of SRO use of excessive and unnecessary physical and mechanical restraint and other physical force on children;

   c.   A policy, practice, and/or custom of repeated constitutional violations that were not properly investigated and/or documented and for which the violators were not disciplined, reprimanded, or punished, and C.B. suffered constitutional injuries as a result; and

   d.   A policy, practice, and/or custom of SROs failing to use their body cameras, or using their body cameras improperly, during handcuffings and other use of force incidents at school.

148.   These policies, practices, and customs were the moving forces in Defendants' unreasonable seizures and use of excessive force on C.B. described above and alleged in the First Claim for Relief. Defendants' policies, practices, and customs are frequent, consistent, and widespread, as evidenced in part by the SROs' similar use of force on C.B. at two separate District campuses.

149.   Defendants exhibited deliberate indifference to the constitutional rights of C.B. in maintaining such policies, practices, and customs. Defendants' practice violates the Sheriff's Department's own policies, including Policies

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

306.2.3 and 324.9, and Policy SRU-003.

150.   Defendants knew or should have known that maintaining such policies, practices, and customs were in violation of well-established constitutional rights of minors – especially those with disabilities – to be treated with special care by police officers. The Defendants' policies, practices, and customs did directly result in the pattern of violations of C.B.'s constitutional rights.

151.   Further, on information and belief, Defendants Sheriff's Department and County have failed and continue to fail to train and supervise SROs so as to prevent a pattern of lawful restraints from occurring.

152.   Defendants do not adequately train SROs on how to safely and appropriately interact with students, especially students with disabilities. Defendants failure to train in this area constitutes deliberate indifference in light of the statistical likelihood, based on national and District-level data, that SROs will disproportionately encounter students with disabilities. Defendants also do not adequately train SROs on when to abstain from intervening in incidents involving minor and/or disability-related behaviors.

153.   Defendants have also failed to train and ensure compliance with state laws and internal procedures pertaining to restraints, including but not limited to restrictions on the physical and mechanical restraint of children with and without disabilities, documentation and parent notification requirements for restraint and injury, and proper body camera procedures.

154.   Despite evidence that SROs routinely disregard state laws and internal procedures, Defendants have failed to investigate, discipline, and terminate officers who unlawfully restrain children and fail to document these restraints in police reports and on body camera footage.

155.   As a proximate result of Defendants' acts and omissions, C.B. has suffered and continues to suffer severe emotional distress, pain, and exacerbation of his disabilities. C.B. continues to experience fear, distrust, and anxiety regarding

law enforcement officers.

156.   C.B. is entitled to damages, injunctive and declaratory relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**

**VIOLATIONS OF TITLE II OF THE ADA, 42 U.S.C. § 12132**

***(Defendants Moreno Valley USD, Superintendent Kedziora, County of Riverside, Sheriff's Department, and Sheriff Bianco)***

157.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

158.   Congress enacted the ADA to "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

159.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

160.   C.B. is an individual with a disability under the ADA. 42 U.S.C. § 12102. His disabilities substantially limit one or more major life activities, including learning, concentration, thinking, and interacting with others.

161.   As a school-age child who lives in the District, he is qualified to participate in Defendants' educational programs and services. 42 U.S.C. § 12131(2).

162.   Defendants Moreno Valley USD, County of Riverside, and Sheriff's Department are all public entities within the meaning of the ADA. Defendants Superintendent Kedziora and Sheriff Bianco are officials responsible for running and/or supervising the operations of their respective public entities.  42 U.S.C. § 12131(1).

163.   Defendant Moreno Valley USD is legally responsible for all violations of the ADA committed by Defendants County and/or Sheriff's Department in the course of performing security services to students within the District. *See* 28 C.F.R. § 35.130(b)(1).

164.   Through the acts and omissions described above, Defendants are violating the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Pt. 35, including by:

   a. Failing to make reasonable modifications to policies, practices, and procedures to avoid discrimination against C.B.;

   b. Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' programs with respect to C.B., including using police to enforce school rules, rather than teachers and administrators;

   c. Denying C.B. an opportunity to participate in and benefit from educational services that is equal to that afforded of other students.

165.   In addition, through the acts and omissions described above, the District and Superintendent Kedziora in his official capacity are violating the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Pt. 35, by:

   a. Aiding or perpetuating discrimination by providing significant assistance to the County and/or Sheriff's Department, public entities that discriminate against C.B.; and

   b. Subjecting C.B. to disability-based harassment that is so severe and pervasive that it creates a hostile learning environment.

166.   Defendants at all times have known or should have known that C.B. was a student with disabilities and required reasonable modifications.

167.   Defendants have demonstrated a deliberate indifference that harm to Plaintiffs' federally protected rights under the ADA was substantially likely, and failed to act upon that likelihood.

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

168.   The acts and omissions of Defendants have caused and will continue to cause C.B. to suffer irreparable harm, and he has no adequate remedy at law.

169.   Under the ADA, Plaintiffs are entitled to attorneys' fees and costs as appropriate and permitted by law, pursuant to 42 U.S.C. § 12205.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF SECTION 504, 29 U.S.C. § 794 *et seq.*

*(Defendants Moreno Valley USD, Superintendent Kedziora, County of Riverside, Sheriff's Department, and Sheriff Bianco)*

170.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

171.   Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States...shall, solely by reason of [their] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

172.   Plaintiff C.B. is a qualified individual with a disability under Section 504.

173.   Defendants are recipients of federal funds.

174.   Solely by reason of his disabilities, C.B. has been excluded from participation in, denied the benefit of, and subjected to discrimination in his attempts to receive meaningful and equal access to the facilities, programs, services, and activities offered by Defendants in violation of Section 504, 29 U.S.C. § 794, *et seq.*, and its implementing regulations at 34 C.F.R. Pt. 104 (U.S. Department of Education) and 28 C.F.R. 42.501 *et seq.* (U.S. Department of Justice). The Defendants' acts and omissions violating C.B.'s rights under the ADA also violate his rights under Section 504 (*see* Third Claim for Relief, *supra*).

175.   Defendants have demonstrated a deliberate indifference that harm to Plaintiffs' federally protected rights under Section 504 was substantially likely,

and failed to act upon that likelihood.

176.   The acts and omissions of Defendants have caused and will continue to cause C.B. to suffer irreparable harm, and he has no adequate remedy at law.

177.   Under Section 504, Plaintiffs are entitled to attorneys' fees and costs as appropriate and permitted by law, pursuant to 29 U.S.C. § 794a.

### FIFTH CLAIM FOR RELIEF

**VIOLATION OF CALIFORNIA GOVERNMENT CODE § 11135** *et seq.*

*(Defendants Moreno Valley USD, Superintendent Kedziora, County of Riverside, Sheriff's Department, and Sheriff Bianco)*

178.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

179.   California Government Code § 11135 prohibits discrimination under, and the denial of full and equal access to the benefits of, state-funded programs and activities on the basis of race, ethnicity, and disability.

180.   Violations of the ADA constitute violations of Government Code § 11135(b).

181.   At all times relevant to this action, Plaintiff C.B. has been and is a qualified individual with a disability within the meaning of California law. Cal. Gov't Code § 12926. As a Black student, C.B. is entitled to California law protections against discrimination on the basis of race and ethnicity. *Id.*

182.   Defendants Moreno Valley USD, County of Riverside, and Sheriff's Department are public agencies that receive financial assistance from the State of California. Defendants Kedziora and Sheriff Bianco are officials responsible for running and/or supervising the operations of their respective public entities.

183.   Through the acts and omissions described above, Defendants are violating Government Code § 11135, and its implementing regulations, Cal. Code Regs. tit. 2, § 11154. Defendants discriminate against C.B. and other similarly situated Black students with respect to law enforcement referrals that result in an

adverse disparate impact. Defendants selectively enforce facially neutral policies by referring Black students to police for less severe behaviors than their non-Black peers, denying Black students full and equal access to the benefits of their education without nondiscriminatory justification. Defendants disproportionately arrest Black students for minor and/or disability-related behaviors.

184. Defendants also discriminate against C.B. and other similarly situated Black students with respect to school police restraints that result in an adverse disparate impact on Black students. These disparities result in part from Defendants' implicit and unconscious biases and stereotypes against Black students, which are incorporated into the Sheriff's Department policy allowing SROs to handcuff children who officers perceive as "combative or threatening."

185. Defendant Moreno Valley USD has also aided or perpetuated discrimination by transferring state support to the County and/or Sheriff's Department, other recipients of state support that discriminate against C.B. and other similarly situated Black students, as described *supra*.

186. Defendant Moreno Valley USD utilizes methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' programs with respect to C.B. and other similarly situated Black students, including using police to enforce school rules, rather than teachers and administrators.

187. Defendant Moreno Valley USD subjects C.B. and other similarly situated Black students to racial harassment that is so severe and pervasive that it creates a hostile learning environment.

188. Defendants have also violated Government Code § 11135 by discriminating against C.B. and other similarly situated students with disabilities in violation of the ADA (*see* Third Claim for Relief, *supra*).

189. Defendant's actions have caused and will continue to cause C.B. to suffer irreparable harm, and he has no adequate remedy at law. Because

Defendant's discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

190.   C.B. is also entitled to reasonable attorneys' fees and costs.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA CIVIL CODE § 51 *et seq.*

### (Defendants Moreno Valley USD and Superintendent Kedziora)

191.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

192.   California's Unruh Civil Rights Act prohibits business establishments from discriminating against individuals with disabilities and also prohibits discrimination based on a person's disability or perceived disability. Cal. Civ. Code § 51 *et seq.*

193.   Any violation of the Americans with Disabilities Act is also a violation of the Unruh Act. Cal. Civ. Code § 51(f).

194.   The Unruh Act further makes any entity that "denies, aids or incites a denial, or makes any discrimination or distinction" prohibited by the Act liable for damages for "each and every offense." Cal. Civ. Code § 52.

195.   Defendants are a public entity under Title II of the ADA and a business establishment under the Unruh Civil Rights Act.

196.   C.B. is an individual with a disability under the ADA. 42 U.S.C. § 12102. His disabilities substantially limit one or more major life activities, including learning, concentration, thinking, and interacting with others.

197.   Defendants have violated Title II of the ADA as described in the Third Claim for Relief, *supra*.

198.   As a result of Defendants' acts and omissions, C.B. has suffered injuries including, but not limited to, denial of meaningful access to the benefits of a public education, humiliation, hardship, pain and suffering, and anxiety. Plaintiff seeks injunctive and declaratory relief, as well as statutory damages of at least

$4,000 under California Civil Code § 52(f) for "each and every offense" Defendants have committed against him or three times his actual damages and attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF

## VIOLATION OF ARTICLE I, § 7(A) AND ARTICLE IV, § 16(A) OF THE CALIFORNIA CONSTITUTION

### (Defendants Moreno Valley USD and Superintendent Kedziora)

199.   Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

200.   Moreno Valley USD and Superintendent Kedziora have violated the rights of C.B. and other Black students and students with disabilities in the District to receive equal protection of the laws, as guaranteed by Article I, § 7(a) and Article IV, § 16(a) of the California Constitution, by failing to provide them with equal educational opportunities that meet the statewide standard.

201.   These constitutional provisions impose on Defendants the duty to provide Black students and students with disabilities an equal opportunity to educational services adequate to teach them the skills they need to succeed as productive members of society and to meet the statewide education standard – a safe learning environment free from unnecessary and abusive punishments, including police stops, restraints, and arrests. *See Butt v. State of California*, 4 Cal. 4th 668, 687 & n.14, 16 (Cal. 1992).

202.   Yet Defendants subject Black students, including Black students with disabilities, to a school program that disproportionately refers them to law enforcement and thereby imposes unnecessary and harmful restraints and arrests that create and exacerbate emotional and psychological trauma and interfere with their fundamental right to a basic education.

203.   Defendants fall below statewide standards by referring students, and Black students in particular, to law enforcement at a much higher rate than

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

comparably sized school districts. The Defendants have failed to meet their constitutional duty to prevent these practices and thereby fully deprive Black students and students with disabilities of access to the classroom, learning, and their education rights.

204.  As a proximate cause of the actions of Defendants herein, Plaintiff is entitled to an order and judgment enjoining Defendants from violating his rights and the rights of similarly situated Black and disabled students to equal protection under the California Constitution.

205.  As a proximate cause of the actions of Defendants herein, Plaintiff is also entitled to a Declaration that Defendants' actions or omissions violated his rights and the rights of similarly situated Black and disabled students to equal protection under the California Constitution.

206.  C.B. is also entitled to reasonable attorneys' fees and costs.

## EIGHTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(All Defendants)*

207.  Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

208.  Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10 engaged in extreme and outrageous conduct when they intentionally committed the acts described herein.

209.  As a proximate result of Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10's extreme and outrageous conduct, Plaintiff C.B. has suffered severe emotional distress.

210.  Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10 were adults in a position of power over Plaintiff C.B. and aware of his susceptibility to injuries through emotional distress as a minor student with disabilities.

211.   California Government Code § 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of their employment.

212.   The District and Superintendent Kedziora in his official capacity were at all relevant times the employers of Defendants Scott, Walker, Owens, Arellano, and some or all of Does 1-10.

213.   Defendants Scott, Walker, Owens, Arellano, and some or all of Does 1-10 committed the acts described herein while acting within the scope of their employment. The District and Superintendent Kedziora are therefore vicariously liable for these acts.

214.   The County, Sheriff's Department, and Sheriff Bianco in his official capacity were at all times relevant the employers of Defendants Loza and some or all of Does 1-10.

215.   Defendants Loza and some or all of Does 1-10 committed the acts described herein while acting within the scope of their employment. The County, Department, and Sheriff Bianco are therefore vicariously liable for these acts.

216.   Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper.

## NINTH CLAIM FOR RELIEF

### FALSE IMPRISONMENT

#### (*All Defendants*)

217.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

218.   Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10 intentionally and unlawfully exercised force or the implied threat of force to restrain or confine C.B. when they committed the acts described herein.

219.   Each of the known unlawful restraints of C.B. described *supra* lasted

for an appreciable amount of time.

220.   C.B. did not consent to Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10's acts, and as a result of their acts suffered severe harm and emotional distress.

221.   California Government Code § 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of their employment.

222.   The District and Superintendent Kedziora in his official capacity were at all relevant times the employers of Defendants Scott, Walker, Owens, Arellano, and some or all of Does 1-10.

223.   Defendants Scott, Walker, Owens, Arellano, and some or all of Does 1-10 committed the acts described herein while acting within the scope of their employment. The District and Superintendent Kedziora are therefore vicariously liable for these acts.

224.   The County, Sheriff's Department, and Sheriff Bianco in his official capacity were at all times relevant the employers of Defendants Loza and some or all of Does 1-10.

225.   Defendants Loza and some or all of Does 1-10 committed the acts described herein while acting within the scope of their employment. The County, Department, and Sheriff Bianco are therefore vicariously liable for these acts.

226.   Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper.

## TENTH CLAIM FOR RELIEF

### BATTERY

#### (All Defendants)

227.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

228.   Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10 intentionally committed acts which resulted in harmful or offensive contact with Plaintiff C.B.'s person when they committed the acts described herein.

229.   During the commission of the acts alleged herein, C.B. did not consent to the contact.

230.   Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10's harmful or offensive contact caused injury or harm to C.B.

231.   California Government Code § 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of their employment.

232.   The District and Superintendent Kedziora in his official capacity were at all relevant times the employers of Defendants Scott, Walker, Owens, Arellano, and some or all of Does 1-10.

233.   Defendants Scott, Walker, Owens, Arellano, and some or all of Does 1-10 committed the acts described herein while acting within the scope of their employment. The District and Superintendent Kedziora are therefore vicariously liable for these acts.

234.   The County, Sheriff's Department, and Sheriff Bianco in his official capacity were at all relevant times the employers of Defendants Loza and some or all of Does 1-10.

235.   Defendants Loza and some or all of Does 1-10 committed the acts described herein while acting within the scope of their employment. The County, Department, and Sheriff Bianco are therefore vicariously liable for these acts.

236.   Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper.

///

///

1

### **ELEVENTH CLAIM FOR RELIEF**

2

### **ASSAULT**

3

### *(All Defendants)*

4       237.   Plaintiff incorporates by reference the above paragraphs as though

5   fully set forth herein.

6       238.   Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10

7   demonstrated the unlawful intent to inflict immediate injury on Plaintiff C.B. when

8   they committed the acts described herein.

9       239.   Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10's

10   acts described herein placed C.B. in imminent apprehension of harmful or

11   offensive contact.

12       240.   Defendants Scott, Walker, Owens, Loza, Arellano, and Does 1-10's

13   unlawful intent to inflict immediate injury on C.B. caused him injury or harm.

14       241.   California Government Code § 815.2 provides that a public entity is

15   liable for injury proximately caused by an act or omission of an employee of the

16   public entity within the scope of their employment.

17       242.   The District and Superintendent Kedziora in his official capacity were

18   at all relevant times the employers of Defendants Scott, Walker, Owens, Arellano,

19   and some or all of Does 1-10.

20       243.   Defendants Scott, Walker, Owens, Arellano, and some or all of Does

21   1-10 committed the acts described herein while acting within the scope of their

22   employment. The District and Superintendent Kedziora are therefore vicariously

23   liable for these acts.

24       244.   The County, Sheriff's Department, and Sheriff Bianco in his official

25   capacity were at all relevant times the employers of Defendants Loza and some or

26   all of Does 1-10.

27       245.   Defendants Loza and some or all of Does 1-10 committed the acts

28   described herein while acting within the scope of their employment. The County,

1    Department, and Sheriff Bianco are therefore vicariously liable for these acts.

2       246.   Plaintiffs are entitled to Damages according to proof, reasonable

3    attorneys' fees, costs of suit incurred herein, and such other and further relief as the

4    Court deems just and proper.

5                    **TWELFTH CLAIM FOR RELIEF**

6                      **NEGLIGENT SUPERVISION**

7    (***Defendants Moreno Valley Unified School District, Superintendent Kedziora,***

8                         ***Scott, and Walker***)

9       247.   Plaintiff incorporates by reference the above paragraphs as though

10   fully set forth herein.

11      248.   Defendants Scott and Walker were responsible for the supervision of

12   Defendants Arellano, Owens, and some or all of Does 1-10.

13      249.   Defendants Arellano, Owens, and some or all of Does 1-10 became

14   unfit to perform the work for which they were hired due to their propensity to

15   subject students to harmful and excessive handcuffings and use of physical force.

16      250.   The at least four known, unlawful handcuffings establish that

17   Defendants Scott and Walker had or should have had prior knowledge of

18   Defendants Arellano, Owens, and Does 1-10's propensity to subject C.B. to harm.

19   They also establish that the risk of harm to C.B. from Defendants Arellano,

20   Owens, and Does 1-10's actions was reasonably foreseeable.

21      251.   Defendants Scott and Walker's negligence in supervising Defendants

22   Arellano, Owens, and Does 1-10 was a substantial factor in causing C.B.'s harm

23   and injuries.

24      252.   California Government Code § 815.2 provides that a public entity is

25   liable for injury proximately caused by an act or omission of an employee of the

26   public entity within the scope of their employment.

27      253.   The District and Superintendent Kedziora in his official capacity were

28   at all times relevant times the employers of Defendants Scott, Walker, Owens,

Arellano, and some or all of Does 1-10.

254.   Defendants Scott and Walker committed the negligent supervision described herein while acting within the scope of their employment. The District and Superintendent Kedziora are therefore vicariously liable for these acts.

255.   Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff C.B. prays that the Court grant the following relief:

256.   Order and declare that Defendants are violating the rights of Plaintiff C.B. under the U.S. Constitution, Title II of the ADA, Section 504, California Government Code § 11135, Unruh Civil Rights Act, California Constitution, and state common law torts.

257.   Enjoin Defendants their successors in office, agents, employees and assigns, and all persons acting in concert with them, to:

    a.   Stop school police officers from mechanically restraining students and intervening in low level and disability-related behaviors, up to and including ordering school police officers to cease patrolling District schools.

    b.   Provide C.B. and similarly situated students with positive supports and services in lieu of police intervention so that they may enjoy full and equal access to the District's programs.

258.   Compensatory, general, and special damages, according to proof.

259.   Award Plaintiff's attorneys' fees and costs as appropriate and permitted by law.

260.   Any other relief as this Court finds just and proper.

///

///

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

# DEMAND FOR JURY TRIAL

261.   Plaintiff demands a jury trial.


DATED: February 2, 2021          Respectfully submitted,


*/s/ Robert Borrelle*

ROBERT BORRELLE

LINDSAY APPELL

DISABILITY RIGHTS CALIFORNIA


*/s/ Claudia Center*

CLAUDIA CENTER

MALHAR SHAH

DISABILITY RIGHTS EDUCATION

& DEFENSE FUND


*/s/ Maronel Barajas*

MARONEL BARAJAS

ANNA RIVERA

BARAJAS & RIVERA, APC



*Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

# Exhibit 1

  

July 15, 2020

*Via Certified U.S. Mail and Facsimile*

Sandra Ayala
Director, Risk Management
Moreno Valley Unified School District
25634 Alessandro Blvd.
Moreno Valley, CA 92553
Fax: (951) 571-7550

Jason Ramirez, Executive Dir.
Moreno Valley SELPA
25634 Alessandro Blvd.
Moreno Valley, CA 92553
Fax: (951) 571-7511

George Johnson, Executive Officer
County of Riverside
County Administrative Center
4080 Lemon Street
Riverside, CA 92501
Fax: (951) 955-1811

Clerk of the Board of Supervisors
County of Riverside
Attn: Claims Division
4080 Lemon Street, PO Box 1147
Riverside, CA 92502-1147
Fax: (951) 955-1071

Sheriff Chad Bianco
Riverside County Sheriff's Department
4095 Lemon Street
Riverside, CA 92501
Fax: 951-955-2428

Pat Jacquez-Nares, City Clerk
City of Moreno Valley
14177 Fredrick St., PO Box 88005
Moreno Valley, CA 92552
Fax: (951) 413-3009

**Re:** **Student C▆▆▆▆ B▆▆'s Claim for Damages; Cal. Gov't Code § 910 *et seq.***

To whom it may concern:

This is a claim for damages against the Moreno Valley Unified School District ("MVUSD" or "District"), the Riverside County Sheriff's Department ("Department"), Moreno Valley Special Education Local Plan Area ("SELPA"), the County of Riverside ("County"), and the City of Moreno

Exhibit 1 - page 55

Student C.B.'s Claim for Damages
July 15, 2020
Page 2 of 22

Valley ("City") (referred to collectively as "Respondents") under California Government Code Section 910 *et seq.* for injuries sustained by Claimant C██████ B██ (hereinafter "C.B." or "Claimant") arising out of violations of statutory, common law, and constitutional rights as set forth below.

## I. Summary of Claim

W████ B██ and B████████ T████, on behalf of their son, C.B., a minor, bring this claim for deprivations of C.B.'s constitutional, statutory, and common law rights by Respondents and persons employed by Respondents. B██ and T████ allege that Respondents have subjected C.B. to abusive and traumatic physical and mechanical restraints and have discriminated against him on the basis of disability and race by, including, but not limited to: (1) failing to maintain, implement, and/or reasonably modify policies and procedures to prohibit and prevent the systemic use of physical and mechanical restraints; (2) failing to maintain and enforce policies and procedures that ensure prompt, accurate reporting of student injuries and restraints to District administrators, additional authorities, and parents; (3) failing to provide adequate structure, supervision, oversight, and training of employees to ensure that students like C.B. are not injured, and that any injuries are quickly identified, investigated, and prevented in the future.

Despite that school districts throughout California have begun to incorporate positive behavior supports, restorative justice practices and other strategies to focus on addressing the root causes of student misconduct and minimizing the use of officers, the District continues to use police officers to address student misconduct within the District resulting in disability and race-based discrimination, among other legal wrongs.

## II. Name and Mailing Address of Claimant

B████ T████ on behalf of her son C██████ B██.

*Mailing address:*



W████ B██ on behalf of his son C██████ B██.

*Mailing address:*

Exhibit 1 - page 56

Student C.B.'s Claim for Damages
July 15, 2020
Page 3 of 22



### III.   Address to Which Notices Should Be Sent

Please address all correspondence related to this claim to C.B.'s counsel, Robert Borrelle, at Disability Rights California, 350 South Bixel Street, Suite 290, Los Angeles, CA 90017. Mr. Borrelle's telephone number is (213) 213-8000 and his email address is Robert.Borrelle@disabilityrightsca.org.

### IV.   Date, Place, and Other Circumstances Which Gave Rise to the Claim Asserted

Claimant C.B. is a Black, eleven-year-old boy with multiple disabilities, including attention deficit hyperactivity Disorder ("ADHD") and oppositional defiant disorder ("ODD"). He has been a student of the District since March 2019.[1] He is an incoming 7th grader at Mountain View Middle School ("Mountain View MS") in MVUSD and has received special education and related services through an Individualized Education Program (IEP) since at least the third grade.[2] Prior to attending Mountain View MS, C.B. went to Landmark Middle School ("Landmark MS"). Both schools are within MVUSD's boundaries. Claimant intends to remain a student of the District.

As a result of his disabilities, Claimant has difficulty with, *inter alia*, regulating his emotions, maintaining focus, and communicating and complying promptly with directives. These impairments substantially limit several major life activities including concentrating, thinking, and interacting with others, and several major bodily functions, including brain function.

---

[1] C.B. first enrolled in MVUSD in March 2019. He briefly reenrolled in Val Verde Unified School District from May to June 2019. C.B. then reenrolled in MVUSD in August 2019.

[2] Claimant notes he is eligible for special education and related services as evidence that Respondents had knowledge of his disabilities and to support his disability discrimination claims. Claimant does not challenge the adequacy of his IEP, nor does he assert the District violated the Individuals with Disabilities Education Act (IDEA). The District acknowledged in multiple IEP meetings that the handcuffing incidents described herein are not part of C.B.'s special education program or IEP and should not be discussed or addressed in an IEP. The District and Claimant agree these incidents and relief for such claims are issues separate from C.B.'s IEP/special education.

Exhibit 1 - page 57

Student C.B.'s Claim for Damages
July 15, 2020
Page 4 of 22

At all times relevant to this claim, Respondents have known or should have known that C.B. is a child with disabilities. For example, C.B.'s disabilities are well-documented in his IEP,[3] which includes references to his diagnoses and disability-related behaviors. His behaviors include acting out, cursing, and difficulty complying promptly with verbal demands.

C.B.'s build is slender; he stood 4'8" tall and weighed about 70 pounds at the time of the events discussed herein. Despite C.B.'s small size and their knowledge of his disabilities, Respondents and their agents repeatedly tackled and handcuffed him over a span of three and half months as punishment for his disability-related behavior. Claimant provides detailed factual explanations of these illegal restraints in Section IV.A-D below. C.B. had never been handcuffed before these incidents.

As a result of Respondents' acts and/or omissions, C.B. has suffered and continues to suffer severe emotional distress, trauma, physical harm, humiliation, reputational consequences, and loss of his civil rights. He has had difficulty falling asleep, staying asleep, and expressing his emotions. C.B.'s parents have noticed he is more "shut down" emotionally than he was before. He has also exhibited new, more intense, and more frequent behaviors in school and a fear of police officers. C.B.'s parents secured therapy services for their son to help him cope with the trauma he experienced and continues to experience from these incidents.

### A. On information and belief, on or about August 21, 2019, the District's agents and representatives handcuffed C.B. for conduct resulting from his disabilities.

On or about August 21, 2019, District staff handcuffed C.B. for the first time at Landmark MS. Then-Landmark MS Assistant Principal Pedro Gutierrez called C.B.'s mother, Ms. T█████, to tell her to pick C.B. up from school early because he was "acting up." On information and belief, C.B. was exhibiting behaviors that were caused by his disability.

When Ms. T█████ arrived at Landmark MS, Mr. Gutierrez verbally informed her that school police officers had handcuffed C.B. The officers removed the handcuffs before Ms. T█████ arrived. Mr. Gutierrez said that he

---

[3] See footnote 2, supra.

Exhibit 1 - page 58

Student C.B.'s Claim for Damages
July 15, 2020
Page 5 of 22

instructed officers to remove the handcuffs because he believed handcuffing C.B. was "totally unacceptable," or words to that effect.

Mr. Gutierrez did not provide Ms. T████ any further information. The District did not provide parents or counsel with a written incident report for this handcuffing incident, even though SELPA policy required District staff to create written reports (hereinafter "Incident Reports") after using such interventions on students. At this time, Claimant believes that only District staff – i.e., not Department officers – were involved in the incident.

> **B. On August 26, 2019, the District's agents and representatives shackled C.B.'s hands and ankles for conduct resulting from his disabilities.**

On August 26, 2019, District staff handcuffed C.B. for the second time at Landmark MS. The incident began when Mr. Gutierrez directed Campus Security Officer ("CSO")[4] Demetrius Owens to bring C.B. to the office for a meeting. CSO Owens' report does not describe a reason for this meeting, demonstrating the District's defective record keeping practices. A behavior log drafted by C.B.'s teacher, Mr. Proprofsky, says that C.B. had disrupted class earlier in the day by cursing and ripping paper. As such, Claimant suspects that the meeting with Mr. Gutierrez may have been related to his alleged disruptive behavior in class – which took place approximately three hours before Mr. Gutierrez summoned him to his office.

CSO Owens, along with CSO King (first name unknown), and then-Landmark MS Assistant Principal Kamilah O'Connor found C.B. on the playground. All three directed C.B. to leave the playground and go to the office. C.B. verbally refused and started to exhibit conduct related to his disability, including an inability to self-regulate or express himself. He allegedly clenched his fists and began breathing heavily. CSO King and CSO Owens responded by dragging C.B. by his arms to a seclusion room.

Then-Landmark MS Principal Scott Walker joined the CSOs Owens and King. Surrounded by three much larger adults in the seclusion room, C.B. began experiencing and externalizing emotions of fear, anxiety, and frustration. He began pulling away, pushing, and swinging with his arms in

---

[4] On information and belief, MVUSD established its CSO program pursuant to California Education Code section 38000. Claimant believes that CSOs are District employees.

Exhibit 1 - page 59

Student C.B.'s Claim for Damages
July 15, 2020
Page 6 of 22

an attempt to free himself from the room. C.B. was not acting out physically before the CSOs physically dragged him to the seclusion room.

Mr. Walker directed CSO King and CSO Owens to handcuff C.B. At the time, C.B. was 4'8" tall and approximately seventy pounds. The CSOs placed C.B. in a physical control hold, tackled him to the floor, and forced him into District-issued metal cuffs. The CSOs pulled C.B. up from the ground and attempted to sit him in a chair. Now handcuffed in a seclusion room and surrounded by three adults, C.B. became even more upset and distressed. Unable to regulate his emotions due to his disabilities, he began flailing his legs towards the CSOs.

Mr. Walker then directed CSO King and CSO Owens to place handcuffs on C.B.'s ankles. The CSOs complied and simultaneously shackled C.B.'s hands and ankles with metal cuffs. C.B. remained shackled in this manner for an unknown period of time.

The District suspended C.B. from school that day and his aunt came to pick him up. She was concerned and confused to find C.B. sitting in the fetal position against the wall of the seclusion room. His arms were hugging his knees and his head was down. C.B. was not wearing a shirt, which had come off during his struggle with the CSOs. A desk was blocking the door to the seclusion room. C.B. and his aunt helped school staff clean up the room, and then she took him home. No one told C.B.'s aunt that CSOs had physically tackled C.B. and then handcuffed and leg-cuffed him. District staff never told C.B.'s parents of the incident either.

The District never gave an Incident Report to C.B.'s parents. In November 2019, counsel made a request to MVUSD for a full and complete copy of C.B.'s educational records. Only after counsel received the records did C.B.'s parents learn that the CSOs shackled C.B.'s hands and ankles. The District provided Claimant with CSO King's and CSO Owens' witness statements, which were missing at least two pages. Further, the District did not provide a witness statement from Mr. Walker. The District has not responded to counsel's January 2020 follow-up request for the missing pages. On information and belief, the District did not adequately investigate, train, supervise, or discipline staff involved in this incident.

Exhibit 1 - page 60

Student C.B.'s Claim for Damages
July 15, 2020
Page 7 of 22

### C. On October 8, 2019, Respondents' representatives and agents tackled C.B. and handcuffed him while pressing a knee into his back for disability-related behaviors.

On October 7, 2019, C.B. allegedly threw a rock in the general direction of CSO Manuel Arellano. Per the Department's police report obtained by Claimant's counsel dated October 8, 2019, sometime after school hours on October 7, 2019, an unidentified District staff member requested that Deputy Norma Loza ("Deputy Loza") intervene and "investigate."[5] On information and belief, the District contracts with the Department to run its School Resource Officer ("SRO") program. Unlike CSOs, SROs are employees of the Department. Further, on information and belief, the City of Moreno Valley contracts with the Department for its services.

On October 8, Deputy Loza and CSO Arellano arrived at C.B.'s special education classroom to investigate the alleged rock-throwing from the day before. At no time prior to involving the CSOs and SROs did anyone with the District attempt to arrange a meeting with C.B. with his parents present.

Unlike the other incidents where school police officers handcuffed C.B., Deputy Loza's body camera partially captured the October 8 incident. At Claimant's counsel's request, the Department produced a video that is approximately 8-minutes long. On information and belief, Deputy Loza shut off her body camera before the incident concluded, violating Department policy and leaving the remaining hour of the incident unfilmed.

Based on the review of the available Department footage, immediately upon entering C.B.'s classroom, Deputy Loza directed the teacher (name unknown) to remove the other students from the classroom. This left C.B. alone with Deputy Loza and CSO Arellano. C.B. sat motionless at his desk with his head down. Deputy Loza stood over C.B. and said, "You're going to go to the office, no matter what. Either you go, cooperating, or I'm going to take you to the office." Neither Deputy Loza nor CSO Arellano explained

---

[5] On information and belief, the unidentified District staff member in the police report is CSO Arellano. The police report states an individual (name redacted) contacted Deputy Loza on October 7, 2019 and alleged that C.B. threw a rock in his direction earlier that day at Landmark MS. Separately, on October 7, 2019, CSO Arellano added a behavior log entry in C.B.'s education file alleging that C.B. threw a rock towards him. School staff did not create a behavior log entry documenting its restraint of C.B. on October 8.

Exhibit 1 - page 61

Student C.B.'s Claim for Damages
July 15, 2020
Page 8 of 22

to C.B. why they were asking him to go to the office. C.B. kept his head down on his arms and quietly said he was not going. For thirty seconds, Deputy Loza repeated different variations of "do you understand you are going to the office?" but never explained why. C.B. remained completely still, repeating that he was not going at barely audible volume.

After less than 90 seconds, the footage shows, Deputy Loza grabbed the back of C.B.'s sweatshirt and physically pulled him out of his seat. She then passed C.B. to CSO Arellano. While CSO Arellano twisted the 4'8" boy's wrists behind his back to try and force handcuffs on him, Deputy Loza repeated, "You are going to the office." Again, consistent with his disabilities and behavior that they had seen him exhibit before, C.B. swore and stated he was not going. The officers then tackled C.B., pinned him to the ground, and pressed him face down into the floor. He screamed out in pain: "Ow! My knee!" CSO Arellano then dug his own knee into C.B.'s back, and Deputy Loza placed him in handcuffs. Neither officer spoke to C.B. about his legal rights.

The Department footage also shows that while the two officers pinned C.B. on the ground, Deputy Loza told him not to move or the handcuffs were "going to get tight on you." While C.B.'s hands are out of frame, a distinct clicking can be heard on video for about thirty seconds, as Deputy Loza presumably followed through with her threat and tightened C.B.'s handcuffs. C.B. wiggled on his stomach briefly and swore, behavior consistent with his disabilities and of being physically and mechanically restrained. He then laid still on the ground, facedown and handcuffed. Deputy Loza radioed an unknown person and stated: "I have one juvenile detained. He's being uncooperative."

The video then shows Deputy Loza and CSO Arellano pulling C.B. to his feet and pushing him towards the classroom door, while C.B. squirmed and cried out to be let go. The officers again physically forced C.B. face down onto the floor. Another CSO then arrived (the "second CSO").[6] The second

---

[6] On information and belief, the second CSO was Demetrius Owens. CSO Arellano can be heard on video using his radio to ask someone he refers to as "Owens" to come assist in the classroom. About 30 seconds later, the video shows the second CSO entering the classroom. Owens was a CSO assigned to Landmark MS at the time of the incident. He also handcuffed C.B. on August 26, 2019, along with CSO King.

Exhibit 1 - page 62

Student C.B.'s Claim for Damages
July 15, 2020
Page 9 of 22

CSO told C.B. that he should "relax." At one point while CSO Arellano held C.B. facedown, Deputy Loza stood over him and accused him of kicking. The video does not show C.B. kicking anyone in frame.

The officers surrounded C.B. and held him face-down on the floor for almost two minutes. The video shows Deputy Loza, CSO Arellano, and the second CSO pull him up to a seated position on the floor. Still handcuffed, C.B. cried out as CSO Arellano pressed down on his shoulders. The second CSO used what appears to be a pain compliance hold on C.B. The video shows this person twisting C.B.'s leg and using both arms and his body weight to press C.B.'s calf into the ground. C.B. cried, "Let me go! Let me go!" While immobilizing C.B.'s hands, shoulders, and leg, the two male CSOs repeated: "If you calm down, we calm down. You calm down, we calm down." C.B. – a child with known emotional disabilities – was unable to "calm down" while handcuffed and restrained by three officers.

The Department footage then shows two unidentified district staff arriving, but neither took any steps to intervene. One radioed for Principal Walker to come to the classroom, but could not reach him. CSO Arellano directed her to leave the room and find Mr. Walker. All the while, C.B. remained handcuffed, immobilized on the floor. Deputy Loza stood over him, and threatened to take him to the police station if he did not calm down.

After two more minutes, the second CSO can be seen finally releasing C.B.'s leg from the pain compliance hold. The three officers then pulled C.B. into a standing position, and C.B. cried out in apparent pain. Deputy Loza said that a fourth officer, her partner, would be arriving to help the three officers escort C.B. off campus to the awaiting police car. At that point, the body camera footage abruptly ends.

Deputy Loza and her partner, Deputy Toscano (first name unknown), later placed C.B. in the back of a police car. By that time, given the traumatic events that had just occurred and were continuing to occur, C.B. was experiencing worsening trauma. While locked in the back seat, C.B. stated:

Exhibit 1 - page 63

Student C.B.'s Claim for Damages
July 15, 2020
Page 10 of 22

"I wish I was dead."[7] At times the deputies left C.B. alone in the locked car. On information and belief, C.B. was in handcuffs for over an hour.

While locked and handcuffed in the police car, C.B. managed to use his cell phone to call his mother. C.B.'s mom recalls that he repeatedly screamed, "Tell them to let me go!" before the phone hung up. C.B.'s mom was afraid and confused; no one from the school had informed her about these events. When Ms. T███ called her son back, Deputy Loza answered the phone. Ms. T███ told Deputy Loza that she was on her way to pick C.B. up from school. Deputy Loza responded that it was too late; the ambulance was coming to pick him up. C.B. remained in the back of the police car for nearly another hour before an ambulance arrived. During this time, other students passing by saw C.B. handcuffed in the back of the police car.

At approximately 12:55 pm, the ambulance took C.B. from Landmark MS to Riverside's Emergency Treatment Service facility for a Section 5585 evaluation.[8] At the time of hospitalization, the treating psychiatrist, Dr. Alexander Tsang, and treating therapist, Shirlee Lyons, noted C.B. presented as "selectively mute." His distress began to decrease once his mom arrived, and they discharged him that day at around 4:00 pm. C.B. spent over half a day handcuffed, held in a police car, transported by ambulance, and psychiatrically hospitalized.

Days after this incident, Landmark staff handed Ms. T███ a notice of suspension, which only mentioned the alleged rock throwing incident from October 7 and not the use of physical and mechanical restraints. Ms. T███ asked staff to provide her with more information about the school police officers restraining, handcuffing, and holding her son in a police car. Staff told Ms. T███ they had no information about the incident. Contrary to its own documentation and reporting procedures, the District did not and has not provided Ms. T███ and Mr. B███ with any documentation related to

---

[7] C.B. later told his dad that he intentionally made these statements to protect himself. C.B. was afraid because Deputy Loza repeatedly threatened to take him juvenile hall while he was in the back seat of the police car.

[8] Under California Welfare & Institutions Code section 5585, officers may temporarily place a minor in a psychiatric facility where probable cause supports that "as a result of mental disorder" the minor is: (1) a danger to themselves or others or "gravely disabled"; and (2) "voluntary treatment is not available."

Exhibit 1 - page 64

Student C.B.'s Claim for Damages
July 15, 2020
Page 11 of 22

the October 8 restraint, handcuffing, detention, or hospitalization. To date, the District has failed to produce any written Incident Reports from its staff related to this handcuffing, even after multiple requests by counsel.

The Department similarly failed to comply with its own documentation procedures. On information and belief, Deputy Loza turned off her body camera before the incident ended, against Department policy. Also against Department policy, Deputy Loza did not document her reasons for turning off her camera in a report or memorandum. In addition, despite requests from counsel, the Department has not produced all body camera footage from Deputy Loza for this incident. Also, on information and belief, Deputy Toscano did not create a police report or body camera footage for this incident and/or the Department did not produce these records.

Again, on information and belief, Respondents did not adequately investigate, train, supervise, or discipline staff following this incident.

> **D. On December 9, 2019, Respondents' agents and representatives handcuffed C.B. while he was already physical restrained for exhibiting disability-related behaviors.**

After their son was restrained, handcuffed, locked in a police car, and sent for an involuntary psychiatric hold while at Landmark MS, C.B.'s parents were understandably afraid for his safety and no longer wanted him to return to the same school. After the October 8, 2019 incident, C.B. remained at home from school for approximately five weeks. Desperate for another option, C.B.'s parents obtained an intra-district transfer permit so that C.B. could attend Mountain View MS. The move forced C.B. to, among other things, leave his friends and social networks behind.

Even after changing schools, Respondents' district-wide discriminatory practices and policies and failure to supervise its employees continued to harm C.B. On December 9, 2019, shortly after starting at Mountain View MS, Respondents again handcuffed C.B. after he had an argument with a classmate. The incident began when C.B. pulled a classmate's chair out from under him. The classmate then shoved C.B. The two children pushed each other a few times, and the teacher intervened to break it up. Unable

Exhibit 1 - page 65

Student C.B.'s Claim for Damages
July 15, 2020
Page 12 of 22

to regulate his emotions effectively, C.B. pushed his teacher and began to throw classroom items.

The teacher cleared the classroom and called for CSOs and SROs to respond. CSO Juan Ramirez and CSO Kristopher Woodside arrived first and, almost immediately, physically restrained C.B., who was displaying disability-related behaviors. CSO Woodside restrained C.B. on the ground.

Deputy Loza arrived next about 15 minutes later. Deputy Loza did not turn on her body camera and later failed to report why she did not turn it on, despite Department procedures mandating otherwise. When Deputy Loza arrived, CSOs Ramirez and Woodside were still physically restraining C.B. Without attempting to deescalate the situation or address C.B.'s disability related behaviors, Deputy Loza handcuffed C.B.

After handcuffing C.B., Deputy Loza transported him to the Moreno Valley Police Station. While the police held C.B. at the station, Deputy Loza made the decision to refer C.B. to the Emergency Treatment Services Center for another Section 5585 evaluation and requested an ambulance transport. Before the ambulance got to the police station to transport C.B., Ms. T█ arrived and expressed her desire to take her son home. But Deputy Loza refused. Instead, Ms. T█ watched the police officers escort her son outside the back of the police station building and into the ambulance.

The ambulance transported C.B. to the Emergency Treatment Services Center. According to the official police report, an unidentified person restrained C.B. to the gurney during the ride. Hours later, C.B. finally reunited with his mother and received his discharge. This traumatic episode, which involved handcuffing, detention in a police station, physical restraint on an ambulance gurney, and a psychiatric hospitalization referral, lasted, in total, approximately three hours.

The District later initiated expulsion proceedings against C.B. based on the initial fight at school. On December 20, 2019, the IEP team met for a Manifestation Determination Review, a procedure required under the IDEA before expelling a student with a disability. The IEP team determined that C.B.'s behaviors – the same behaviors he had exhibited many times before and in each of the prior handcuffing incidents – were in fact caused by his

Exhibit 1 - page 66

Student C.B.'s Claim for Damages
July 15, 2020
Page 13 of 22

disabilities, including ADHD and ODD.[9] The IEP team's determination nullified the pending expulsion charges.

On information and belief, Respondents did not document the incident or adequately investigate, train, supervise or discipline the staff involved.

## V.   Nature of the Legal Claims That Claimant Asserts

### A. Respondents fail to maintain, implement, and reasonably modify policies and procedures to prohibit and prevent the systemic use of physical and mechanical restraints.

*i. Respondents fail to reasonably modify policies, denying students with disabilities, including students of color, meaningful and equal access to their education*

Respondents' policies, procedures, and practices related to referrals to law enforcement have discriminated against and continue to discriminate against C.B. and similarly situated students with disabilities and students of color. Respondents have an obligation to design and modify their policies and practices to avoid disability and race discrimination. Their individual and joint failures to do so have resulted in, among other things, students with disabilities, like C.B., being subject to interrogation, use of force, and/or arrests for conduct relating to their disabilities.

The failure to modify these policies as applied to students with disabilities disproportionately impacts students with disabilities and Black students with disabilities by subjecting them to physical restraint, handcuffing, arrest, campus removal, and involuntary hospitalization at higher rates than their non-disabled or non-Black peers. For example, during the 2015-16 school year, the District referred at least 143 children to law enforcement.[10] Of

---

[9] Claimant includes this information merely to provide evidence that Respondents discriminated against C.B. by handcuffing him for disability-related behaviors. Claimant does not challenge the adequacy of his IEP or allege Respondents violated the IDEA.
[10] Moreno Valley Unified School District, Civil Rights Data Collection (2015-16), *available at* https://ocrdata.ed.gov/Page?t=d&eid=30417&syk=8&pid=2539. Counsel for Claimant requested updated law enforcement referral, on-campus arrest, and mechanical restraint data through a California Public Record Act request to the District on January 3, 2020. To date, the District has not produced this data.

Exhibit 1 - page 67

Student C.B.'s Claim for Damages
July 15, 2020
Page 14 of 22

these, 28% were students with disabilities, compared to just 16.6% of children districtwide who are students with disabilities.[11] Of the students with disabilities referred to law enforcement, 42.5% were Black. This is more than twice the percentage of students with disabilities district-wide who are Black (19.2%).

Respondents' failure to reasonably modify their policies results in further traumatized children, escalated and unnecessary use of physical restraints, and worsened behaviors. Respondents operate SRO and CSO programs that discipline and punish students with disabilities, especially Black students with disabilities, and deny C.B. and similarly situated students access to reasonable modifications in police encounters and deprive them of meaningful access to public education and Respondents' services.

### ii. Respondents' use of force policies and practices are unconstitutional

Respondent violated Claimant's fourth amendment right to be free from unreasonable seizure and excessive use of force in violation of substantive and procedural due process. Respondents also violated Claimant's substantive and procedural due process rights under the fourteenth amendment.

Further, based on information and belief, seizure and use of force practices used on students within the District were and are unconstitutional. Further, on information and belief, the District and Department use of force on C.B., including the use of handcuffs and restraints, by Department officers and District staff, resulted in part from a lack of effective training, force review, and complaint process. Contributing to these violations is the District's lack of meaningful oversight of its CSOs pursuant to Education Code Section 38000. On information and belief, Respondents' policies and procedures relating to the use of SROs and CSOs also have an adverse disparate impact on students with disabilities and students of color like C.B.

---

[11] "Students with disabilities" refers to those eligible for an IEP under the IDEA. Claimant here provides law enforcement referral data disaggregated by IDEA eligibility because the data is only available in this form. But Claimant alleges Respondents discriminate against all students with disabilities, including those who are not IDEA-eligible.

Exhibit 1 - page 68

Student C.B.'s Claim for Damages
July 15, 2020
Page 15 of 22

**B. Respondents fail to maintain and enforce policies and procedures ensuring prompt, accurate reporting of restraints and student injuries to District administrators, additional authorities, and parents, as required by law.**

*i. Respondents fail to ensure their respective employees comply with the deficient reporting policies and procedures already in place*

The excessive use of physical restraints and seclusion that SROs and CSOs used on C.B. and on similarly situated students with disabilities in the District often remains in the shadows. The District's staff systematically fail to comply with internal documentation and notification policies for police incidents, which include incidents involving SROs.

For example, existing District and SELPA policy – Administrative Regulation 5145.11 – mandates that administrators attempt to contact the parent before allowing law enforcement to question a student and before removing a student from campus. Yet here, District administrators failed to contact C.B.'s parents before police questioned or attempted to remove him in any of the incidents described above.

Further, existing District and SELPA policies require school staff to immediately notify the Superintendent and to create a written report when police take a student into custody. SELPA policy also requires District staff to create written Incident Reports after using physical interventions on a student. Each District staff member involved in the restraint must complete a separate Incident Report and the school site administrator must review and forward them to the District's Special Education Director. Yet the District has not produced any Incident Reports for any of incidents described above, demonstrating the District's defective practices.

As was the case with C.B., District staff frequently fail to timely notify parents, or notify them at all, when school police question, restrain, handcuff, assault, or arrest their children. The District also fails to adequately document, report, or investigate these acts of abuse, and fails to take reasonable steps to prevent further abuse. When students with disabilities struggle to communicate experiences, especially traumatic ones, to parents or trusted adults, as was the case with C.B., these

Exhibit 1 - page 69

Student C.B.'s Claim for Damages
July 15, 2020
Page 16 of 22

caregivers are often unaware that their children have experienced any interaction with police at all.

Similarly, the Department's SROs fail to adequately document incidents of restraint involving MVUSD students. In a 2016 directive to all personnel, the Department instructed officers to create body camera recordings of "any law enforcement action where there is reason to believe it would be appropriate and valuable to record the event." This includes citizen contacts and detentions. If an officer fails to initiate the recording of an event when required, the officer must document the reasons for the failure in a report or memorandum. Officers may not terminate the body camera recording until the encounter ends. Even at rare times when "tactical or practical reasons" necessitate temporarily pausing body camera footage, the officer must reinitiate the recording as soon as possible. The officer must then document the reasons for stopping their body camera in a report. As was the case with C.B., SROs frequently fail to create police reports, fail to record incidents on their body cameras, and fail to document the reasons for turning off their body cameras in incidents involving MVUSD students.

Respondents' current policies and/or practices create little to no documentation regarding student injuries, handcuffing, and/or use of restraints. As a result, parents of students with disabilities like C.B.'s cannot obtain adequate information about the cause of injuries suffered while at school. Respondents have discriminated against C.B. and other similarly situated students with disabilities and students of color by failing to create, follow, and implement appropriate policies and procedures regarding documentation of student injuries, handcuffing, and/or use of restraints.

> ii. *The District violated the Child Abuse and Neglect Reporting Act and other laws, by failing to report abuse against Claimant to the proper authorities.*

In addition to not complying with its own deficient polices, the District and its employees violated their duties as mandated reporters by failing to report the abuse of C.B. to the proper authorities. On information and belief, at no point did any of the District employees who witnessed the handcuffing incidents detailed above report this abuse of C.B. to the proper authorities as required by state law.

Exhibit 1 - page 70

Student C.B.'s Claim for Damages
July 15, 2020
Page 17 of 22

One such state law is the Child Abuse and Neglect Reporting Act ("CANRA"), which requires certain "mandated reporters," including teachers, teacher's and instructional aids, and employees of an organization whose duties require direct contact and supervision of children, to exercise vigilance in identifying and reporting known or reasonably suspected instances of abuse.  Cal. Penal Code §§ 11164, 11165.7, 11166.  Under CANRA, "abuse" includes "physical injury . . . inflicted upon a child by another person by other than accidental means . . . unlawful corporal punishment or injury . . . the willful harming or injuring of a child or the endangering of the person or health of a child."  *Id.* § 11165.5.

Further, under CANRA, "the willful harming or injuring of a child or the endangering of the person or health of a child, means a situation in which any person willfully causes or permits any child to suffer, or inflicts thereon, unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes the person or health of the child to be placed in a situation in which his or her person or health is endangered."  *Id.* § 11165.3. "The intent and purpose of [CANRA] is to protect children from abuse and neglect."  *Id.* § 11164.

The school police officers' use of physical and mechanical restraint on Claimant during the fall of 2019 met the standard for abuse under CANRA. By failing to report this abuse to the proper authorities, the District and its employees violated the spirit and letter of this law.

> ### C. Respondents fail to provide adequate structure, supervision, oversight, and training of employees to ensure that students with disabilities like C.B. are not injured, and that any injuries are quickly identified, investigated, and prevented in the future.

Respondents do not provide officers (through their SRO program) or their employees (through their CSO program or otherwise) or staff with adequate training – or any training at all – to work with students with disabilities. For example, the nine SROs and dozens of CSOs patrolling MVUSD campuses frequently and disproportionately subject students with disabilities, and Black students with disabilities in particular, to handcuffing, physical restraint, campus removal, arrest, and involuntary hospitalization for disability-related behaviors. They use these traumatic practices to punish

Exhibit 1 - page 71

Student C.B.'s Claim for Damages
July 15, 2020
Page 18 of 22

minor misconduct typical for school-age children and disability-related behaviors, regardless of whether the behavior poses an imminent danger of physical harm to anyone.

According to the District's job description,[12] CSOs "supervise," "monitor," and "control" school campuses and "enforce[] the rules and regulations governing student behavior." They are expected to "physically restrain[] persons involved in crimes, fights, or other acts of violence," and are trained to use, among other things, Tasers and pepper spray.

Despite requiring these duties of its officers, the District's CSO Program has no written policies and/or procedures to communicate boundaries, guidelines, and best practices for staff. While providing training on the use of pepper spray and use of Tasers, the District provides no training regarding working with students with disabilities, de-escalation, or crisis communication. Instead, on information and belief, Director of Safety and Security Darryl Scott issues only verbal commands and guidelines to the CSOs. Also, on information and belief, Director Scott fails to investigate and discipline CSOs who use physical force on students, including students with disabilities.

In addition to the CSO program, the District established its SRO program through a Law Enforcement Services Agreement with the Riverside County Sheriff's Department. These SROs are sworn law enforcement officers whose duties broadly include patrolling MVUSD campuses, investigating crimes that occur on District grounds, facilitating conversations between students and their parents, and serving as a liaison at elementary school sites. The Law Enforcement Services Agreement, which governs the relationship between the District and Department, does not prohibit SROs from intervening in minor school discipline incidents. It does not outline when they may use restraints or handcuffs. It does not describe applicable legal protections for students with disabilities, including the requirement to provide reasonable accommodations in police encounters.

---

[12] MVUSD Human Resources Division, *Position Title: Campus Security Officer I* (Oct. 17, 2017), available at: https://4.files.edl.io/af25/09/04/18/173822-651104c9-971a-47b6-ba39-362fd1900e5b.pdf (last accessed July 13, 2020).

Exhibit 1 - page 72

Student C.B.'s Claim for Damages
July 15, 2020
Page 19 of 22

Further, on information and belief, the Department does not have any training or policies on interacting with students with disabilities. For example, based on information and belief, in fall 2019, the Department verbally ordered SROs to arrest any MVUSD student accused of on-campus fighting, without exception. This order will likely disproportionately affect students with disabilities, including students of color with disabilities.

There is a fundamental flaw in the content and delivery of training by Respondents that requires, *inter alia*, system-wide fixes to appropriately accommodate students with disabilities and students of color to avoid discriminating against them, and to ensure that staff are properly trained to supervise students' behavior. As a result of these failures, Respondents have discriminated against C.B. on the basis of his disability and race.

## VI. <u>General Description of the Indebtedness, Obligation, Injury, Damage, or Loss Incurred</u>

Respondents have violated multiple federal and state laws, including but not limited to: Title II of the ADA (42 U.S.C. §§ 12131, *et seq.*); Section 504 of the Rehabilitation Act (29 U.S.C. § 794); Section 1983 (42 U.S.C. § 1983); California Government Code Section 11135; California Disabled Persons Act (Cal. Civ. Code §§ 54.1 *et seq.*); California Education Code Section 220; California Education Code Section 234 *et seq.*; California Education Code Section 38000 *et seq.*; California Education Code Section 44807; California Education Code Section 49000 *et seq.*; California's Unruh Civil Rights Act (Cal. Civ. Code § 51, *et seq.*); California's Bane Act (Cal. Civ. Code § 52.1); California's Child Abuse and Neglect Reporting Act (Cal. Penal Code §§ 11164 et seq.); Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, *et seq.*); U.S. Constitution; California Constitution; intentional torts; non-intentional torts; assault; battery; excessive force; unreasonable search and seizures; violations of substantive and procedural due process; false arrest and imprisonment; intentional infliction of emotional distress; negligent infliction of emotional distress; negligence; negligent supervision; invidious discrimination; non-invidious discrimination; vicarious liability; non-vicarious liability; discrimination against students with disabilities and students of color like C.B. with respect to law enforcement referrals that result in adverse disparate impact on students of color and students with disabilities; and all other legal theories that may apply. The foregoing list of legal claims is intended to be illustrative, not exhaustive.

Exhibit 1 - page 73

Student C.B.'s Claim for Damages
July 15, 2020
Page 20 of 22

As a direct and proximate result of Respondents' actions and omissions described above, C.B. has experienced extreme emotional and physical injuries and loss of his civil rights. C.B. claims damages for his physical and emotional injuries, punitive damages against the involved individuals, statutory damages as appropriate, and attorneys' fees and costs. C.B. has been and continues to be unlawfully excluded and denied meaningful access to the programs, services, and activities offered by Respondents as a result of the handcuffing incidents and Respondents' unlawful policies and practices regarding the management of student behavior, including the SRO and CSO programs. Further, as a result of these practices, policies and/or failure to train and supervise staff, students with disabilities and students of color are being systemically excluded from equal access to a public education and denied their right to full and equal access to, and use and enjoyment of, the facilities, programs, services and activities of Respondents as required by law.

Additionally, C.B. has been and continues to be excluded and deprived from having meaningful access to the programs, services and activities offered by Respondents based on Respondents' failure to modify their policies and procedures with respect to their law enforcement referrals and use of SROs and CSOs. As Respondents' discriminatory acts and omissions as herein alleged are ongoing, they constitute a continuing violation of C.B.'s rights, for which Respondents are liable.

Additionally, C.B. contends, based on the foregoing, that Respondents including the District, the SELPA, the Department, the County, the City, and their employees and agents, acting under color of law and within the course and scope of their employment, subjected him to various common-law and statutory torts, including but not limited to those described above, all of which subject the District, the SELPA, the Department, and the County and the involved employees to personal and vicarious liability.

## VII.   The Names of the Public Employees Causing the Injury, Damage, or Loss

As of the date of presentation of this claim, Claimant believes that the District, the SELPA, the County, the Department, the City and their respective current and former employees and agents of the same have caused injury, damage, and loss. These employees and agents include but

Exhibit 1 - page 74

Student C.B.'s Claim for Damages
July 15, 2020
Page 21 of 22

are not limited to: Superintendent Martinrex Kedziora, Director of Safety and Security Darryl Scott, Special Education Director Jason Ramirez, CSO Demetrius Owens, CSO King (first name unknown), former Landmark MS Principal Scott Walker, former Landmark MS Assistant Principal Kamilah O'Connor, former Landmark MS Assistant Principal Pedro Gutierrez, School Psychologist David Satre, Mr. Scarefone, former Landmark MS teacher Mr. Proprofsky, CSO Manuel Arellano, Josh (campus supervisor involved in October 8, 2019, incident, last name unknown), unknown female campus supervisor (involved in October 8, 2019, incident), Landmark MS Interim Administrator Penny Macon, CSO Kristopher Woodside, CSO Juan Ramirez, CSO Christopher Hill, Mountain View MS Principal Jon Black, Sheriff Chad Bianco, Deputy Norma Loza, and Deputy Toscano (SRO, first name unknown), as well as all unknown persons responsible for formulating the aforementioned illegal policies and practices, all unknown persons responsible for failing to modify said illegal policies and practices to prevent discrimination, and all unknown persons responsible for implementing the aforementioned illegal policies and practices.

Claimant further asserts that this is not an exhaustive list of the employees who have caused his injury, damage, and loss. There are likely other witnesses, although Claimant does not currently have those names. Claimant reserves the right to augment this list if and when he identifies other employees responsible for the injury, damage, and loss.

## VIII.  __The Amount Claimed__

C.B. claims damages for his physical and emotional injuries, punitive damages against the involved individuals, statutory damages as appropriate, and attorneys' fees and costs. The amount of damages claimed exceeds the jurisdiction for a limited civil case in state court.

Claimant also seeks non-monetary declaratory and injunctive relief regarding Respondents' school police officer programs.

Claimant supports the Moreno Valley community's call for the District School Board to cut ties with the Riverside Sheriff Department's SRO program. But should the Board not heed this call, Claimant maintains that declaratory and injunctive relief is necessary to prevent school police

Exhibit 1 - page 75

Student C.B.'s Claim for Damages
July 15, 2020
Page 22 of 22

officers from continuing their unlawful and systemic physical and
mechanical restraint practices.

## IX.   <u>Application for Late Claim</u>

To the extent the District considers any part of this claim to be late filed,
please consider this an application for late filing. The District must grant a
timely application for leave to file a late claim if either: (1) the Claimant
failed to present the claim as a result of "mistake, inadvertence, surprise or
excusable neglect," and the public entity was not prejudiced by the failure
to file the claim within the time allowed by California Government Code
Section 911.2; or (2) the Claimant was a minor throughout the time
allowed for filing such claims. *E.M. v. Los Angeles Unified Sch. Dist.*, 194
Cal.App.4th 736, 746 (2011).

Here, C.B. has been a minor throughout the entire time period. Thus, any
claims accrued are subject to the mandatory granting of leave for a late
claim. *See E.M.*, 194 Cal.App.4th at 746. Moreover, as an eleven-year-old
child, C.B. was unaware of the tort claim requirement during the earlier
period of the violations at issue.

## X.   <u>Conclusion</u>

Should you have any questions regarding this matter, please do not
hesitate to contact Robert Borrelle, Supervising Attorney at Disability
Rights California.

Sincerely,

**Disability Rights
California**
Robert Borrelle
Lindsay Appell
*Attorneys for
Claimant, C*█████
*B*██

**Barajas & Rivera APC**
Maronel Barajas
Anna Rivera
*Attorneys for Claimant,*
*C*████ *B*███

**Disability Rights
Education & Defense
Fund**
Claudia Center
Malhar Shah
*Attorneys for Claimant,*
*C*█████ *B*███

Exhibit 1 - page 76