1    ROBERT BORRELLE (SBN 295640)
2    Robert.Borrelle@disabilityrightsca.org
    LINDSAY APPELL (SBN 330296)
3    Lindsay.Appell@disabilityrightsca.org
    DISABILITY RIGHTS CALIFORNIA
4    350 South Bixel Street, Suite 290
5    Los Angeles, CA  90017
    Tel.: (213) 213-8000
6    Fax: (213) 213-8001

7

8    *Attorneys for Plaintiffs*
    (Additional Counsel Listed on Next Page)

9

10          UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12   C.B., by and through his *guardians ad litem* W.B. and B.T., | Case No. 5:21-CV-00194-JGB (SPx) |
| 13 | **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF** |
| 14         Plaintiff, | |
| 15   v. | 1)   Unreasonable Seizure and Excessive Force (42 U.S.C. § 1983) |
| 16   MORENO VALLEY UNIFIED SCHOOL DISTRICT; MARTINREX | |
| 17   KEDZIORA, in his official capacity as Moreno Valley Unified School District | 2)   *Monell* Claim (42 U.S.C. § 1983) 3)   Title II of the ADA (42 U.S.C. § 12132) |
| 18   Superintendent; DARRYL SCOTT; | |
| 19   SCOTT WALKER; DEMETRIUS OWENS; MANUEL ARELLANO; | 4)   Section 504 of the Rehabilitation Act (29 U.S.C. § 794) |
| 20   LONIESHA KING; COUNTY OF | 5)   California Gov't Code § 11135 |
| 21   RIVERSIDE; RIVERSIDE COUNTY SHERIFF'S DEPARTMENT; ; | 6)   Intentional Infliction of Emotional Distress |
| 22   DEPUTY SHERIFF NORMA LOZA; | 7)   False Imprisonment |
| 23   DEPUTY SHERIFF JERSSY TOSCANO; and DOES 3-10. | 8)   Battery 9)   Assault |
| 24 | 10) Negligent Supervision |
| 25         Defendants. | |
| 26 | **DEMAND FOR JURY TRIAL** |

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES
& INJUNCTIVE & DECLARATORY RELIEF

1

## <u>LIST OF ADDITIONAL ATTORNEYS</u>

2

MARONEL BARAJAS (SBN 242044)

3

MB@barajasriveralaw.com
ANNA RIVERA (SBN 239601)

4

AR@barajasriveralaw.com
BARAJAS & RIVERA, APC

5

1440 N. Harbor Blvd. Suite 900

6

Fullerton, CA 92835

7

Tel: (714) 443-0096
Fax: (714) 443-0096

8

9

CLAUDIA CENTER, SBN 158255
ccenter@dredf.org

10

MALHAR SHAH, SBN 318588

11

mshah@dredf.org
DISABILITY RIGHTS EDUCATION & DEFENSE FUND

12

3075 Adeline St #210

13

Berkeley, CA 94703
Tel.: (510) 644-2555

14

Fax: (510) 841-8645

15

DAN STORMER, SBN 101967

16

dstormer@hadsellstormer.com

17

SHALEEN SHANBHAG, SBN 301047
sshanbhag@hadsellstormer.com

18

DAVID CLAY WASHINGTON, SBN 305996

19

dwashington@hadsellstormer.com
HADSELL STORMER RENICK & DAI LLP

20

128 N. Fair Oaks Ave.

21

Pasadena, CA 91103
Tel.: (626) 585-9600

22

Fax: (626) 577-7079

23

*Attorneys for Plaintiff*

24

25

26

27

28

# INTRODUCTION

1.     Plaintiff C.B., a minor, by and through his *guardians ad litem* W.B.
and B.T. ("Plaintiff" or "C.B."), brings this action for injunctive relief and
damages against the Moreno Valley Unified School District ("District" or "Moreno
Valley USD"), District Superintendent Martinrex Kedziora, the County of
Riverside ("County"), the Riverside County Sheriff's Department ("Sheriff's
Department"), and various individuals for harms resulting from at least four violent
handcuffings and detentions at his middle school campuses. C.B. alleges that
Defendants' actions, inactions, policies, practices, customs and procedures violated
and continue to violate his rights under the U.S. Constitution, the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the
Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 *et seq.*, state civil rights laws,
and common law torts.

2.     C.B. further alleges that the District, Sheriff's Department, and
County partner to operate a discipline system that discriminates against students
with disabilities and Black students, including Black disabled students. The
District employs its own Campus Security Officers (CSOs) and contracts with the
Sheriff's Department to provide School Resource Officers (SROs) at District
schools. The District calls on CSOs and SROs (together, "school police officers")
to respond with physical force to minor and/or disability-related behaviors that
could be managed by teachers or administrators with less harmful methods, such as
crisis intervention, de-escalation, patience, communication, and waiting.

3.     C.B. is a Black student with disabilities residing within the boundary
of the District. School police officers tackled and handcuffed C.B. in response to
his disability-related behaviors at least four separate times over a less than four-
month span in 2019. At the time of the handcuffings, C.B. was between ten and
eleven years old, stood about four feet, eight inches, and weighed about seventy
pounds. In at least one incident the school police officers simultaneously shackled

1   his wrists and ankles.

2       4.    School police officer body camera footage captured part of the third

3   mechanical restraint, which occurred on October 8, 2019, and part of the fourth

4   mechanical restraint, which occurred on December 9, 2019.

5       5.    In the October 8 incident, the officers entered C.B.'s special education

6   classroom to investigate an allegation that he threw a rock the day before. C.B. sat

7   with his head down on his desk while the school police officers questioned him.

8   Within ninety seconds of their arrival, the officers physically pulled C.B. from his

9   desk by his arms and shoulders, pushed him with force to the ground, and

10  handcuffed him. One officer pinned his knee in C.B.'s back while another officer

11  placed him in handcuffs.

12      6.    In the December 9 incident, two officers entered C.B.'s special

13  education classroom to investigate an allegation that C.B. had gotten into a shoving

14  match with another student and had thrown classroom items. One of the officers

15  immediately restrained C.B. on the floor until a third officer arrived and

16  handcuffed him, and a fourth officer arrived to escort C.B. to a police cruiser. He

17  complained several times of pain from the handcuffs, but the officers did nothing

18  to address the pain, instead shoving his head into the side of the police cruiser, and

19  yanking him from behind by his handcuffs. Rather than release C.B. to his mother,

20  they took him to the police station and sent him off in an ambulance for a

21  psychiatric evaluation.

22      7.    As a result of Defendants' unnecessary and excessive physical and

23  mechanical restraints, C.B. has suffered and continues to suffer severe emotional

24  distress, mental anguish, pain, humiliation, and exacerbation of his disabilities. His

25  parents have secured therapy services to help him cope with the trauma caused by

26  these incidents.

27      8.    On information and belief, Defendants were and are on notice that

28  interactions with school police officers trigger and exacerbate C.B.'s disabilities

FIRST AMENDED COMPLAINT FOR DAMAGES          - 2 -
& INJUNCTIVE & DECLARATORY RELIEF

and cause emotional distress. Nevertheless, the District continues to request and direct school police officers to respond to C.B.'s minor and/or disability-related behaviors, unnecessarily escalating matters. By way of example, in a meeting with C.B.'s parents, Defendant District stated that it could not implement a policy at all times of exhausting less intrusive methods before calling officers. Further, school police officers responded and continue to respond with excessive physical force during each interaction with C.B.

9.    On information and belief, and as evidenced by the at least four handcuffings and detentions of C.B., the District fails to sufficiently train its teachers, administrators, and other non-school police officer staff on using alternatives to law enforcement to respond to minor and/or disability-related behaviors. The District's law enforcement referral data demonstrates its excessive and disproportionate reliance on school police officers. The District refers students to law enforcement at a significantly higher rate than comparable districts in the state. Moreover, while Black students make up about 14% of total District enrollment, they are nearly 30% of District referrals to law enforcement. The District's rate of referring Black students to law enforcement is more than 2.5 times its rate of referring non-Black students to law enforcement.

10.    The injuries suffered by C.B. at the hands of SROs were also the product of Defendant Sheriff's Department's and County's handcuffing policies and practices and failures to train and supervise its staff. The pattern of unlawful or excessive restraint and handcuffing in response to C.B.'s minor and/or disability-related behavior constitutes deliberate indifference to his constitutional rights.

11.    Defendants have practices, policies, and/or customs of willful failure to adequately report, document, investigate, and/or respond to, complaints of unnecessary mechanical and other physical restraints of students, which has caused C.B. to suffer constitutional injuries as a result, and has compounded the harms suffered by C.B. By way of example, Defendants have failed to provide any

1    meaningful information regarding what transpired in the four incidents, despite

2    C.B.'s parents' repeated requests. Defendants have abdicated their responsibility to

3    train, supervise, and discipline their employees by failing to adequately report,

4    document, investigate and/or respond to complaints of unlawful or excessive force.

5        12.    Plaintiff seeks monetary damages, including punitive damages, and

6    injunctive and declaratory relief for ongoing violations of his rights, including an

7    order that Defendants cease the involvement of school police officers in low-level

8    student misbehaviors and instead provide C.B. and similarly situated students with

9    reasonable modifications and positive supports and services.

10                          **JURISDICTION AND VENUE**

11        13.    This Court has jurisdiction over Plaintiff's federal claims pursuant to

12    28 U.S.C. §§ 1331 and 1343. The same actions and omissions that form the basis

13    of Plaintiff's federal claims, form the basis of his California state law claims. Thus,

14    this Court has supplemental jurisdiction over Plaintiff's state law claims under 28

15    U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. § 2201 and

16    Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by

17    28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

18        14.    Venue is proper in the Central District of California, Eastern Division,

19    because Plaintiff resides in, and Defendants operate and perform official duties in,

20    Riverside County. A substantial part of the events, acts, and omissions giving rise

21    to the claims also occurred in Riverside County. 28 U.S.C. § 1391(b).

22                                **PARTIES**

23    **A. Plaintiff**

24        15.    Plaintiff C.B. is a Black, twelve-year-old boy with disabilities in the

25    seventh grade. At the time of the events described herein, C.B. was between ten

26    and eleven years old, approximately seventy pounds, and in the sixth grade. He

27    appears by and through his parents and *guardians ad litem* W.B. and B.T.

28        16.    Presently, and at all times relevant to this action, C.B. was and is a

qualified individual with a disability within the meaning of all applicable statutes including the Americans with Disabilities Act, Section 504, and California Government Code § 12926. C.B. has diagnoses of Attention Deficit Hyperactivity Disorder (ADHD), Oppositional Defiant Disorder (ODD), Intermittent Explosive Disorder, and Other Specified Trauma and Stressor Related Disorder. C.B.'s diagnosis of Other Specified Trauma and Stressor Related Disorder is related to Defendants' violent and degrading treatment of him. C.B.'s symptoms of Intermittent Explosive Disorder are exacerbated by his interactions with Defendants. These disabilities make it difficult for him to regulate his emotions, maintain focus, communicate, and comply promptly with directions. C.B., at all times relevant to this action, received special education services.[1] C.B.'s parents suspect that he may have additional undiagnosed emotional and behavioral disabilities, some of which resulted from or were exacerbated by his interactions with law enforcement.

17.    Presently, and at all times relevant to this action, C.B. was and is a resident of Moreno Valley, Riverside County, California.

18.    Presently, and at all times relevant to this action, C.B. was a student at Landmark Middle School or Mountain View Middle School within the school district boundary of Moreno Valley USD.

**B. Defendants**

*Moreno Valley USD*

19.    Defendant Moreno Valley USD is a public school district organized and existing under the laws of the State of California, with the capacity to sue and be sued. The District is located in the County of Riverside. It receives federal and state funding to educate students. The District has a student population of 32,299,

---

[1] Through this complaint, C.B. does not challenge the adequacy of his Individualized Education Program (IEP) or allege Defendants violated the Individuals with Disabilities Education Act (IDEA). All references to his IEP, IEP team meetings, or special education classroom herein are for background purposes, e.g., to support his status as a qualified individual with disabilities, establish Defendants' knowledge of his disabilities, and provide evidence that Defendants discriminated against him by handcuffing him for disability-related behaviors.

1   making it the twenty-fifth most populous school district in California.[2]

2       20.     The District is a public entity for purposes of Title II of the ADA and

3   receives both state and federal assistance such that it is subject to Section 504 and

4   California Government Code § 11135. The District is a business establishment for

5   purposes of the Unruh Civil Rights Act, California Civil Code § 51 *et seq*.

6       21.     The District is the owner, operator, or lessor/lessee of Landmark and

7   Mountain View Middle Schools. It is responsible for promulgating policies and

8   procedures at those schools. The District is sued in its own right and on the basis of

9   the acts and/or omissions of its officials, agents and employees, including those

10  associated with its CSO Program. Under law, including California Government

11  Code § 815(a), the District is liable for the unlawful tortious acts hereinafter

12  complained of, including those violating state law and committed by any District

13  entity or employee acting within the course and scope of their employment.

14      22.     The District created and operates its CSO Program. The District

15  contracts with the County of Riverside and/or its Sheriff's Department to provide

16  SROs on its middle school and high school campuses.

17                     ***Superintendent Martinrex Kedziora***

18      23.     Defendant Martinrex Kedziora is the Superintendent of the Moreno

19  Valley USD. As Superintendent, Defendant Kedziora has authority, oversight, and

20  control of the District's schools and facilities, including the policies, practices,

21  procedures, programs, trainings, activities, services and employees of said schools.

22  Defendant Kedziora is responsible for the daily operations of the District,

23  including operation of the CSO program, and he is responsible for ensuring that

24  District schools and employees/staff comply with anti-discrimination laws, as well

25  as for ensuring compliance with state and federal laws.

26      24.     Defendant Martinrex Kedziora is sued in his official capacity for

27

28
_____
[2] California Department of Education, *Largest & Smallest Public School Districts* – CalEdFacts (Jul. 9, 2020),
https://www.cde.ca.gov/ds/sd/cb/ceflargesmalldist.asp.

prospective relief.

### *Darryl Scott*

25.    Defendant Darryl Scott is the District's Director of Safety and Security. Defendant Scott was or is employed by the District. As the District's Director of Safety and Security, Defendant Scott is responsible for the supervision of the CSO Program under the direction of Superintendent Kedziora.

26.    Defendant Scott directed and/or participated substantially in the events described herein against C.B., and/or knew of the acts of his subordinates and failed to act to prevent them as required by law. Defendant Scott is sued in his individual capacity for damages.

### *Scott Walker*

27.    Defendant Scott Walker is the former principal of Landmark Middle School. As principal, Defendant Walker had authority and control over Landmark Middle School's programs and facilities, including policies, practices, procedures, programs, activities, services, training, and employees of Landmark Middle School. As principal, he was responsible for ensuring that Landmark Middle School complies with state and federal law.

28.    Defendant Walker directed and/or participated substantially in the events described herein against C.B., and/or knew of the acts of his subordinates and failed to act to prevent them as required by law. He is sued in his individual capacity for damages.

### *Manuel Arellano*

29.    Defendant Manuel Arellano is or was a CSO employed by Moreno Valley USD and assigned to its schools. Defendant Arellano was responsible for and/or participated substantially in the events described herein against C.B. Defendant Arellano is sued in his individual capacity for damages.

### *Demetrius Owens*

30.    Defendant Demetrius Owens is or was a CSO employed by Moreno

---

FIRST AMENDED COMPLAINT FOR DAMAGES
& INJUNCTIVE & DECLARATORY RELIEF

- 7 -

Valley USD and assigned to its schools. Defendant Owens was responsible for
and/or participated substantially in the events described herein against C.B.
Defendant Owens is sued in his individual capacity for damages.

### Loniesha King

31.     Defendant Loniesha King is or was a CSO employed by Moreno
Valley USD and assigned to its schools. Defendant King was responsible for
and/or participated substantially in the events described herein against C.B.
Defendant King is sued in her individual capacity for damages.

### County of Riverside

32.     Defendant County is an incorporated municipality organized and
existing under the laws of the State of California and wholly located within the
State of California. The District contracts with the County and/or its Sheriff's
Department to operate an SRO program on its campuses.

33.     At all relevant times, Defendant County had the power and authority
to adopt policies and prescribe rules, regulations, and practices affecting the
operation of the Sheriff's Department, and particularly the Sheriff's Department's
SRO Program operating on the campuses of the Moreno Valley USD, and its
tactics, methods, practices, policies, training, and customs regarding the use of
force, personnel supervision, and meaningful records review and maintenance.

### Riverside County Sheriff's Department

34.     Defendant Sheriff's Department is an operating department of the
County. The District contracts with the County and/or the Sheriff's Department to
operate an SRO program on its campuses.

35.     On information and belief, SROs are employees of the Sheriff's
Department, unlike CSOs who are employees of the District. Under law including
California Government Code § 815(a), the Sheriff's Department is liable for any
and all unlawful tortious acts hereinafter complained of, including those in
violation of state law and committed by the Sheriff's Department entity and its

---

1  employees acting within the course and scope of their employment.

2  ### *Deputy Sheriff Norma Loza*

3      36.    Defendant Norma Loza is a Riverside County Deputy Sheriff. She is

4  or was an SRO assigned to Moreno Valley USD schools. Defendant Loza was

5  responsible for and/or participated substantially in the events described herein

6  against C.B. In doing the acts alleged herein, she acted within the scope of her

7  employment and under the color of state law. Defendant Loza is sued in her

8  individual capacity for damages.

9  ### *Deputy Sheriff Jerssy Toscano*

10      37.    Defendant Jerssy Toscano is a Riverside County Deputy Sheriff. He is

11  or was an SRO assigned to Moreno Valley USD schools. Defendant Toscano was

12  responsible for and/or participated substantially in the events described herein

13  against C.B. In doing the acts alleged herein, he acted within the scope of his

14  employment and under the color of state law. Defendant Toscano is sued in his

15  individual capacity for damages.

16  ### *DOES 3-10*

17      38.    Plaintiff is ignorant of the true names or capacities of those defendants

18  named DOES 3 through 10. He therefore sues said defendants by fictitious names.

19      39.    Plaintiff is informed and believes that these Defendants may also be

20  responsible for the acts and omissions claimed herein.

21      40.    Plaintiff is informed and believes that each of the Defendants is the

22  agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer,

23  employee, representative, franchiser, franchisee, lessor, lessee, joint venture,

24  parent, subsidiary, affiliate, related entity, partner and/or associate, or such similar

25  capacity of each of the other Defendants, and was at all times, acting and

26  performing, or failing to act or perform, within the course and scope of such

27  similar aforementioned capacities, and with the authorization, consent, permission

28  or ratification of each of the other Defendants, and is personally responsible in

some matter for the acts and omissions of the other Defendants in proximately causing the violations and damages complained of herein, and have participated, directed, and have ostensibly and/or directly approved or ratified each of the acts or omissions of each of the other Defendants, as herein described. Plaintiff will seek leave to amend when the true names, capacities, connections, and responsibilities of Defendants DOES 3 through 10, inclusive are ascertained.

41.    Hereinafter, references to "Defendants" shall include Paragraphs 19-40, inclusive, above.

**PLAINTIFF COMPLIED WITH GOVERNMENT CLAIM REQUIREMENT**
*(with respect to damages under California State law)*

42.    Plaintiff complied with the California Government Claims Act (also known as the Tort Claims Act), California Government Code § 900 *et seq*. On July 15, 2020, Plaintiff filed an administrative tort claim pursuant to California Government Code § 910 *et seq.* with Defendants Moreno Valley USD, County, Sheriff's Department, Superintendent Kedziora, Director Scott, Principal Walker, CSO Arellano, CSO Owens, CSO King, Deputy Loza, and Deputy Toscano, notifying Defendants of claims that are now set forth herein.[3] Plaintiff's claim stated that the claim was timely as to all events, but also included an application for leave to file a late claim, to the extent any such claims were required.

43.    On August 10, 2020, Defendant Moreno Valley USD rejected Plaintiff's claim by way of letter. Similarly, on August 6, 2020, Defendant County rejected Plaintiff's claim by way of letter. On November 13, 2020, Plaintiff sought clarification of these Defendants' purported rejection of Plaintiff's application to present a late claim. Defendant Moreno Valley USD did not respond to Plaintiff's request for clarification.

44.    On November 25, 2020, the County provided written letter directing

---

[3] A true and correct copy of Plaintiff's tort claim is incorporated by reference as Plaintiff's Exhibit 1, and will be filed separately under seal with this Court.

Plaintiff to file a late claim petition pursuant to California Government Code §
946.6. Petitioner filed that petition in Riverside County Superior Court on
February 2, 2021, naming the District, County, and Sheriff's Department.

45.    Defendant Sheriff's Department failed to reply to Plaintiff's claim
and, by operation of law, Plaintiff's claim was rejected on August 29, 2020. On
November 13, 2020, Plaintiff sought clarification of Defendant Sheriff's
Department's purported rejection of Plaintiff's application to present a late claim.
Defendant Sheriff's Department did not respond to Plaintiff's request for
clarification.

46.    Plaintiff has thus complied with the requirements of Government
Code Section 910, *et seq.*

## STATEMENT OF FACTS

### A. Racial and Disability Disparities in School Policing and Restraint
### *Increased Police Presence in America's Schools*

47.    In recent decades, school districts have drastically expanded school
police programs.[4] Instead of addressing student behaviors by providing positive
supports or through administrative discipline, school administrators now call the
police.[5] The addition of police officers in schools has not made schools safer and
instead has increased the criminalization of minor and/or disability-related
behaviors.[6]

48.    As school districts have expanded school police programs, they have
failed to fund behavioral and mental health supports. For instance, around fourteen

---

[4] In 1975, just 1% of schools placed police officers on campus, as compared to nearly half of schools today. This
expansion was primarily driven by readily available federal funding for SRO programs, rather than an actual
need for increased police presence. *See, e.g.*, Amir Whitaker, et al., AMERICAN CIVIL LIBERTIES UNION, COPS
AND NO COUNSELORS: HOW THE LACK OF MENTAL HEALTH STAFF IS HARMING STUDENTS (2019),
https://www.aclu.org/sites/default/files/field_document/030419-acluschooldisciplinereport.pdf.
[5] *Id.*
[6] *Id.*; *see also* Emily K. Weisburst, *Patrolling Public Schools: The Impact of Funding for School Police on
Student Discipline and Long-Term Education Outcomes*, 38 J. OF POLICY ANALYSIS & MANAGEMENT 338
(2019) (finding that federal grants placing police on school campuses increased sanctions for low-level offenses,
particularly for Black students, and decreased high school graduation rates).

1  million students in the United States attend schools patrolled by police but entirely

2  lacking in counselors, nurses, psychologists, or social workers.[7]

3      49.    Increased police presence in schools has had a disproportionate

4  impact on students with disabilities and Black students. According to the U.S.

5  Department of Education's 2015-16 Civil Rights Data Collection Survey,[8] students

6  with disabilities represent just 12% of the student population nationally but 28% of

7  all students referred to law enforcement[9] or arrested at school. Black students make

8  up 15% of student enrollment nationally but 31% of students referred to law

9  enforcement or arrested at school.

10      50.    These disparities are also present in the national data on mechanical

11  restraints,[10] the category capturing handcuffings. According to the 2017-18 Civil

12  Rights Data Collection survey,[11] students with disabilities again make up about

13  12% of the student population nationally but 41% of all students subjected to

14  mechanical restraints. Black students represent 18% of all students with disabilities

15  nationally, but 34% of those put in mechanical restraints.

16      51.    Police presence and contact have grave, lifelong consequences for

17  students. Multiple studies demonstrate that police contact causes and exacerbates

18  mental health disabilities, especially trauma and anxiety.[12] Youth are particularly

19  vulnerable to heightened emotional distress when they experience intrusive police

---

[7] Whitaker, *supra* note 4.

[8] U.S. Dept. of Educ., *2015-16 Civil Rights Data Collection: School Climate and Safety* (May 2019), https://www2.ed.gov/about/offices/list/ocr/docs/school-climate-and-safety.pdf.

[9] The Civil Rights Data Collection defines law enforcement referral as "[A]ction[s] by which a student is reported to any law enforcement agency or official, including a school police unit, for an incident that occurs on school grounds, during school-related events, or while taking school transportation, regardless of whether official action is taken." *See id.* at p. 3.

[10] The Civil Rights Data Collection uses the same definition of "mechanical restraint" as California state law: "The use of a device or equipment to restrict a pupil's freedom of movement." Cal. Educ. Code § 49005.1(d)(1).

[11] U.S. Dept. of Educ., *2017-18 Civil Rights Data Collection: The Use of Restraint and Seclusion on Children with Disabilities in K-12 Schools* (Oct. 2020), https://www2.ed.gov/about/offices/list/ocr/docs/restraint-and-seclusion.pdf.

[12] *See, e.g.*, Amanda Geller *et al.*, *Aggressive Policing and the Mental Health of Young Urban Men*, 104 AM. J. PUBLIC HEALTH 2321 (2014) (studying young men's experiences of police encounters and finding that men who reported more police contact also reported more trauma and anxiety symptoms, indicating a need for less invasive tactics); Dylan B. Jackson *et al.*, *Police Stops Among At-Risk Youth: Repercussions for Mental Health*, 65 J. ADOLESCENT HEALTH 627 (2019) (finding that youth who were stopped more often by police officers were more likely to report emotional trauma).

stops.[13] Districts that are overpoliced and under-resourced thus subject their students to traumatic police contact, while simultaneously leaving them without mental health resources to process these events.

52.    Police contact causes even greater harm when accompanied by physical force. The U.S. Government Accountability Office ("GAO") has explained that even if no physical injury is sustained, children who are restrained can be severely traumatized as a result.[14] Students are too anxious, frightened, or angry to focus on and fully participate in classroom activities. When an individual is exposed to trauma, especially in the form of repeated traumatic stress of an extreme traumatic event, the brain becomes over-sensitized to any potential stimulus that might cue a threat. The individual thus perceives ordinary encounters as threatening ones, triggering a "fight or flight" or dissociative response.[15]

53.    Dissociative responses impair a student's attention, organization, comprehension, memory, and trust, all necessary for the acquisition of academic skills. Thus, childhood trauma is linked to poor academic outcomes, including failure to reach proficiency in core subjects and/or to graduate from high school. Exposure to trauma causes challenges with emotional self-regulation – including aggression, disproportionate reactivity, impulsivity, distractibility, or withdrawal and avoidance – that disrupt the learning environment and frequently lead to exclusionary school discipline measures or absence from school. Thus, police presence, contact, and use of force are not only traumatizing, but also counter-productive to creating a safe school environment that is conducive to learning.

### California's Movement Away from School Policing

54.    School districts and other programs for children and youth throughout

---

[13] Jackson *et al.*, *supra* note 12.

[14] *See* U.S. Gov't Accountability Office, GAO-09-719T, Testimony before the Committee on Education and Labor, House of Representatives: Seclusions and Restraints, Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers p.1, 8 (May 19, 2009), https://www.gao.gov/products/GAO-09-719T.

[15] Perry et al., *Childhood Trauma, The Neurobiology of Adaptation, and "Use-dependent" Development of the Brain: How "States" Become "Traits"* 16 INFANT MENT. HEALTH J. 271, 277-79 (1995) http://media.wix.com/ugd/29cec4_4951bdf3fb444a62b01f2da71e4a4cae.pdf.

California have begun to incorporate behavioral supports, trauma-informed approaches, Restorative Justice practices, access to mental health services, and other positive strategies to focus on addressing the root causes of student behaviors and minimizing involvement with the juvenile justice system.

55.    Schools in California are reviewing and addressing racial and disability disparities in discipline to ensure students of color and students with disabilities, including disabled students of color, like C.B., are not disproportionately subject to police referrals and restraints as compared with their similarly situated peers. For these reasons, several large school districts, including Oakland Unified School District and Sacramento City Unified School District, have abolished their SRO programs completely.[16]

56.    Moreno Valley USD is not one of these districts. Following the murder of George Floyd, a coalition of Riverside County community groups organized to abolish the District's SRO program. On July 23, 2020, the District's Board conducted a "Study Session" to gather community input regarding the SRO program. During this Session, the Board received almost fifty public comments, with nearly all speakers urging the Board to abolish the SRO program and reinvest its $1.3 million-dollar budget in mental health supports, Restorative Justice, culturally relevant curricula, and other non-police programming. Many speakers specifically cited the officers' abuse of C.B. as reason to make these changes. The Board, however, did not abolish the SRO program.

**B. Moreno Valley USD's Campus Security Officer Program**

57.    On information and belief, the District established its CSO Program pursuant to the School Security Department provisions in California Education Code § 38000 *et seq*. Defendant Scott supervises the CSO Program as Director of Safety and Security under the direction of Defendant Kedziora. *See* Cal. Educ.

---

[16] Nicole Karlis, *Oakland is at the Forefront of a National Movement to Abolish Police from K-12 Schools*, SALON (June 30, 2020, 11:52 PM), https://www.salon.com/2020/06/30/oakland-is-at-the-forefront-of-a-national-movement-to-ban-police-from-k-12-schools/.

Code § 38000(a).

58.     On information and belief, CSOs are employees of the District.

59.     According to the District's position description,[17] a CSO, under the general direction of the Director of Safety and Security, "supervises, monitors, and controls" school campuses and "enforces the rules and regulations governing student behavior." Expected duties include "physically restrain[ing] persons involved in crimes, rights, or other acts of violence." The position also requires CSOs to receive ongoing trainings on the use of pepper spray and tasers, suggesting that the District considers use of force to be essential to the CSOs' role.

60.     The CSOs wear police-style uniforms and are issued metal handcuffs. On information and belief, CSOs also carry pepper spray and tasers.

61.     On information and belief, the District's CSO Program has no written policies and/or procedures. CSOs instead take verbal orders from Director Scott.

62.     State law governs the use of restraint, including mechanical restraint, in schools. Cal. Educ. Code § 49005 *et seq.* Staff may only use restraint in an emergency and not for the purpose of coercion, discipline, convenience, or retaliation. Cal. Educ. Code § 49005.2. They may not place a pupil in a facedown position with the pupil's hands held or restrained behind the pupil's back. Cal. Educ. Code § 49005.8(a)(5).

63.     District policy implementing these state laws prohibits its staff, including CSOs, from using restraints that employ a device, material, or objects that simultaneously immobilize all four extremities.[18] The same District policy only allows its staff, including CSOs, to use restraint if they have received a certification in Crisis Prevention Intervention (CPI).

///

---

[17] Moreno Valley USD Human Resources Division, *Position Title: Campus Security Officer I* (Oct. 17, 2017), https://4.files.edl.io/af25/09/04/18/173822-651104c9-971a-47b6-ba39-362fd1900e5b.pdf.

[18] Moreno Valley USD, *MVUSD SELPA Handbook* at p. 6-4 (Aug. 26, 2020), https://4.files.edl.io/460c/08/26/20/224843-47f1cf94-84cd-47e4-8a31-5c07ab6ef4b2.pdf.

## C. The District's School Resource Officer Program

### *Relationship Between the District and Sheriff's Department*

64.     The District maintains an SRO program through a "Law Enforcement Services Agreement" with the Sheriff's Department and/or County. The agreement, effective July 1, 2018, to June 30, 2021, specifies that the Sheriff's Department will provide nine SROs to the District, three of whom serve the middle school campuses and six of whom serve the high school campuses. The total cost of the three-year contract is $4.3 million, which includes the full cost of the SROs' salaries. On information and belief, the District funds the Agreement almost entirely through Local Control Funding Formula Supplemental and Concentration Funds.

65.     On information and belief, the SROs are employees of the Sheriff's Department and/or County of Riverside.

66.     According to the contract, the SROs are sworn law enforcement officers whose duties include patrolling and investigating crimes on Moreno Valley USD campuses, facilitating conversations between students and their parents, and serving as a liaison at elementary school sites.

### *Department Policies Governing Body Camera Footage*

67.     Under a 2016 directive, the Sheriff's Department requires its officers to create body camera recordings of "any law enforcement action where there is reason to believe it would be appropriate and valuable to record the event." This includes citizen contacts and detentions.

68.     If an officer fails to initiate the recording of an event when required, the officer must document the reasons for the failure in a subsequent report or memorandum. Further, officers may not terminate the body camera recording until the conclusion of the encounter, "unless tactical or practical reasons dictate otherwise." Even then, the officer must reinitiate the recording as soon as possible and document the reasons for early termination in a report.

### *Sheriff's Department Policies on Restraint and Handcuffing*

69.    The Sheriff's Department Standards Manual ("Manual") sets out the standards for when officers may handcuff youth. Policy 306.2.3 directs officers not to handcuff youth under age fourteen "unless he/she is suspected of a dangerous felony or when the deputy has a reasonable suspicion that the juvenile may resist, attempt escape, injure him/herself, injure the deputy, or damage property."

70.    Policy 324.9 further specifies that officers may not handcuff status offenders or children age eleven or younger unless they are "combative or threatening." The Policy does not guide officers as to how to decide whether a child meets the standard of being "combative or threatening." This standard is susceptible to implicit and explicit racial biases, since officers are more likely to view ambiguous or disability-related behavior as "combative and threatening" when shown by Black students rather than white students.[19]

71.    The Manual does not require, or even encourage, officers to use crisis communication or other non-violent alternatives to restraint, particularly for students with disabilities.

### D. Facts Regarding Plaintiff C.B.

72.    C.B. is a student of Defendant Moreno Valley USD and is in the seventh grade at Mountain View Middle School. C.B. has been on a remote learning model for school since on or about March 16, 2020, due to the Covid-19 shutdown. At the time of the incidents described herein, C.B. was between ten and eleven years old and enrolled in the sixth grade.

73.    C.B. is an engaging and bright twelve-year-old boy who loves playing basketball, fishing competitively and with his father, playing video games, and spending time with his family. C.B. is intelligent and enjoys learning, showing

---

[19] *See* Kurt Hugenberg & Galen V. Bodenhausen, *Facing Prejudice: Implicit Prejudice and the Perception of Racial Threat*, 14 PSYCHOL. SCIENCE 640, 643 (Nov. 2003), https://www.frontiersin.org/articles/10.3389/fpsyg.2017.00519/full; Anthony Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L. REV. 155, 222-24 & n.337 (2005) (citing studies that show "people will assign different significance to identical actions depending on the actors' race.").

particular aptitude in mathematics. He and his parents hope that he will one day attend college and pursue a career about which he is passionate.

74.    C.B. has diagnoses of Attention Deficit Hyperactivity Disorder (ADHD), Oppositional Defiant Disorder (ODD), Intermittent Explosive Disorder, and Other Specified Trauma and Stressor Related Disorder. C.B.'s diagnosis of Other Specified Trauma and Stressor Related Disorder is related to Defendants' violent and degrading treatment of him. C.B.'s symptoms of Intermittent Explosive Disorder are exacerbated by his interactions with Defendants. These disabilities make it difficult for him to regulate his emotions, maintain focus, communicate, and comply promptly with directions. C.B.'s parents suspect that he may have additional undiagnosed emotional and behavioral disabilities, some of which resulted from or were exacerbated by his interactions with law enforcement.

75.    C.B. enrolled in the District in May 2019 after attending other school districts in Los Angeles and Riverside Counties. Staff never handcuffed C.B. in his prior school districts. Since C.B. enrolled in the District, CSOs and SROs handcuffed him at least four times in less than four months, as detailed below.

***Mechanical Restraint No. 1: On or about August 21, 2019, school police officers handcuffed C.B. for conduct resulting from his disabilities.***

76.    C.B. had been a student at Landmark Middle School ("Landmark") for less than one month, when on or about August 21, 2019, school police officers handcuffed him.

77.    That day, then-Landmark Assistant Principal Pedro Gutierrez called C.B.'s mother, B.T., to tell her to pick him up from school early because he was "acting up." On information and belief, C.B. was exhibiting behaviors caused by his disability.

78.    When C.B.'s mother arrived at Landmark, Mr. Gutierrez told her that school police officers had handcuffed C.B. The officers had removed the handcuffs before she arrived. Mr. Gutierrez told C.B.'s mother that he instructed officers to

remove the handcuffs because he believed that handcuffing C.B. was "totally unacceptable," or words to that effect. Other than this statement, Mr. Gutierrez did not provide C.B.'s mother with any further information regarding the handcuffing.

79.    Contrary to District policy, the District did not document the mechanical restraint in an Incident Report. As a result, Plaintiff cannot state the names of the school police officers who handcuffed him. He believes this information is solely in the hands of Defendants.

80.    On information and belief, the District did not document the incident or adequately investigate, train, supervise, or discipline the staff involved.

***Mechanical Restraint No. 2: On August 26, 2019, school police officers shackled C.B.'s hands and ankles for conduct resulting from his disabilities.***

81.    Five days later, on August 26, 2019, District CSOs handcuffed and leg-cuffed C.B. at Landmark.

82.    That day, Mr. Gutierrez directed CSO Demetrius Owens to bring C.B. to the office for a meeting. CSO Owens' witness statement does not describe a reason for this meeting. According to a behavior log drafted by C.B.'s teacher, Mr. Proprofsky, C.B. had disrupted class earlier in the day by cursing and ripping paper. Plaintiff suspects that the meeting with Mr. Gutierrez was related to his alleged disruptive behavior in class – which took place approximately three hours before Mr. Gutierrez summoned him to his office. Again, these behaviors were caused by his disabilities.

83.    CSO Owens, CSO King, and then-Landmark Assistant Principal Kamilah O'Connor found C.B. on the playground. All three directed C.B. to leave the playground and go to the office. C.B. verbally refused and started to exhibit conduct related to his disabilities, including an inability to self-regulate or express himself. He allegedly clenched his fists and began breathing heavily. CSO King and CSO Owens responded by dragging C.B. by his arms to a seclusion room.

84.    Then-Landmark Principal Scott Walker joined CSOs Owens and King

in the seclusion room. Surrounded by three much larger adults in the seclusion room, C.B. began experiencing and externalizing emotions of fear, anxiety, and frustration. He began pulling away, pushing, and swinging with his arms in an attempt to free himself from the room. C.B. was not acting out physically before the CSOs physically dragged him to the seclusion room.

85.    Principal Walker directed CSO King and CSO Owens to handcuff C.B. At the time, C.B. was four feet, eight inches tall and approximately seventy pounds. The CSOs placed C.B. in a physical hold, tackled him to the floor, and forced him into District-issued metal cuffs. The CSOs pulled C.B. up from the ground and attempted to sit him in a chair. Now handcuffed in a seclusion room and surrounded by three adults, C.B. became even more upset and distressed. Unable to regulate his emotions due to his disabilities, he began flailing his legs.

86.    Principal Walker then directed CSO King and CSO Owens to place separate handcuffs on C.B.'s ankles. The CSOs then immediately and simultaneously shackled C.B.'s hands and ankles with metal cuffs. C.B. remained shackled in this manner for an unknown period of time.

87.    The District suspended C.B. from school that day and his aunt came to pick him up. She was concerned and confused to find C.B. sitting in the fetal position against the wall of the seclusion room. His aunt observed that C.B.'s arms were hugging his knees and his head was down. C.B. was not wearing a shirt, which had come off during the CSOs' interaction with him. A desk was blocking the door to the seclusion room. C.B. and his aunt helped school staff clean up the seclusion room, and then she took him home.

88.    No District staff told C.B.'s aunt that CSOs had physically tackled C.B. and then handcuffed and leg-cuffed him. District staff never told C.B.'s parents of the incident either.

89.    Defendants' actions, *inter alia*, violated District policies prohibiting staff from using mechanical restraints that simultaneously immobilize all four

extremities.

90.    The District also failed to provide an Incident Report to C.B.'s parents. In November 2019, counsel made a request to the District for a full and complete copy of C.B.'s educational records. Only after counsel received the records did C.B.'s parents learn that the CSOs shackled C.B.'s hands and ankles. The District provided C.B. with CSO King's and CSO Owens' witness statements, which were missing at least two pages. Further, the District did not provide a witness statement from Principal Walker. As of the date of this filing, the District has not provided the missing statements and pages.

91.    On information and belief, the District did not document the incident or adequately investigate, train, supervise, or discipline the staff involved.

***Mechanical Restraint No. 3: On October 8, 2019, school police officers tackled and handcuffed C.B. while pressing a knee into his back***

92.    On October 7, 2019, C.B. allegedly threw a rock in the general direction of CSO Manuel Arellano. No one from the District informed C.B.'s parents about this incident on the day that it allegedly occurred. According to a police report dated October 8, 2019, sometime after school hours on October 7, 2019, an unidentified District staff member requested that Deputy Norma Loza intervene and "investigate" the alleged rock throwing incident.[20]

93.    On October 8, Deputy Loza and CSO Arellano arrived at C.B.'s special education classroom to investigate the alleged rock-throwing from the day before. At no time prior to involving the CSOs and SROs did anyone with the District attempt to arrange a meeting with C.B. with his parents present.

94.    Unlike the other incidents where school police officers handcuffed C.B., Deputy Loza's body camera partially captured the October 8, 2019,

---

[20] On information and belief, the unidentified District staff member is CSO Arellano. The police report states an individual (name redacted) contacted Deputy Loza on October 7, 2019, and alleged that C.B. threw a rock in his direction earlier that day. Separately, on October 7, 2019, CSO Arellano added a behavior log entry in C.B.'s pupil file alleging he threw the rock. No one created a log entry documenting the restraints on October 8, 2019.

incident.[21] At C.B.'s counsel's request, the Sheriff's Department produced a video that is approximately eight minutes long. On information and belief, Deputy Loza shut off her body camera before the incident concluded, violating Sheriff's Department policy and leaving the remaining hour of the incident unfilmed.

95.     Based on the review of the available Department footage, immediately upon entering C.B.'s classroom, Deputy Loza directed the teacher (name unknown) to remove the other students from the classroom. This left C.B. alone with Deputy Loza and CSO Arellano. C.B. sat motionless at his desk with his head down.

96.     Deputy Loza stood over C.B. and said, "You're going to go to the office, no matter what. Either you go, cooperating, or I'm going to take you to the office." Neither Deputy Loza nor CSO Arellano explained why they were asking him to go to the office. C.B. kept his head down and quietly said he was not going. For thirty seconds, Deputy Loza repeated different variations of "do you understand you are going to the office?" but never explained why. C.B. remained completely still, repeating that he was not going at a barely audible volume.



***Body Camera Image: C.B. sits with his head down while Deputy Loza demands
he go to the office***

---

[21] A true and correct copy of the October 8, 2019, body camera footage is incorporated by reference as Plaintiff's Exhibit 2. Plaintiff will fill Exhibit 2 separately under seal with this Court.

97.    After less than ninety seconds, Deputy Loza grabbed the back of C.B.'s sweatshirt and physically pulled him out of his seat. She then passed C.B. to CSO Arellano. While CSO Arellano twisted the four foot, eight inch boy's wrists behind his back to try and force handcuffs on him, Deputy Loza repeated, "You are going to the office." Again, consistent with his disabilities and behavior that they had seen him exhibit before, C.B. swore and stated that he was not going. The officers then tackled C.B., pinned him to the ground, and pressed him face down into the floor. He screamed out in pain: "Ow! My knee!" CSO Arellano then dug his own knee into C.B.'s back, and Deputy Loza placed him in handcuffs. Neither officer spoke to C.B. about his legal rights.



**Body Camera Image: CSO Arellano puts his knee into C.B.'s back while Deputy Loza places C.B. in handcuffs**

98.    The Sheriff's Department footage also shows that while the two officers pinned C.B. on the ground, Deputy Loza threatened him by stating that if he moved then the handcuffs were "going to get tight on [him]." While C.B.'s hands are out of frame, a distinct clicking can be heard on video for about thirty seconds, as Deputy Loza presumably followed through with her threat and tightened C.B.'s handcuffs. C.B. wiggled on his stomach briefly and swore,

behavior consistent with his disabilities and of being physically and mechanically restrained and having handcuffs tightened. He then laid still on the ground, facedown and handcuffed. Deputy Loza radioed an unknown person and stated: "I have one juvenile detained. He's being uncooperative."

99.    The Sheriff's Department footage then shows Deputy Loza and CSO Arellano pulling C.B. to his feet and pushing him towards the classroom door, while C.B. squirmed and cried out to be let go. The officers again physically forced C.B. face down onto the floor. Another CSO then arrived (the "second CSO").[22] The second CSO told C.B. that he should "relax." At one point while CSO Arellano held C.B. facedown, Deputy Loza stood over him and accused him of kicking. The video does not show C.B. kicking anyone in frame.

100.    The officers surrounded C.B. and held him face-down on the floor for almost two minutes. The video shows Deputy Loza, CSO Arellano, and the second



**Body Camera Image: Unknown CSO twists C.B.'s leg and pushes it into the ground. CSO Arellano and Deputy Loza are to the left holding C.B. down.**

---

[22] On information and belief, the second CSO was Demetrius Owens. CSO Arellano is heard on video using his radio to ask someone he refers to as "Owens" to come assist in the classroom. About thirty seconds later, the video shows the second CSO entering the classroom. Owens was a CSO assigned to Landmark at the time of the incident. He also handcuffed C.B. on August 26, 2019, along with CSO King.

CSO pull him up to a seated position on the floor. Still handcuffed, C.B. cried out as CSO Arellano pressed down on his shoulders. The second CSO also held C.B. down. The video shows this person twisting C.B.'s leg and using both arms and his body weight to press C.B.'s calf into the ground.

101.    C.B. was visibly in pain and cried, "Let me go! Let me go!" While immobilizing C.B.'s hands, shoulders, and leg, the two male CSOs repeated: "If you calm down, we calm down. You calm down, we calm down." C.B. – a child with known behavioral and emotional disabilities – was  unable to "calm down" while handcuffed and restrained by three officers.

102.    The Sheriff's Department footage then shows two unidentified district staff arriving, but neither took any steps to intervene. One radioed for Principal Walker to come to the classroom, but could not reach him. CSO Arellano directed her to leave the room and find Mr. Walker. All the while, C.B. remained handcuffed, immobilized on the floor. Deputy Loza stood over him, and threatened to take him to the police station if he did not calm down.

103.    After two more minutes, the video shows the second CSO releasing C.B.'s leg from his hold. The three officers then pulled C.B. into a standing position, and C.B. cried out in apparent pain. Deputy Loza said that a fourth officer, her partner, would be arriving to help them escort C.B. off campus to an awaiting police car. At that point, the body camera footage abruptly ends.

104.    Deputy Loza and her partner, Deputy Jerssy Toscano, later placed C.B. in the back of a police car. By that time, given the events that had just occurred and were continuing to occur, C.B. was experiencing worsening trauma. While locked in the back seat, C.B. reportedly stated: "I wish I was dead." At times the deputies left C.B. alone in the locked car.

105.    While locked and handcuffed in the police car, C.B. managed to use his cell phone to call his mother. C.B.'s mother recalls that he repeatedly screamed, "Tell them to let me go!" before the phone hung up. C.B.'s mother was afraid and

confused; no one from the school had contacted her about these events. When

C.B.'s mother called her son back, Deputy Loza answered the phone. C.B.'s

mother told Deputy Loza that she was on her way to pick C.B. up from school.

Deputy Loza responded that it was too late; the ambulance was coming to pick him

up. However, C.B. remained in the back of the police car for nearly an hour before

an ambulance arrived. During this time, other students passing by saw C.B.

handcuffed in the back of the police car.

106.   At approximately 12:55 pm, the ambulance took C.B. from Landmark

to Riverside's Emergency Treatment Service facility for a 5585 evaluation.[23] At the

time of hospitalization, the treating psychiatrist, Dr. Alexander Tsang, and treating

therapist, Shirlee Lyons, noted that C.B. presented as "selectively mute." His

distress began to decrease once his mother arrived, and they discharged him that

day at around 4:00 pm. C.B. spent over half a day handcuffed, held in a police car,

transported by ambulance, and psychiatrically hospitalized.

107.   Days after this incident, Landmark staff handed B.T. a notice of

suspension, which mentioned the alleged rock throwing incident from October 7,

but not the October 8 use of physical and mechanical restraints.

108.   C.B.'s mother asked staff to provide her with more information about

the school police officers restraining, handcuffing, and holding her son in a police

car. Staff told C.B.'s mother that they had no information about the incident. Based

on information and belief, the District failed to properly document and/or report

this incident. Contrary to its own documentation and reporting procedures, the

District has failed to provide C.B.'s parents with any documentation related to the

October 8, 2019, restraint, handcuffing, detention, or hospitalization. To date, the

District has failed to produce any written Incident Reports from its staff related to

this handcuffing, even after multiple requests by counsel. Plaintiff presumes based

---

[23] Under California Welfare & Institutions Code Section 5585, officers may temporarily place a minor in a
psychiatric facility where probable cause supports that "as a result of mental disorder" the minor is: (1) a danger
to themselves or others or "gravely disabled"; and (2) "voluntary treatment is not available."

on this reasonable investigation that none exist.

109.   The Sheriff's Department similarly failed to comply with its own documentation procedures. On information and belief, Deputy Loza turned off her body camera before the incident ended, against Sheriff's Department policy. Also against Sheriff's Department policy, Deputy Loza did not document her reasons for turning off her camera in a report or memorandum. In addition, despite requests from counsel, the Sheriff's Department has not produced all body camera footage from Deputy Loza for this incident. Also, on information and belief, Deputy Toscano did not create a police report for this incident and/or the Sheriff's Department did not produce these records.

110.   The SROs violated their own Policies 306.2.3 and 324.9 when they handcuffed C.B., who was eleven years old at the time and not combative, threatening, or suspected of committing any crimes.

111.   Again, on information and belief, Defendants Moreno Valley USD and Sheriff's Department did not document the incident or adequately investigate, train, supervise, or discipline the staff involved.

***Mechanical Restraint No. 4: On December 9, 2019, school police officers handcuffed C.B. while he was already physically restrained for exhibiting disability-related behaviors.***

112.   After their son was restrained, handcuffed, locked in a police car, and sent for an involuntary psychiatric hold while at Landmark, C.B. and his parents were afraid for his safety and no longer wanted him to return to the same school.

113.    After the October 8, 2019, incident, C.B.'s parents made the difficult decision to keep C.B. at home rather than subject him to further discrimination, harm and repeated constitutional injuries. He remained at home without any schooling for approximately five weeks. Desperate for another option, C.B.'s parents obtained an intra-district transfer permit so that C.B. could attend Mountain View Middle School ("Mountain View"). The move forced C.B. to,

among other things, leave his friends and social networks behind.

114.    On December 9, 2019, shortly after starting at Mountain View, Deputy Loza again handcuffed C.B. after he had a disagreement with a classmate. C.B. allegedly pulled a classmate's chair out from under him. The classmate then shoved C.B. The two children pushed each other a few times, and the teacher intervened to break it up. Unable to regulate his emotions effectively, C.B. pushed his teacher and began to throw classroom items.

115.    The teacher cleared the classroom and called for CSOs and SROs to respond. CSO Juan Ramirez and CSO Kristopher Woodside arrived first and, almost immediately, physically restrained C.B., who was displaying disability-related behaviors. CSO Woodside restrained C.B. on the ground.

116.    Deputy Loza arrived next about fifteen minutes later. Contrary to Sheriff's Department protocols, Deputy Loza did not turn on her body camera and later failed to report why she did not turn it on, despite Department procedures mandating otherwise. When Deputy Loza arrived, CSOs Ramirez and Woodside were still physically restraining C.B. Without attempting to deescalate the situation or address C.B.'s disability-related behaviors, Deputy Loza handcuffed C.B. behind his back.

117.    After Deputy Loza handcuffed C.B., Deputy Toscano arrived with his body camera activated. The footage shows[24] Deputies Loza and Toscano each grabbing one of CB.'s arms and walking him across the campus in front of students and staff as he repeatedly asked the deputies to take the handcuffs off, continuously yelled in pain, and shouted at least twice, "It hurts!" Upon reaching Deputy Loza's police cruiser, Deputy Toscano walked C.B. to the left rear door and ordered C.B. to "Get inside. Sit down." Deputy Toscano smashed C.B.'s head against the left rear door frame as he shoved C.B.'s back, causing C.B. to fall

---

[24] A true and Correct copy of the December 9, 2019, body camera footage is incorporated by reference as Plaintiff's Exhibit 3. Plaintiff will file Exhibit 3 separately under seal with this Court.

inside the vehicle. Deputy Toscano aggressively shoved C.B. farther inside the vehicle. When C.B. stuck his leg out of the open left rear door, Deputy Toscano told Deputy Loza, who was standing outside the right rear door, to "snatch him." Deputy Loza reached in from the right rear door and ripped C.B. backwards by his handcuffs as C.B. screamed in pain. Deputy Toscano slammed the left rear door and turned off his body camera, and Deputy Loza proceeded to transport him to the Moreno Valley Police Station.

118.   While the police held C.B. at the station, Deputy Loza decided to refer C.B. to the Emergency Treatment Services Center (ETS) for a 5585 evaluation and requested an ambulance transport. Before the ambulance got to the police station to transport C.B., his mother arrived and asked to take her son home. But Deputy Loza refused. Instead, C.B's mother watched the officers escort her son outside the back of the police station building and into the ambulance.

119.   The ambulance transported C.B. to the ETS Center. According to the official police report, an unidentified person restrained C.B. to the gurney during the ride. Hours later, C.B. finally reunited with his mother and received his discharge. This traumatic episode, which involved handcuffing, detention in a police station, physical restraint on an ambulance gurney, and a psychiatric hospitalization referral, lasted, in total, around three hours.

120.   The District later initiated expulsion proceedings against C.B. based on the initial incident with his classmate at school. On December 20, 2019, the Individualized Education Program ("IEP") team met for a Manifestation Determination Review, a procedure required under federal law before expelling a student with a disability. The IEP team determined that C.B.'s behaviors – the same behaviors he had exhibited many times before and in each of the prior handcuffing incidents – were in fact caused by his disabilities, including ADHD and ODD. The IEP team's determination nullified the pending expulsion charges.

121.   On information and belief, Defendants Moreno Valley USD and

Sheriff's Department did not document the incident or adequately investigate, train, supervise or discipline the staff involved.

122.   As a result of these four handcuffings and detentions, C.B. is now so terrified of police that when he hears they are coming to a location, even if they are not seeking him, he flees.

**D. Facts Regarding Systemic Discrimination**

***Racial and Disability Disparities in Moreno Valley USD***

123.   C.B.'s experience highlights systemic discrimination within Moreno Valley USD. The District refers its students to law enforcement at a much higher rate than other large California school districts. In 2017-18, as reported to the Civil Rights Data Collection, the District referred 2,108 students to police or about 6.3 per 100 students. By comparison, the Los Angeles Unified School District referred just 1 student per 100. Nearby Riverside Unified School District referred just 3 students per *1,000.*

124.   The District refers Black students to law enforcement at dramatically higher rates than non-Black students. In 2017-18, as reported to the Civil Rights Data Collection, Black students were 13.7% of the District's student population but 29% of referrals to law enforcement. The District's law enforcement referral rate for Black students is 13.5 per 100 students, more than 2.5 times its referral rate for non-Black students (5.2 per 100 students).

125.    The District's referral rate of Black students to law enforcement is exponentially higher than the referral rates for Black students in similarly sized districts in the state:



126.    The Sheriff's Department's school arrest data further show that Black students are more likely to be arrested and arrested for non-violent offenses than their non-Black peers. Of Black students arrested on campus, 78% were arrested for non-violent offenses, compared to 63% of non-Black students arrested on campus. Similarly, 46% of Black students arrested on campus are arrested for the most minor offense – being out of class during school hours – while only 37% of non-Black students are arrested for this offense.

127.    Related to the disproportionate representation of Black students in law enforcement referrals and arrests is the fact that the District disproportionately restrains Black students. Per the Civil Rights Data Collection, Black students make up 37% of all students restrained, almost three times their representation in the District. The District also disproportionately restrains students with disabilities. Students with disabilities make up 61% of all students restrained, over 3.5 times their representation in the District.

### Defendants' Discriminatory Policies, Practices, and Procedures

128.    The high rates of law enforcement referrals result from Defendants'

---

various policies, practices and procedures that allow and even encourage school police officer involvement in low-level and disability-related behaviors, even for incidents that occurred on days prior – like C.B.'s act of throwing a rock. Teachers or administrators could handle these incidents instead.

129.   For example, the aforementioned "Law Enforcement Services Agreement" between the District and Sheriff's Department that establishes the SRO program does not prohibit SROs from intervening in minor school discipline incidents. It does not outline when SROs may use restraints or handcuffs. It does not describe applicable legal protections for students with disabilities, including the requirement to provide reasonable modifications in police encounters. It does not provide for alternatives to physical restraint.

130.   The Sheriff's Department Policies grant SROs broad authority to intervene in incidents involving students, even where the student has committed no crime. Policy SRU-003 authorizes SROs to "counsel" students who are "about to engage" in criminal misconduct. This policy further allows officers to search students with only "reasonable suspicion" that the student has violated a school rule, regardless of whether there is a basis for believing that the student has violated a law or is carrying weapons or contraband. The policy allows SROs to "stop, question, interview, and take police action without the prior authorization of the principal." Policy SRU-004 further authorizes SROs to stop, question, detain, and cite students simply for being out of class during school hours.

131.   Another example is the District's 2019-20 Secondary Sequential Discipline Standard (the "Standard"), a document that dictates the "consequences" and "interventions" to violations of the student code of conduct. The Standard authorizes, and at times requires, school staff to refer students to law enforcement in situations where California law does not.

132.   For instance, California Education Code § 48902 mandates school staff refer students to law enforcement in only limited circumstances involving

major offenses (e.g., assault with a firearm). But the Standard *requires* District staff to refer students to law enforcement in many additional circumstances, including such minor infractions as vandalism or possession of a lighter.

133.   The Standard also gives staff discretion to refer students to law enforcement for other non-criminal, low-level offenses that can be handled through the administrative discipline system or by providing supports and reasonable modifications. The Standard does not guide staff as to how to exercise their discretion in referring students to law enforcement, nor does it explain why staff might refer some students but not others.

134.   On information and belief, the District does not provide any training to its staff on how to exercise their law enforcement referral discretion, including on whether the student conduct is the result of disabilities, whether such referral will exacerbate students' disabilities or contribute to racial disparities, and alternatives to referrals.

135.   On information and belief, the Sheriff's Department has failed to properly train SROs on interacting with students with disabilities. On information and belief, the Sheriff's Department has also failed to properly train SROs to abstain from intervening in incidents involving minor and/or disability-related behaviors. The SROs' treatment of C.B. shows that SROs are not appropriately trained on how to interact with students with disabilities and when to refuse to intervene in on-campus incidents.

### *Failure to Document Mechanical Restraints and Use of Force Incidents*

136.   C.B.'s experiences also reveal Defendants' pervasive failures to accurately document incidents of restraint and use of force, and to promptly notify parents of such incidents. This practice of general applicability, *inter alia*, discriminates against students with disabilities who may not be able to explain what happened to them because of impaired communication abilities, trauma, or other disability-related reasons.

---

137.    The District's own restraint policies, *supra* note 18, require "all personnel" who assist in a restraint to complete their own "Incident Report" and submit it to District administrators for their review. But as described above, the District and its staff routinely violated this policy by failing to complete an Incident Report for every single one of C.B.'s handcuffings. C.B.'s parents still do not know the full extent of the CSOs' use of force and any injuries C.B. sustained. C.B. was, and still is, unable to fully discuss or describe these traumatic events.

138.    Further, under District Board Policy 5145.11, administrators must attempt to contact the parent before allowing law enforcement to question a student. Administrators must make further attempts to contact the student's parent before allowing law enforcement to remove a student from campus. If an SRO arrests or removes a student from campus, both Policy SRU-003 and Administrative Regulation 5145.11 require the SRO to inform the school administrator and sign the "Removal of Student from Campus" form. In C.B.'s case, the District administrator failed to create this form or make any attempt to contact C.B.'s parents in three of the four known incidents.

139.    On information and belief, Defendants District, Kedziora, and Scott are aware that CSOs violate state law and District policies by unnecessarily restraining students, including disabled students, Black students, and Black disabled students, and by failing to document and report restraints and resulting student injuries to parents, but take no steps to investigate or discipline the CSOs.

140.    The Sheriff's Department and County have failed to provide all documentation of the cuffings of C.B. involving SROs. Further, contrary to Sheriff's Department protocols, Deputy Loza turned off her body camera early during the October 8, 2019, use of force incident. She failed to turn it on at all during the cuffing on December 9, 2019, and did not submit the required report explaining why.

141.    On information and belief, the Sheriff's Department and County are

aware that SROs violate internal policies by failing to properly document use of force incidents in writing or on body camera, but fail to investigate or discipline these SROs.

## FIRST CLAIM FOR RELIEF

**Unreasonable Seizure and Excessive Force in Violation of the Fourth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. § 1983**

***(Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10)***

142.    Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

143.    The Fourth Amendment of the U.S. Constitution protects Plaintiff C.B. against unreasonable seizures and excessive force. The Fourteenth Amendment of the U.S. Constitution extends this protection to the states.

144.    Whether a seizure is unreasonable and unconstitutional depends upon the totality of the circumstances.

145.    Defendants' actions and failures to act described herein constituted a seizure that was objectively unreasonable under the totality of the circumstances, in violation of the Fourth Amendment of the United States Constitution.

146.    The seizures of Plaintiff C.B. were unreasonable in light of the totality of the circumstances, including but not limited to:

a.    C.B.'s age, size, and disabilities, including his limited ability to impose physical harms on others and limited ability to form criminal intent;

b.    That C.B. was exhibiting behavior typical of school-age children and/or related to his disabilities while at his middle school;

c.    That C.B. did not actively resist school officer intervention or attempt to flee;

d.    The length of the time between the alleged behaviors and the seizures

(e.g., the third incident occurred more than twenty-four hours after the disciplinary incident involving C.B.);

   e.  That the handcuffing incidents violated District and SRO policies and state law governing physical and mechanical restraints;

   f.  The length of time of the handcuffings and detentions; and

   g.  The trauma of the handcuffing and restraint techniques, including, but not limited to, from officers simultaneously shackling C.B.'s wrists and ankles, digging a knee into his back while pinning him facedown, shoving him, and yanking him by his handcuffs.

147.   By engaging in the acts and failures to act described herein, Defendants Scott, Loza, Toscano, Walker, Owens, King, Arellano, and Does 3-10, acting under color of state law and with deliberate indifference, violated C.B.'s rights under the U.S. Constitution to be free from unreasonable seizures and excessive force. This includes not only their own violations in effectuating and participating in these violations but their failures to intervene to stop them despite having the opportunity to do so.

148.   Defendants Walker and Scott are liable as supervisors because the actions described herein constituted culpable action or inaction in the training, supervision, and control of subordinates, acquiescence in the constitutional deprivation after a complaint/incidents was made/occurred, and showed a reckless or callous indifference to C.B.'s rights.

149.   The right of C.B. to be free from unreasonable seizures and excessive force as described herein was clearly established in law at the time of the incidents alleged. As a proximate result of Defendants' unreasonable seizure and use of excessive force, C.B. has suffered and continues to suffer severe emotional distress, pain, humiliation and exacerbation of his disabilities. C.B. continues to experience fear, distrust, and anxiety regarding law enforcement officers.

150.   C.B. is entitled to damages, injunctive and declaratory relief, and

reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988. The conduct of Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 was willful, wanton, malicious, and done with an evil motive and intent and a willful, conscious, and reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendants) in an amount adequate to punish the wrongdoers and deter future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved shackling, handcuffing, detaining, shoving, and kneeling on a Black student with disabilities at his middle school campuses. Punitive damages are therefore justified.

## **SECOND CLAIM FOR RELIEF**

### *Monell* **Claim, 42 U.S.C. § 1983**

### *(Defendants County of Riverside and Riverside County Sheriff's Department)*

151.  Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

152.  Defendants County of Riverside and Sheriff's Department maintain and implement the following unconstitutional policies, practices, and/or customs:

     a.  A policy, practice, and/or custom of SRO intervention in minor misconduct typical of school-age children and/or related to their disabilities;

     b.  A policy, practice, and/or custom of SRO use of excessive and unnecessary physical and mechanical restraint and other physical force on children;

     c.  A policy, practice, and/or custom of repeated constitutional violations that were not properly investigated and/or documented and for which the violators were not disciplined, reprimanded, or punished, and C.B. suffered constitutional injuries as a result; and

     d.  A policy, practice, and/or custom of SROs failing to use their body

1    cameras, or using their body cameras improperly, during handcuffings

2    and other use of force incidents at school.

3    153.   These policies, practices, and customs were the moving forces in

4 Defendants' unreasonable seizures and use of excessive force on C.B. described

5 above and alleged in the First Claim for Relief. Defendants' policies, practices, and

6 customs are frequent, consistent, and widespread, as evidenced in part by the

7 SROs' similar use of force on C.B. at two separate District campuses.

8    154.   Defendants exhibited deliberate indifference to the constitutional

9 rights of C.B. in maintaining such policies, practices, and customs. Defendants'

10 practice violates the Sheriff's Department's own policies, including Policies

11 306.2.3 and 324.9, and Policy SRU-003.

12    155.   Defendants knew or should have known that maintaining such

13 policies, practices, and customs were in violation of well-established constitutional

14 rights of minors – especially those with disabilities – to be treated with special care

15 by police officers. The Defendants' policies, practices, and customs did directly

16 result in the pattern of violations of C.B.'s constitutional rights.

17    156.   Further, on information and belief, Defendants Sheriff's Department

18 and County have failed and continue to fail to train and supervise SROs so as to

19 prevent a pattern of lawful restraints from occurring.

20    157.   Defendants do not adequately train SROs on how to safely and

21 appropriately interact with students, especially students with disabilities.

22 Defendants failure to train in this area constitutes deliberate indifference in light of

23 the statistical likelihood, based on national and District-level data, that SROs will

24 disproportionately encounter students with disabilities. Defendants also do not

25 adequately train SROs on when to abstain from intervening in incidents involving

26 minor and/or disability-related behaviors.

27    158.   Defendants have also failed to train and ensure compliance with state

28 laws and internal procedures pertaining to restraints, including but not limited to

restrictions on the physical and mechanical restraint of children with and without disabilities, documentation and parent notification requirements for restraint and injury, and proper body camera procedures.

159.   Despite evidence that SROs routinely disregard state laws and internal procedures, Defendants have failed to investigate, discipline, and terminate officers who unlawfully restrain children and fail to document these restraints in police reports and on body camera footage.

160.   As a proximate result of Defendants' acts and omissions, C.B. has suffered and continues to suffer severe emotional distress, pain, and exacerbation of his disabilities. C.B. continues to experience fear, distrust, and anxiety regarding law enforcement officers.

161.   C.B. is entitled to damages, injunctive and declaratory relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF

### VIOLATIONS OF TITLE II OF THE ADA, 42 U.S.C. § 12132

*(Defendants Moreno Valley USD, Superintendent Kedziora, County of Riverside, and Sheriff's Department)*

162.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

163.   Congress enacted the ADA to "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

164.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

165.   C.B. is an individual with a disability under the ADA. 42 U.S.C. §

12102. His disabilities substantially limit one or more major life activities, including learning, concentration, thinking, and interacting with others.

166.   As a school-age child who lives in the District, he is qualified to participate in Defendants' educational programs and services. 42 U.S.C. § 12131(2).

167.   Defendants Moreno Valley USD, County of Riverside, and Sheriff's Department are all public entities within the meaning of the ADA. Defendant Superintendent Kedziora is an official responsible for running and/or supervising the operations of Defendant Moreno Valley USD.  42 U.S.C. § 12131(1).

168.   Defendant Moreno Valley USD is legally responsible for all violations of the ADA committed by Defendants County and/or Sheriff's Department in the course of performing security services to students within the District. *See* 28 C.F.R. § 35.130(b)(1).

169.   Through the acts and omissions described above, Defendants are violating the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Pt. 35, including by:

     a.  Failing to make reasonable modifications to policies, practices, and procedures to avoid discrimination against C.B.;

     b.  Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' programs with respect to C.B., including using police to enforce school rules, rather than teachers and administrators;

     c.  Denying C.B. an opportunity to participate in and benefit from educational services that is equal to that afforded of other students.

170.   In addition, through the acts and omissions described above, the District and Superintendent Kedziora in his official capacity are violating the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Pt. 35, by:

     a.  Aiding or perpetuating discrimination by providing significant

assistance to the County and/or Sheriff's Department, public entities that discriminate against C.B.; and

    b. Subjecting C.B. to disability-based harassment that is so severe and pervasive that it creates a hostile learning environment.

171. Defendants at all times have known or should have known that C.B. was a student with disabilities and required reasonable modifications.

172. Defendants have demonstrated a deliberate indifference that harm to Plaintiffs' federally protected rights under the ADA was substantially likely, and failed to act upon that likelihood.

173. The acts and omissions of Defendants have caused and will continue to cause C.B. to suffer irreparable harm, and he has no adequate remedy at law.

174. Under the ADA, Plaintiffs are entitled to attorneys' fees and costs as appropriate and permitted by law, pursuant to 42 U.S.C. § 12205.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF SECTION 504, 29 U.S.C. § 794 *et seq*.**

***(Defendants Moreno Valley USD, Superintendent Kedziora, County of Riverside, and Sheriff's Department)***

175. Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

176. Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States...shall, solely by reason of [their] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

177. Plaintiff C.B. is a qualified individual with a disability under Section 504.

178. Defendants are recipients of federal funds.

179. Solely by reason of his disabilities, C.B. has been excluded from

participation in, denied the benefit of, and subjected to discrimination in his
attempts to receive meaningful and equal access to the facilities, programs,
services, and activities offered by Defendants in violation of Section 504, 29
U.S.C. § 794, *et seq.*, and its implementing regulations at 34 C.F.R. Pt. 104 (U.S.
Department of Education) and 28 C.F.R. 42.501 *et seq.* (U.S. Department of
Justice). The Defendants' acts and omissions violating C.B.'s rights under the
ADA also violate his rights under Section 504 (*see* Third Claim for Relief, *supra*).

180.    Defendants have demonstrated a deliberate indifference that harm to
Plaintiffs' federally protected rights under Section 504 was substantially likely,
and failed to act upon that likelihood.

181.    The acts and omissions of Defendants have caused and will continue
to cause C.B. to suffer irreparable harm, and he has no adequate remedy at law.

182.    Under Section 504, Plaintiffs are entitled to attorneys' fees and costs
as appropriate and permitted by law, pursuant to 29 U.S.C. § 794a.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA GOVERNMENT CODE § 11135 *et seq.*

#### *(County of Riverside and Sheriff's Department)*

183.    Plaintiff incorporates by reference the above paragraphs as though
fully set forth herein.

184.    California Government Code § 11135 prohibits discrimination under,
and the denial of full and equal access to the benefits of, state-funded programs
and activities on the basis of race, ethnicity, and disability.

185.    Violations of the ADA constitute violations of Government Code §
11135(b).

186.    At all times relevant to this action, Plaintiff C.B. has been and is a
qualified individual with a disability within the meaning of California law. Cal.
Gov't Code § 12926. As a Black student, C.B. is entitled to California law
protections against discrimination on the basis of race and ethnicity. *Id.*

---

FIRST AMENDED COMPLAINT FOR DAMAGES        - 42 -
& INJUNCTIVE & DECLARATORY RELIEF

187.    Defendants County of Riverside and Sheriff's Department are public agencies that receive financial assistance from the State of California.

188.    Through the acts and omissions described above, Defendants are violating Government Code § 11135, and its implementing regulations, Cal. Code Regs. tit. 2, § 11154. Defendants discriminate against C.B. and other similarly situated Black students with respect to law enforcement referrals that result in an adverse disparate impact. Defendants selectively enforce facially neutral policies by referring Black students to police for less severe behaviors than their non-Black peers, denying Black students full and equal access to the benefits of their education without nondiscriminatory justification. Defendants disproportionately arrest Black students for minor and/or disability-related behaviors.

189.    Defendants also discriminate against C.B. and other similarly situated Black students with respect to school police restraints that result in an adverse disparate impact on Black students. These disparities result in part from Defendants' implicit and unconscious biases and stereotypes against Black students, which are incorporated into the Sheriff's Department policy allowing SROs to handcuff children who officers perceive as "combative or threatening."

190.    Defendants have also violated Government Code § 11135 by discriminating against C.B. and other similarly situated students with disabilities in violation of the ADA (*see* Third Claim for Relief, *supra*).

191.    Defendants' actions have caused and will continue to cause C.B. to suffer irreparable harm, and he has no adequate remedy at law. Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

192.    C.B. is also entitled to reasonable attorneys' fees and costs.

///

///

///

# SIXTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *(Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10)*

193.    Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

194.    Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10 engaged in extreme and outrageous conduct when they intentionally committed the acts described herein.

195.    As a proximate result of Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10's extreme and outrageous conduct, Plaintiff C.B. has suffered severe emotional distress.

196.    Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10 were adults in a position of power over Plaintiff C.B. and aware of his susceptibility to injuries through emotional distress as a minor student with disabilities.

197.    Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper. The conduct of Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 was willful, wanton, malicious, and done with an evil motive and intent and a willful, conscious, and reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendants) in an amount adequate to punish the wrongdoers and deter future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved shackling, handcuffing, detaining, shoving, and kneeling on a Black student with disabilities at his middle school campuses. Punitive damages are therefore justified.

## SEVENTH CLAIM FOR RELIEF

### FALSE IMPRISONMENT

**(Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10)**

198.    Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

199.    Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10 intentionally and unlawfully exercised force or the implied threat of force to restrain or confine C.B. when they committed the acts described herein.

200.    Each of the known unlawful restraints and detentions of C.B. described *supra* lasted for an appreciable amount of time.

201.    C.B. did not consent to Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10's acts, and as a result of their acts suffered severe harm and emotional distress.

202.    Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper. The conduct of Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 was willful, wanton, malicious, and done with an evil motive and intent and a willful, conscious, and reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendants) in an amount adequate to punish the wrongdoers and deter future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved shackling, handcuffing, detaining, shoving, and kneeling on a Black student with disabilities at his middle school campuses. Punitive damages are therefore justified.

///

///

# EIGHTH CLAIM FOR RELIEF

## BATTERY

### *(Defendants Scott, Walker, Loza, Owens, Arellano, King, and Does 3-10)*

203.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

204.   Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10 intentionally committed acts which resulted in harmful or offensive contact with Plaintiff C.B.'s person when they committed the acts described herein.

205.   During the commission of the acts alleged herein, C.B. did not consent to the contact.

206.   Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10's harmful or offensive contact caused injury or harm to C.B.

207.   Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper. The conduct of Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 was willful, wanton, malicious, and done with an evil motive and intent and a willful, conscious, and reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendants) in an amount adequate to punish the wrongdoers and deter future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved shackling, handcuffing, detaining, shoving, and kneeling on a Black student with disabilities at his middle school campuses. Punitive damages are therefore justified.

///

///

///

# NINTH CLAIM FOR RELIEF

## ASSAULT

### *(Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10)*

208.    Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

209.    Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10 demonstrated the unlawful intent to inflict immediate injury on Plaintiff C.B. when they committed the acts described herein.

210.    Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10's acts described herein placed C.B. in imminent apprehension of harmful or offensive contact.

211.    Defendants Scott, Walker, Owens, Loza, Toscano, Arellano, King, and Does 3-10's unlawful intent to inflict immediate injury on C.B. caused him injury or harm.

212.    Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper. The conduct of Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 was willful, wanton, malicious, and done with an evil motive and intent and a willful, conscious, and reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendants) in an amount adequate to punish the wrongdoers and deter future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved shackling, handcuffing, detaining, shoving, and kneeling on a Black student with disabilities at his middle school campuses. Punitive damages are therefore justified.

///

# TENTH CLAIM FOR RELIEF

## NEGLIGENT SUPERVISION

### (*Defendants Scott and Walker*)

213.    Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

214.    Defendants Scott and Walker were responsible for the supervision of Defendants Arellano, Owens, King, and some or all of Does 3-10.

215.    Defendants Arellano, Owens, King, and some or all of Does 3-10 became unfit to perform the work for which they were hired due to their propensity to subject students to harmful and excessive detentions, handcuffings and use of physical force.

216.    The at least four known, unlawful handcuffings and detentions establish that Defendants Scott and Walker had or should have had prior knowledge of Defendants Arellano, Owens, King, and Does 3-10's propensity to subject C.B. to harm. They also establish that the risk of harm to C.B. from Defendants Arellano, Owens, King, and Does 3-10's actions was reasonably foreseeable.

217.    Defendants Scott and Walker's negligence in supervising Defendants Arellano, Owens, King, and Does 3-10 was a substantial factor in causing C.B.'s harm and injuries.

218.    Plaintiffs are entitled to Damages according to proof, reasonable attorneys' fees, costs of suit incurred herein, and such other and further relief as the Court deems just and proper. The conduct of Defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 was willful, wanton, malicious, and done with an evil motive and intent and a willful, conscious, and reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendants) in an amount adequate to punish the wrongdoers and deter

future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved shackling, handcuffing, detaining, shoving, and kneeling on a Black student with disabilities at his middle school campuses. Punitive damages are therefore justified.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff C.B. prays that the Court grant the following relief:

219.   Order and declare that Defendants are violating the rights of Plaintiff C.B. under the U.S. Constitution, Title II of the ADA, Section 504, California Government Code § 11135, Unruh Civil Rights Act, California Constitution, and state common law torts.

220.   Enjoin Defendants their successors in office, agents, employees and assigns, and all persons acting in concert with them, to:

    a.   Stop school police officers from mechanically restraining students and intervening in low level and disability-related behaviors, up to and including ordering school police officers to cease patrolling District schools.

    b.   Provide C.B. and similarly situated students with positive supports and services in lieu of police intervention so that they may enjoy full and equal access to the District's programs.

221.   Compensatory, general, and special damages, according to proof.

222.   Award Plaintiff's attorneys' fees and costs as appropriate and permitted by law.

223.   For punitive and exemplary damages against individually named Defendants in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct.

224.   Any other relief as this Court finds just and proper.

///

///

1

# DEMAND FOR JURY TRIAL

2      225.   Plaintiff demands a jury trial.

3

4   DATED: February 14, 2022     Respectfully submitted,

5

6                     */s/ Robert Borrelle*

7                     ROBERT BORRELLE

8                     LINDSAY APPELL

9                     DISABILITY RIGHTS CALIFORNIA

10

11                     */s/ Claudia Center*

12                     CLAUDIA CENTER

13                     MALHAR SHAH

14                     DISABILITY RIGHTS EDUCATION

15                     & DEFENSE FUND

16

17                     */s/ Maronel Barajas*

18                     MARONEL BARAJAS

19                     ANNA RIVERA

20                     BARAJAS & RIVERA, APC

21

22                     */s/ Dan Stormer*

23                     DAN STORMER

24                     SHALEEN SHANBHAG

25                     DAVID CLAY WASHINGTON

26                     HADSELL STORMER RENICK & DAI LLP

27                     *Attorneys for Plaintiffs*

28