UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 21-0194 JGB (SPx)** | Date | October 13, 2023 |
|---|---|---|---|
| Title | ***C.B. v. Moreno Valley Unified School District, et al.*** | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order GRANTING Plaintiff's Partial Motion for Summary Judgment (Dkt. No. 205) (IN CHAMBERS)**

Before the Court is a motion[1] for partial summary judgment filed by plaintiff C.B., by and through his guardians ad litem W.B. and B.T. ("C.B." or "Plaintiff"). ("Motion," Dkt. Nos. 205, 211.)  The Court finds this matter appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed in support of and in opposition to the Motion, the Court **GRANTS** the Motion as to Plaintiff's ADA and Section 504 claims.  The Court **VACATES** the October 23, 2023 hearing.

## I.    BACKGROUND

C.B.[2] filed his complaint on February 2, 2021 against defendants Moreno Valley Unified School District ("MVUSD"), Martinrex Kedziora, in his official capacity as MVUSD Superintendent ("Kedziora"), Darryl Scott ("Scott"), Scott Walker ("Walker"), Demetrius Owens ("Owens"), Manuel Arellano ("Arellano"), County of Riverside ("County"), Riverside County Sheriff's Department ("Sheriff's Dept."), Chad Bianco, in his official capacity as

---

[1] While Plaintiff originally filed the Motion on September 1, 2023 (Dkt. No. 205), the Court refers to the Corrected Memorandum and Corrected Statement of Uncontroverted Facts filed as part of Plaintiff's notice of errata as Plaintiff's operative motion.  ("Motion," Dkt. No. 211.)

[2] On February 10, 2021, the Court appointed W.B. as guardian ad litem for minor C.B. in this action.  (Dkt. No. 39.)  C.B. is a minor who is twelve years old, W.B. is his father, and B.T. is his mother.  (Id.)

Riverside County Sheriff ("Bianco"), Deputy Sheriff Norma Loza ("Loza"), and Does 1-10. ("Complaint," Dkt. No. 1.)

Defendants collectively filed three motions to dismiss ("County MTD," Dkt. No. 68, "Arellano MTD," Dkt No. 69, "MVUSD MTD," Dkt No. 70.) On June 17, 2021, the Court granted the MVUSD MTD, denied the Arellano MTD and granted in part and denied in part the County MTD. (Dkt No. 83.) On July 1, 2021, an answer was filed by County, Loza, and the Sheriff's Dept. (Dkt. No. 87.) On July 16, 2021, an answer was filed by Kedziora and MVUSD. (Dkt. No. 91.) The same day, an answer was filed by Arellano, Owens, Scott and Walker. (Dkt. No. 92.)

On February 14, 2022, Plaintiff filed a motion for leave to file a first amended complaint. (Dkt. No. 101.) On February 18, 2022, County, Loza, and the Sheriff's Dept. opposed. (Dkt. Nos. 103.) On February 28, 2022, MVUSD, Kedziora, Scott, Walker, Owens, and Arellano filed a notice of joinder to County's opposition. ("Joinder," Dkt. No. 104.) On February 28, 2022, Plaintiff replied. (Dkt. No. 105.) On March 1, 2022, Plaintiff filed a motion to strike the Joinder. ("Motion to Strike," Dkt. No. 106.) On March 17, 2022, the Court denied defendants' Joinder and granted Plaintiff's motion for leave to file a first amended complaint. (Dkt. No. 108.)

On March 25, 2022, Plaintiff filed a first amended complaint, the operative complaint, against defendants. ("FAC," Dkt. No. 109.) Plaintiff brings the following claims:

1. Unreasonable seizure and excessive force in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. § 1983, against defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 ("Claim One");
2. Violations pursuant to Monell, 42 U.S.C. § 1983, against defendants County and Sheriff's Dept. ("Claim Two");
3. Violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, against defendants MVUSD, Kedziora, County and Sheriff's Dept. ("Claim Three");
4. Violation of Section 504, 29 U.S.C. § 794 et seq., against defendants MVUSD, Kedziora, County and Sheriff's Dept. ("Claim Four");
5. Violation of California Government Code § 11135 et seq., against defendants County and Sheriff's Dept. ("Claim Five");
6. Intentional infliction of emotional distress against defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 ("Claim Six");
7. False imprisonment against defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 ("Claim Seven");
8. Battery against defendants Scott, Walker, Loza, Owens, Arellano, King, and Does 3-10 ("Claim Eight");
9. Assault against defendants Scott, Walker, Loza, Toscano, Owens, Arellano, King, and Does 3-10 ("Claim Nine"); and
10. Negligent supervisions against defendants Scott and Walker ("Claim Ten").

**CIVIL MINUTES—GENERAL**

(See FAC.)  Plaintiff seeks damages, injunctive, and declaratory relief.  (Id. ¶ 12.)  Plaintiff's claims stem from alleged harms resulting from at least four violent handcuffings and detentions at C.B.'s middle school.  (Id. ¶¶ 1-2.)  Defendants collectively answered the FAC.  (Dkt. Nos. 119, 122, 123.)

On September 1, 2023, Plaintiff filed the Motion for summary judgement as to Claims Three and Four against MVUSD and Kedziora ("Defendants") along with the following documents:

- Statement of Undisputed Facts (Dkt. No. 205-2);
- Declaration of Dr. Jaime Hernandez with attached exhibits ("Hernandez Decl.," Dkt. No. 205-3);
- Declaration of Dr. Edward Miguel with attached exhibits ("Miguel Decl.,"Dkt. No. 205-5); and
- Declaration of Munmeeth K. Soni, Plaintiff's counsel, and 31 exhibits ("Soni Decl.," Dkt. No. 206).

On September 13, 2023, Plaintiff filed a notice of errata as to Plaintiff's corrected memorandum of points and authorities ("Motion," Dkt. No. 211-1), and Plaintiff's corrected statement of undisputed facts ("PSUF," Dkt. No. 211-2.)  On September 14, 2023, Plaintiff filed a notice of conditional settlement between Plaintiff and defendants County, Sheriff's Dept., Loza, and Deputy Sheriff Jerssy Toscano.  (Dkt. No. 212.)

On September 18, 2023, Magistrate Judge Sheri Pym issued a Report and Recommendation which would grant Plaintiff's request for evidentiary sanctions against MVUSD, Owens and King for failure to comply with discovery obligations.  ("R&R," Dkt. No. 213 at 1-2.)  The Court now accepts the R&R in so far as it recommends the following.  (R&R at 18; see Dkt. No. 181 at 3-12.)

In deciding Plaintiff's MSJ, the Court will apply an ***adverse inference*** that MVUSD's testimony regarding the following topics would have been harmful to MVUSD:

1. From January 1, 2016 to the present, [MVUSD] policies, procedures, practices, protocols, and training regarding each of the following, including any recommendations made to change such policies, procedures, practices, protocols, or trainings, and whether or not those recommendations were adopted.  As for trainings, each sub-topic includes whether such training is mandatory and if so the frequency with which such training must be undertaken; the duration in days and/or hours of such training; whether the training is conducted in-person or online; and materials used in such training and/or provided to attendees, including Training Bulletins, Safety and Security Memos, Security Department Inter-Office Communications, video or other illustrative materials.

   o The Americans with Disabilities Act and Section 504 of the Rehabilitation
      Act and provision of ACCOMMODATIONS to STUDENTS WITH
      DISABILITIES.

2. From January 1, 2016 to the present, [MVUSD] policies, procedures, practices,
   protocols, and training regarding each of the following, including any
   recommendations made to change such policies, procedures, practices, protocols,
   or trainings, and whether or not those recommendations were adopted. As for
   trainings, each sub-topic includes whether such training is mandatory and if so the
   frequency with which such training must be undertaken; the duration in days
   and/or hours of such training; whether the training is conducted in-person or
   online; and materials used in such training and/or provided to attendees,
   including Training Bulletins, Safety and Security Memos, Security Department
   Inter-Office Communications, video or other illustrative materials.
   o The Americans with Disabilities Act and Section 504 of the Rehabilitation
      Act and provision of ACCOMMODATIONS to STUDENTS WITH
      DISABILITIES.

3. From January 1, 2016 to the present, any mechanism or program used by MVUSD
   for tracking data on actions by MVUSD personnel, including CSOs, including but
   not limited to uses of force, handcuffing, shackling, and/or other restraint devices;
   and the use of such data in any type of early warning system to detect potential
   concerns about particular personnel's use of force, handcuffing, shackling, and/or
   use of other restraint devices on STUDENTS, including STUDENTS WITH
   DISABILITIES.

4. From January 1, 2016 to the present, any mechanism or program used by MVUSD
   for tracking data on actions by MVUSD personnel, including CSVs, including but
   not limited to uses of force, handcuffing, shackling, and/or other restraint devices;
   and the use of such data in any type of early warning system to detect potential
   concerns about particular personnel's use of force, handcuffing, shackling, and/or
   use of other restraint devices on STUDENTS, including STUDENTS WITH
   DISABILITIES.

(R&R at 18; Dkt. No. 181 at 3-12.)

On September 25, 2023, Defendants opposed the Motion.  ("Opposition," Dkt. No. 216.)
In support of the Opposition, Defendants submitted the following documents:

- Declaration of Shelley Crandall with attached exhibits ("Crandall Decl.," Dkt. No.
  216-1);
- Declaration of Darryl Scott with attached exhibits ("Scott Decl.," Dkt. No. 216-3);
- Statement of Genuine Disputes of Material Fact ("D. Opp. PSUF," "DSUF," Dkt.
  No. 216-5); and

**CIVIL MINUTES—GENERAL**                  Initials of Deputy Clerk mg

- Evidentiary Objections ("Def. Objections," Dkt. No. 216-6).

On October 2, 2023, Plaintiff replied.  ("Reply," Dkt. No. 241.)  In support of the Reply, Plaintiff submitted the following documents:

- Plaintiff's Response to Defendants' Evidentiary Objections ("Pl. Response to Def. Objections," Dkt. No. 241-1);
- Evidentiary Objections ("Pl. Objections," Dkt. No. 241-2);
- Response to Statement of Disputed Material Facts ("PSUF Reply," "P. Opp. DSUF," Dkt. No. 241-3);
- Declaration of Munmeeth K. Soni in support of Plaintiff's Reply, and 8 exhibits ("Reply Soni Decl.," Dkt. No. 241-4).

## II.    FACTS

### A.  Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. Proc. 56(e).  At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See, e.g., Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  The Court considers the parties' objections only where necessary and all other objections are **OVERRULED AS MOOT**.

"[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.")   At the summary judgment stage, the Court focuses on the admissibility of the evidence's contents, not the admissibility of the evidence's form.  Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

The Court denies some of the parties' objections as "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." Doe v. Starbucks, Inc., 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009); Amaretto Ranch Breedables v. Ozimals Inc., 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development"); Communities Actively Living Indep. & Free v. City of Los Angeles, 2011 WL 4595993, at *8 (C.D. Cal. Feb. 10, 2011) (summarily overruling boilerplate evidentiary objections when the grounds for the objections were unduly vague and overbroad).

The Court overrules virtually all of the parties' personal knowledge and foundation objections; except where otherwise noted, the evidence relied upon in the order below has a sufficient basis in personal knowledge and foundation to be considered.  Most of the parties' hearsay objections are likewise overruled.  Declarations which contain hearsay are admissible for summary judgment purposes if they can be presented in an admissible form at trial.  Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004).  Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay."  Calmat Co. v. U.S. Dep't of Labor, 364 F.3d 1117, 1124 (9th Cir. 2004).  At this stage, the Court does not find the parties' hearsay objections to be preclusive of the evidence submitted.

Defendants make multiple references to federal and state laws that "recognize" special education students' "violence."  (Opposition at 9; DSUF ¶¶ 22-24, 29; Crandall Decl. ¶¶ 15-16; Scott Decl. ¶ 13.)  Plaintiff contends that disability-related behaviors are not referred to as "violent" anywhere in federal or state special education or disability law and objects to this evidence on various grounds including that it is impermissibly prejudicial and lacks foundation. (Pl. Objections ¶ 22-24, 29; Federal Rules of Evidence 403, 901.  Defendants provide no authority for these assertions.  The Court agrees with Plaintiff that these claims are baseless and substantially prejudicial to Plaintiff.  As such, the Court **SUSTAINS** Plaintiff's Objections to DSUF ¶¶ 22-24, 29.

## B. Undisputed Facts

"In determining any motion for summary judgment or partial summary judgment, the court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion."  See Fed. R. Civ. P. 56(e)(2); Local Rule 56-3 (emphasis added).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may consider the fact undisputed for purposes of the motion."  Elguezabal v. Hwang, 2015 WL 13918496, at *2 (C.D. Cal. Aug. 21, 2015) (citing Fed. R. Civ. P. 56(e)(2)).  In many instances, Defendants fail to provide any evidence to support their dispute, the Court finds these facts undisputed.  (See, e.g., D. Opp. PSUF ¶¶ 73(c)-78(d); 91(b)-100.)  The following material facts are sufficiently supported by admissible evidence and are uncontroverted.

//
//
//
//
//
//
//
//

1. **Applicable Statutes and Policies**

**MVUSD Safety and Security, Security Officer Handbook ("CSO Handbook," Soni Decl., Ex. 14)**

CHAPTER 10 USE OF HANDCUFFS POLICY

10.0 PURPOSE AND SCOPE
This procedure provides guidelines for handling situations involving handcuffing during detentions and arrests.

10.1 HANDCUFFING POLICY
Although recommended for most arrest situations, handcuffing is a discretionary procedure and not an absolute rule of the Department. When deciding whether to handcuff an arrestee, officers should carefully balance officer safety concerns with factors including, but not limited to the following:

- The circumstances leading to the arrest.
- The attitude and behavior of the arrested person.
- The age, sex, and health of the person.
- Whether the person has a hearing or speaking disability. In such cases consideration should be given, safety permitting, to handcuffing to the front in order to allow the person to sign or write notes.
- Whether the person has any other apparent disability or pregnant. It is not the intent of the Department to dissuade officers from handcuffing all persons they believe warrant that degree of restraint, nor is it the intent of this policy to create the atmosphere that in order to avoid risk, an officer should handcuff all persons regardless of the circumstances. In most situations handcuffs should be applied with the hands behind the person.

10.3 IMPROPER USE OF HANDCUFFS
Handcuffing is never done to punish, to display authority, or as a show of force. Persons are handcuffed only to restrain their hands to ensure officer safety. When practical, handcuffs shall be double locked to prevent tightening which may cause undue discomfort or injury to the hands or wrists.

10.4 JUVENILES
Juveniles 14-years of age or older may be handcuffed when the act committed is of a felonious nature or when their acts have amounted to crimes where the officer has a reasonable suspicion the suspect may have a desire to escape, injure themselves/others, injure the officer, or destroy property.

Juveniles under 14-years of age generally will not be handcuffed unless their acts have amounted to a dangerous felony or when they are of a state of mind which suggests a

reasonable probability of their desire to escape, injure themselves/others, the officer, or to destroy property.

10.5 HANDCUFFING OF DETAINEES

Situations may arise where it may be reasonable to handcuff an individual who may, after subsequent investigation, be released prior to arrest. Such a situation is considered a detention, rather than an actual arrest. Unless arrested, the use of handcuffs on detainees should continue for only as long as is reasonably necessary to assure the safety of officers and others. Officers should continuously weigh the safety interests at hand against the intrusion upon the detainee when deciding to remove handcuffs from a detainee. When an individual is handcuffed and released without an arrest, a written repo11 of the incident shall be made to document the details of the detention and need for use of handcuffs.

Officers must not handcuff students merely because they are directed to do so by an administrator.

The handcuffing of a person is a serious action because it restricts that person's freedom.

There are essentially two occasions when officers may use their handcuffs to restrain a suspect. They are:

1. Making a "PRIVATE PERSON ARREST."
2. A suspect presents an "IMMINENT THREAT TO HIMSELF OR OTHERS."

An officer can make a "private person arrest" when:

1. A public offense is attempted or committed in his/her presence.
2. The pers n has committed a felony, although not committed in his/her presence.
3. A felony has in fact been committed and he/she has reasonable cause to believe that the person being arrested has committed it. (See PC 83 7)

REMINDER: When making an arrest, an officer (private person) may only use the restraint necessary to:

1. Effect an arrest.
2. Overcome resistance.
3. Prevent escape.
4. Summon assistance to make an arrest.

"Imminent threat" is the presence of an impending danger or harm that could occur at any moment. Officers must be able to describe in clear and precise language what caused them to ascertain the presence of an imminent threat. This is especially important

because you may need this information in your written report or a later legal proceeding. The fact that a suspect is "agitated" or making "furtive movements" does not constitute an imminent threat.

Remember: After a suspect is in custody, he/she must be turned over to law enforcement without delay. Before taking your suspect into custody, the officer will ask you the "cause and circumstances" of the arrest.

(Scott Decl. Ex. A 1196-1197.)

### 2. C.B.

C.B. is, and has been, a special education student. (PSUF ¶ 1.) During the relevant time period, C.B. was 70 lbs., and 4 foot 7 inches tall. (DSUF ¶ 54.) In 2016, at the age of seven, C.V. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Oppositional Defiance Disorder ("ODD"). (PSUF ¶ 2.) In March 2019, when he was in fifth grade, C.B. enrolled in Moreno Valley Unified School District ("MVUSD") and most recently attended Moreno Valley High School ("MVHS"). (Id. ¶¶ 3-4.) On April 23, 2019, MVUSD provided C.B. with a Behavior Support Plan ("BSP") that described C.B.'s disability-related behavioral challenges. (Id. ¶ 5.) C.B.'s BSP from April 23, 2019 indicated that he had tendencies to "punch, kick, and/or bite," and that C.B. had a tendency to become "physically aggressive." (DSUF ¶¶ 1-2.) The BSP stated that MVUSD were to give him space to cool down, redirect him, or provide positive reinforcement if C.B. kicks or bites school staff. (PSUF ¶ 11.)

C.B. entered sixth grade in August 2019 and attended MVUSD's Landmark Middle School ("LMS") from August 2019 to October 8, 2019. (Id. ¶ 6.) Walker was the Principal at LMS in 2019. (DSUF ¶ 57.) C.B.'s BSP from April 23, 2019 was in effect when he entered LMS in August 2019. (PSUF ¶ 10.) While at LMS, C.B. was placed in the special education classroom called the "Emotional Disturbance Classroom". (Id. ¶ 8.) In November 2019, C.B. transferred to MVUSD's Mountain View Middle School ("MVMS"). (Id. ¶ 7.) At MVMS, C.B. was placed in the Special Day Class-Emotional Disturbance Classroom. (Id. ¶ 9.)

### 3. Security Resource Officers

MVUSD receives federal funding. (PSUF ¶ 13.) Kedziora is the Superintendent of MVUSD. (Id. ¶ 14.) Scott, who joined MVUSD in December 2016, directs MVUSD's Safety and Security Program and oversees Campus Security Officers ("CSOs").[3] (Id. ¶¶ 15-16.) In this

---

[3] The vast majority of Defendants' disputes of the PSUF are on the basis that Plaintiff "misstates" testimony. (See, e.g., DSUF ¶¶ 15-18, 22, 24, 35-37, 44, 44(a), 47-48; PSUF Reply.) Plaintiff contends that Defendants' responses are immaterial and that "[n]othing in Defendants response refutes the undisputed fact set forth here." (Id.) The Court has carefully combed through each pincite provided by Plaintiff to support the alleged disputes and found that

role, Scott is responsible for providing direct safety supervision to all schools and implementing systems and protocols to keep students and staff safe while on school grounds.  (Id. ¶¶ 16(b), 16(c).)  Scott is also responsible for MVUSD's law enforcement contract with the County of Riverside and Riverside County Sheriff's Department.  (Id. ¶ 17; DSUF ¶ 31.)

Pursuant to the service contract, the Sheriff's Department provides Sheriff's Deputies as School Resource Officers ("SROs") assigned to schools within MVUSD.  (PSUF ¶ 91; DSUF ¶ 32.)  The SROs are employed and trained by the Sheriff's Department.  (PSUF ¶ 33.) Scott does not supervise or train the SROs and the SROs are not under his control.  (Id. ¶ 35.)

MVUSD "specifically task[s] [SROs] to provide law enforcement services." (Id. ¶ 91(e).)  MVUSD's Secondary Sequential Discipline Standard ("SSDS") also recommends "SRO intervention" as a disciplinary consequence for several categories of disruptive student behavior.  (Id. ¶ 92.)  The categories of disruptive student behavior do not make exceptions for disability-related disruptive behavior.  (Id. ¶ 92(a).)  MVUSD's SSDS does not require SROs to provide disability accommodations.  (Id. ¶ 92(d).)  MVUSD provides no training to SROs.  (Id. ¶ 93.)  MVUSD's contract with the Sheriff's Department does not require SROs be trained on special education laws or on accommodating students with disabilities.  (Id. ¶¶ 94-94(a).) MVUSD does not have a policy to inform SROs about its students with disabilities, the accommodations to which students with disabilities are entitled pursuant to their IEPs, the accommodations to which students with disabilities are entitled pursuant to their 504 Plans or their BSPs.  (Id. ¶¶ 95-95(c).)

### 4.  Campus Supervisors

Campus Supervisors ("CSVs") were tasked with "monitor[ing] student behavior before school, during breaks, at lunch, after school, during school and at extracurricular activities."  (Id. ¶ 21.)  CSVs did not have handcuffs or weapons and were prohibited from conducting student searches and seizures.  (Id. ¶ 22.)  CSVs did not receive any "direct training" on how to deal with the "hazard" of disabled students.  (Id. ¶ 24.)  CSVs did not receive any training on special education laws or Behavior Intervention Plans.  (Id. ¶¶ 25-26.)

---

Plaintiff consistently refers to the evidence in a correct and reasonable way.  While in some instances Plaintiff may use synonymous words such as "directs", "oversees" and "supervises", the Court finds that in the context of the evidence, Plaintiff's SUF includes reasonable and accurate statements, not misstatements.  In some instances, Defendants dispute Plaintiff's SUF on the basis of misstatement of testimony when in fact Plaintiff's statement is an identical copy of Defendants' testimony.  (See, e.g., compare "Scott is responsible for providing direct supervision of safety supervision to all schools" PSUF ¶ 16(b), with "I am tasked with supervising roughly 83 employees under my direct supervision, to provide direct supervision of – safety supervision to all the schools in MVUSD" Soni Decl., Ex. 3 at 33:18-22; PSUF ¶¶ 16(c), 17.)  Accordingly, the Court admonishes Defendants for baselessly disputing matters which they should have reasonably known were not in dispute.

In 2016, MVUSD CSOs began its security transition to replace CSVs with CSOs. (Id. ¶ 19.) CSVs were not required to meet the minimum requirements of the current CSO program. (DSUF ¶ 45.) Scott recommended and led the transition to "enhance the safety and security of the school district" and completed the transition in July 2020. (PSUF ¶ 30.) To transition from a CSV to a CSO, MVUSD required the employee to first undergo mandatory trainings and obtain certifications. (Id. ¶ 33.) CSVs were required to complete a 40-hour Peace Officers Standards and Training ("POST") Certification Course, provided by the Riverside County Sheriff's Department, on arrest, search and seizure pursuant to California Penal Code Section 832. (Id. ¶¶ 34-34(a).)

### 5. CSOs

CSOs take a guard card training and a state-mandated course on how to interact with children as required by SB 1626. (Id. ¶¶ 34(b)-34(c); DSUF ¶ 37.) CSOs possess the general authority to use reasonable force and use physical, mechanical, and chemical restraints "to deescalate a situation." (PSUF ¶¶ 35-36.) CSOs are also authorized to remove students from the classroom for de-escalation purposes. (Id. ¶ 37.) The role of a CSO is "essentially defensive," in that they are supposed to "defend and protect." (Id. ¶ 38.) CSOs make up a "critical component of the District's disciplinary program," the purpose of which is to "change negative pupil behavior." (Id. ¶ 38(a).) CSOs may use a restraint to "effect arrest," "overcome resistance," prevent escape," or "secure or obtain a dangerous object." (Id. ¶¶ 39-39(c).) The CSO use of restraint policy makes no exception for students with disabilities and does not acknowledge that many of the types of behaviors for which CSOs are authorized to use restraints may be disability-related behaviors. (Id. ¶¶ 40-40(a).) CSOs have more "tools at his or her disposal" than campus supervisors, including but not limited to restraints and handcuffs. (Id. ¶¶ 42, 44, 44(a).) CSOs receive additional trainings on arrest and control. (Id. ¶ 43.) Teachers can request CSO assistance whenever they "feel they need support" such as when disabled students' behavior is "disrupting the educational process for students." (Id. ¶ 59.)

MVUSD does not train CSOs about the rights of students with disabilities. (Id. ¶ 50.) CSOs interact with students with disabilities. (Id. ¶ 50(a).) CSOs are required to treat all students the same and cannot make exceptions in their enforcement of school rules and regulations governing a student's behavior on account of a student's disability-related behavior. (Id. ¶ 51.) CSOs do not investigate the reasons behind a student's behavior, including ascertaining whether the behavior is the result of a disability. (Id. ¶ 52.) CSOs are authorized to use restraints for "defensive purposes," "to gain compliance when commands have failed and a physical confrontation appears reasonable and imminent," "to gain compliance" when "circumstances indicate that a verbal control would be futile," "to gain compliance" when circumstances indicate that a verbal control would endanger security, "to gain compliance" when "circumstances indicate that a verbal control" would endanger law enforcement, or "to gain compliance" when "circumstances indicate that a verbal control" would endanger persons." (Id. ¶¶ 62-62(e).)

Through a third-party contractor named Keenan and Associates, CSOs received training each academic year from 2016 through 2023.  (Id. ¶ 68.)  These training programs do not cover disability-specific accommodations or behavioral interventions.  (Id. ¶ 69.)

### 6. Use of restraints on C.B.

During this time period, MVUSD CSOs and/or SROs used restraints on C.B. on multiple occasions, the parties' account of which informs the basis of C.B.'s remaining claims.  (Id. ¶ 12.) MVUSD employees and/or Riverside County Sheriff's deputies restrained C.B. on August 26, 2019.  (Id. ¶ 101.)  MVUSD employees and/or Riverside County Sheriff's deputies restrained C.B. on October 8, 2019.  (Id. ¶ 101(a).)  MVUSD employees and/or Riverside County Sheriff's deputies restrained C.B. on December 9, 2019.  (Id. ¶ 101(b).)

Arellano became a CSO in 2017.  (Id. ¶ 31.)  Arellano was a CSO at LMS when C.B. attended LMS.  (Id. ¶ 86(a).)  When Arellano was a CSO at LMS, he was never informed about C.B.'s disabilities, C.B.'s disability-related behaviors, or what accommodations C.B. required pursuant to C.B.'s Behavior Support Plan.  (Id. ¶¶ 86(b)-86(d).)  Arellano testified that he had never seen the CSV Handbook.  (Id. ¶ 28.)  Arellano was constantly called into C.B.'s special education classroom by C.B.'s teacher to remove C.B. due to C.B.'s disruptive behavior.  (Id. ¶ 81.)

CSOs and SROs were never given C.B.'s BSP when responding to his disability-related behavior.  (Id. ¶ 101(c).)  CSOs and SROs never requested C.B.'s BSP when responding to his disability-related behavior.  (Id. ¶ 101(d).)  CSOs and SROs never implemented C.B.'s BSP when responding to his disability-related behavior.  (Id. ¶ 101(e).)

### 7. CSV Handbook

The CSV Handbook outlines a verbal technique called "Verbal Judo," which is an undescribed "communication technique" that claims to "redirect aggression into positive energy."  (Id. ¶ 70.)  Verbal Judo does not account for a student's disabilities.  (Id. ¶ 71(a).)  The CSO Handbook outlines a "tactical five-step process" before using restraints, in which CSOs ask for compliance, explain their reasoning, present "options," ask if the officers can do something to gain cooperation, and then "act!!"  (Id. ¶ 70(a).)  The CSO Handbook's "tactical five-step process" does not make exceptions for disabled students or account for a student's disabilities. (Id. ¶¶ 71(b)-71(c).)

### 8. CSO Handbook

From January 2016 to January 2021, CSOs relied on the CSV Handbook and followed MVUSD Board Policies.  (Id. ¶¶ 45-54.)  The CSV Handbook contained guidelines that provided general best practices based on the Education Code and MVUSD Board Policies.  (Id. ¶ 46.)

The CSO Handbook contains MVUSD's current policies, procedures, rules, and guidelines that CSOs must follow.  (Id. ¶ 48.)  The CSO Handbook authorizes CSOs to use restraints, including on a student when the student attempts to escape, on a student when the student attempts to destroy property, or for any act of physical aggression, even if the student does not pose an imminent threat.  (Id. ¶¶ 56-56(c).)  The CSO Handbook directs CSOs to apply a "good rule of thumb" when using handcuffs, which is to "only handcuff when it serves a reasonable purpose."  (Id. ¶ 49.)  The CSO Handbook authorizes CSOs to remove a student from the classroom, including when a CSO determines "the student has created, or is creating, an unsafe condition," at the request of faculty, classroom staff or administrator, or for "acts of defiance."  (Id. ¶¶ 55(b)-55(e), 57.)  CSOs can use restrains when a student engaging in acts of defiance does not consent to being removed from the classroom.  (Id. ¶ 65.)  The CSO Handbook instructs CSOs that an argument between a teacher and student could potentially rise to a scenario under which a "private person arrest" is warranted.  (Id. ¶ 64.)

The CSO Handbook does not instruct CSOs to determine any information about the student or their potential disability where an argument between a teacher and student could rise to a scenario of making a private arrest.  (Id. ¶ 64(a).)  When asked about the role of CSOs in accommodating disabled students, Scott testified only that CSOs must "provide a safe and secure learning environment for all students and staff."  (Id. ¶ 72.)

The handcuffing policy does not require CSOs to investigate the reason behind an individual's behavior, whether an individual's disability is the reason behind the individual's behavior, or whether an individual is exhibiting disability-related behavior.  (Id. ¶¶ 66-66(b).)  Beyond MVUSD employee's general requirement to provide accommodations under the ADA, there is no MVUSD policy that requires CSOs to provide disability-specific accommodations to prevent removal.  (Id. ¶ 67.)  There is no MVUSD policy that outlines how CSOs should provide disability-specific accommodations to prevent the use of restraints.  (Id. ¶ 67(a).)

The CSO Handbook does not include a policy requiring CSOs to provide accommodations to students with disabilities.  (Id. ¶ 82.)  The word accommodation does not appear anywhere in the CSO Handbook.  (Id. ¶ 82(a).)  The CSV Handbook does not include a policy requiring CSVs to provide accommodations to students with disabilities.  (Id. ¶ 83.)  The word accommodation does not appear anywhere in the CSV Handbook.  (Id. ¶ 83(a).)  MVUSD Board Policies do not have a policy requiring CSOs to provide accommodations to students with disabilities.  (Id. ¶ 84.)  MVUSD Board Policies do not have a policy on the use of restraints by CSOs.  (Id. ¶ 84(a).)  CSOs must enforce District rules against all students with no consideration of whether the student is disabled.  (Id. ¶ 85.)

The CSO Handbook makes removal the default response for all students, regardless of whether they have a disability.  (Id. ¶ 104.)  The CSO Handbook does not outline alternatives to removal.  (Id. ¶ 105.)  The CSO Handbook states officers should "[e]nforce school disciplinary procedures" and "escort students."  (Id. ¶ 107.)

//

### 9. MVUSD Training – Responding to Students with Disabilities

MVUSD does not train CSOs about the rights of students with disabilities. (Id. ¶ 50.) From 2016 to present, MVUSD has not provided any training to CSOs on how to identify disabled students. (Id. ¶ 73.) From 2016 to present, MVUSD has not provided any training to CSOs on how to provide disability-specific accommodations. (Id. ¶ 73(a).) From 2016 to present, MVUSD has not provided any training to CSOs on how to identify disabled students' disability-related behavior. (Id. ¶ 73(b).) From 2016 to present, MVUSD has not provided any training to CSOs on how to provide de-escalation strategies for disabled students. (Id. ¶ 73(c).)

MVUSD training does not address or account for any of the following instances:
- Whether the officers should respond differently than using restraint or removal when defiance is exhibited by students with disabilities. (Id. ¶ 102.)
- Whether the officers should respond differently than using restraint or removal when resistance is exhibited by students with disabilities. (Id. ¶ 102(a).)
- Whether the officers should respond differently than using restraint or removal when escape is exhibited by students with disabilities. (Id. ¶ 102(b).)
- Whether the officers should respond differently than using restraint or removal when physical aggression is exhibited by students with disabilities. (Id. ¶ 102(c).)
- How the officers should respond differently than using restraint or removal when defiance is exhibited by students with disabilities. (Id. ¶ 102(d).)
- How the officers should respond differently than using restraint or removal when resistance is exhibited by students with disabilities. (Id. ¶ 102(e).)
- How the officers should respond differently than using restraint or removal when escape is exhibited by students with disabilities. (Id. ¶ 102(f).)
- How the officers should respond differently than using restraint or removal when physical aggression is exhibited by students with disabilities. (Id. ¶ 102(g).)

MVUSD policy does not prohibit staff from referring students with disabilities to CSOs or SROs for removal from the classroom. (Id. ¶¶ 58-58(a).) MVUSD does not train staff on when to refer disabled students to CSOs or SROs. (Id. ¶¶ 58(b)-58(c).) MVUSD follows a use of restraint continuum policy which begins with the least intrusive restraint of a "uniformed presence" and escalates to using "empty hand control holds" or "impact weapons." (Id. ¶ 61.)

### 10. MVUSD Policy – Sharing Information about Students' Disabilities

MVUSD policy forbids MVUSD staff from informing CSOs about a student's disability. (Id. ¶ 74.) MVUSD policy forbids MVUSD staff from informing CSOs about required accommodations listed in a student's Individualized Education Plan. (Id. ¶ 74(a).) MVUSD policy forbids MVUSD staff from informing CSOs about required accommodations listed in a student's Section 504 Plan. (Id. ¶ 74(b).) MVUSD policy forbids MVUSD staff from informing CSOs about accommodations listed in a student's Behavior Support Plan. (Id. ¶ 74(c).) MVUSD does not have any policy requiring school staff to share accommodations. (Id. ¶ 75.) MVUSD does not have any policy requiring school staff to share supports identified in students'

Individualized Education Plan with CSOs.  (Id. ¶ 75(a).)  MVUSD does not have any policy requiring school staff to share Section 504 Plans with CSOs.  (Id. ¶ 75(b).)  MVUSD does not have any policy requiring school staff to share Behavior Support Plans with CSOs.  (Id. ¶ 75(c).)

### 11. CPI Training

In 2021, MVUSD began providing CSOs with training on de-escalation strategies through the Crisis Prevention Institute ("CPI") for the first time.  (Id. ¶ 76.)  CPI trainings do not include de-escalation strategies specific to disability accommodations.  (Id. ¶ 77(a).)  CPI trainings do not include disability-specific interventions such as identifying disability-related behaviors.  (Id. ¶ 77(b).)  CPI trainings do not include disability-specific interventions such as differential reinforcement strategies.  (Id. ¶ 77(c).)  CPI trainings do not include trainings on how disability-related behaviors escalate.  (Id. ¶ 77(d).)  CPI trainings do not make exceptions for disabled students when responding to disabled students who are "verbally aggressive."  (Id. ¶ 79(a).)

### 12. Disproportionate Impact

MVUSD data shows disproportionate use of restraints on students with disabilities compared to their non-disabled peers.  (Id. ¶¶ 87, 97.)  MVUSD's data shows that students with disabilities are disproportionately referred to law enforcement.  (Id. ¶¶ 88, 99.)  In 2018-2019, MVUSD's data shows students with disabilities were 2.6 times more likely to be restrained than their non-disabled peers.  (Id. ¶ 98.)  In the same year, Black students with disabilities were 3.26 times more likely to be restrained than their non-disabled peers.  (Id. ¶ 98(a).)  In 2019-2020, the data shows that students with disabilities were more than 8.90 times more likely to be restrained than their non-disabled peers.  (Id. ¶ 98(b).)  The same year, Black students with disabilities were 3.81 times more likely to be restrained than their non-disabled peers.  (Id. ¶ 98(c).)  The rates of disproportionality for the use of restraints exceeds the 3.0 threshold established by the California Department of Education.  (Id. ¶ 98(d).)

During the 2018-2019 school year, students with disabilities were 8.97 times more likely to be referred to law enforcement than their non-disabled peers.  (Id. ¶ 99(a).)  The same year, Black students with disabilities were more than 3.48 times more likely to be referred to law enforcement than their non-disabled peers.  (Id. ¶ 99(b).)  During the 2019-2020 school year, students with disabilities were 6.28 times more likely to be referred to law enforcement than their non-disabled peers.  (Id. ¶ 99(c).)  The same year, Black students with disabilities were 3.63 times more likely to be referred to law enforcement than their non-disabled peers.  (Id. ¶ 99(d).)  The rate of disproportionality for law enforcement referrals exceeds the 3.0 threshold set by the California Department of Education.  (Id. ¶ 100.)  Scott repeatedly testified that he does not track the number of restraints used by CSOs at each school.  (Id. ¶ 110.)

//
//
//

### 13. ADA Standard of Care

The standard of care under the ADA and Section 504 requires that CSOs and SROs receive training on the functions of disability-related behavior. (Id. ¶ 108.) The standard of care under the ADA and Section 504 requires that CSOs and SROs receive training on how disability-related behavior escalates. (Id. ¶ 108(a).) The standard of care under the ADA and Section 504 requires that CSOs and SROs receive training on clinically proven strategies for reducing disability-related behavior and incentivizing desired behavior to prevent removals and restraints. (Id. ¶ 108(b).) Removal has been "clinically proven to be harmful" for students with disabilities. (Id. ¶ 109.) Removal is "not a behavioral accommodation [when used] before the student hits their peak and becomes physically aggressive." (Id. ¶ 109(a).)

## III.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 599 (1986). Plaintiffs "seeking summary judgment on a claim must offer evidence sufficient to support a finding upon every element of [their] claim other than elements admitted by the defendants." Barnes v. Sea Hawaii Rafting, LLC, 889 F.3d 517, 537 (9th Cir. 2018). "It is ordinarily a heavy burden." Id. at 538.

//
//
//

## IV.   DISCUSSION

This Motion arises out of instances in which C.B., a small ten-year-old Black student with documented disabilities, was restrained at school on numerous occasions for exhibiting disability-related behavior.  (Motion at 6.)  Plaintiff argues that these instances are discriminatory results of MVUSD's policies which permit CSOs and SROs to restrain, remove, and refer students with disabilities to law enforcement without considering the student's disabilities and violate the ADA and Section 504's requirement to treat disabled student equitably.  (Id.)  Discrimination against students with disabilities is a serious and pervasive issue in our education system, and the Court does not take this Motion lightly.  The Court agrees that MVUSD's methods of administration in maintaining its police program violate the ADA and Section 504 of the Rehabilitation Act.  As such, and for the reasons set forth below, the Court **GRANTS** Plaintiff's Motion as to Claim Three and Four.

To prove a claim of discrimination under the ADA, Plaintiff must establish: (1) he is "qualified individual with a disability;" (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.  (Reply at 3); Duvall v. County of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001). One way Plaintiff can establish the second and third elements of his ADA claim is by showing that Defendants utilize a "criteria or methods of administration" that has the effect or tendency of excluding disabled students like him.  28 C.F.R. §35.130(b)(3).

A claim under Section 504 is composed of identical elements and applies to any public program that receives federal financial assistance.  Duvall v. Cty. of Kitsap, 260 F.3d at 1135; see also Wong v. Regents of Univ. of Cal., 193 F.3d 807, 816 (9th Cir. 1999).

Plaintiff brings the Motion on the assertion that there is no genuine dispute of material fact that (1) Plaintiff is disabled, (2) MVUSD utilizes "methods of administration" under 28 C.F.R. § 35.130(b)(3) and 28 C.F.R. § 41.51(b)(3), which "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" under 28 C.F.R. § 35.130(b)(8) and 28 C.F.R. § 41.51(b)(3)(1) because they cause disproportionate restraints of disabled students and (3) MVUSD receives federal financial assistance.  (See Motion.) Specifically, Plaintiff argues that MVUSD unlawfully applies the following policies, practices, and customs through the CSOs and the SROs: (1) MVUSD authorizes CSOs to remove and restrain students but neither directs not authorizes CSOs or SROs to account for students with disabilities or otherwise require accommodations; (2) MVUSD fails to train its CSOs and SROs about the needs of students with disabilities and appropriate accommodations or behavioral interventions; and (3) MVUSD directs its classroom and other school staff to refer students with disabilities to unqualified CSOs and SROs for disability-related behaviors.  (Motion at 19.) Plaintiff argues that the effect of these policies has resulted in the disproportionate and discriminatory use of removal and physical restraints, and law enforcement referrals as a response to disability-related behaviors.  (Id.)

Defendants fail to make any sound legal arguments to directly dispute Plaintiff's claims, nor do Defendants raise any genuine material disputed facts. (See Opposition.) Instead, Defendants argue that other state and federal laws, such as the IDEA, "directly address the issues" and should preclude summary judgment here. (Opposition at 1-3.) Defendants argue that Plaintiff has not met his burden under the ADA and Section 504 because (1) Plaintiff has not exhausted his remedies under the IDEA, and (2) Plaintiff has not provided competent expert testimony that MVUSD's policies, procedures and training for security and law enforcement personnel fall below the standard of care as to students with disabilities. (Opposition at 13-15.) The Court address each argument below.

## A.    The Individuals with Disabilities Education Act

Defendants argue that Plaintiff is not entitled to summary judgment of his ADA and Section 504 claims because he has not first "show[n] that he exhausted the procedures for [resolution] under the IDEIA." (Opposition at 14.) The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. guarantees individually tailored educational services, while Title II of the ADA and Section 504 promise non-discriminatory access to public institutions. Fry v. Napoleon Community Schools, 580 U.S. 154, 170-71 (2017).

Defendants' reliance on Fry is misplaced. In fact, Fry supports Plaintiff's position, not Defendants'. (See Opposition at 13-14.) The Court finds that Defendants' singular quote from Fry is an attempt to mislead the Court, a poor attempt at advocacy, or both. Defendants' argument that 20 U.S.C. § 1415(l) provides a blanket exhaustion requirement for all ADA and Section 504 claims is incorrect and wholly ignores the lengthy reasoning and analysis in Fry. (Opposition at 13-14); see Fry, 580 U.S., at 154. While instances exist in which ADA and Section 504 claims require exhaustion under the IDEA, this is not one of them.

In Fry, Plaintiffs brought claims under Title II of the ADA and Section 504 on behalf of their daughter who was denied the use of a service-dog in elementary school. Id. The Court considered Section 1415(l), which added a "carefully defined exhaustion requirement" to the IDEA. Id. at 161. Section 1415(l) exhaustion can be required in ADA cases without IDEA claims, however the exhaustion rule "hinges on whether a lawsuit seeks relief for the denial of a "free appropriate public education" ("FAPE"). Id. at 168. A FAPE comprises "special education and related services"—both "instruction" tailored to meet a child's "unique needs" and sufficient "supportive services" to permit the child to benefit from that instruction. Id. at 158. Fry considered the following factors when determining whether a plaintiff's ADA claim required exhaustion under the IDEA: (1) whether the gravamen of a plaintiff's complaint seeks relief for the denial of an appropriate education, (2) whether a hearing officer would be able to make a decision on a request for substantive relief, (3) whether a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute. Id. at 166-73. Further, Fry offered two hypothetical tests to help determine whether the gravamen of a disability discrimination complaint is really FAPE-related: (1) whether the same claim could be brought against another public entity that is not a school, such as a theater or library; and (2) whether an employee or other adult could bring the same claim against the school. Id. at 171-74. "If, in a suit brought

under a different statute, the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required." Id. at 168.

Here, Plaintiff does not seek relief for the denial of an appropriate education, but relief for discrimination, irrespective of the IDEA's FAPE obligation. See id. at 171. Plaintiff's ADA and Section 504 discrimination claims challenge MVUSD's methods of administration in maintaining its school police program and "sweep more broadly" than the IDEA. (Reply at 10); see Smith v. Orcutt Union School District, 2021 WL 527124 at *2 (C.D. Cal. Feb. 10, 2021) (finding that the gravamen of plaintiffs' complaint concerned disability-based discrimination, not the denial of a FAPE.) Additionally, multiple cases hold that non-school public entities must provide disability-specific alternatives to force and law enforcement. (Reply at 10-11); see, e.g., Sheehan v. City & County of San Francisco, 743 F.3d 1211, 1232-33 (9ᵗʰ Cir. 2014), rev'd on other grounds, 575 U.S. 600 (2015) (holding that the ADA and Section 504 applied to a city's police services and officers were required to reasonably accommodate the plaintiff's disability); Estate of Saylor v. Regal Cinemas, Inc., 54 F. Supp. 3d 409, 427 (D. Md. Oct. 16, 2014) (accepting a disability discrimination claim under the ADA where the county failed to train its sheriff deputies to provide disability accommodations). The Court finds that the gravamen of Plaintiff's complaint concerns disability-based discrimination, not the denial of a FAPE. Accordingly, exhaustion under the IDEA is not required.

Defendants admit that CSOs and SROs do not participate in IEP meetings, nor do CSVs. (Opposition at 5.) Defendants' argument that special education staff receives training before being hired into MVUSD is immaterial here. (Opposition at 5-6.) Defendants argue that CSOs are required to complete "annual training for anti-harassment and anti-discrimination" but fail to point to any disability-specific training or policy that would comply with the ADA and Section 504 requirements. (Opposition at 6.)

The Court rejects Defendants' additional arguments related to standard of care under the IDEA and state education law, and training outside the scope of MVUSD because they are immaterial to the instant Motion. (Opposition at 15-16.)

## B.    ADA (Claim Three)

To make out a prima facie case of discrimination under the ADA, Plaintiff must establish: (1) he is "qualified individual with a disability;" (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. Duvall v. County of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001). One way Plaintiff can establish the second and third elements of his ADA claim is by showing that Defendants utilize a "criteria or methods of administration" that has the effect or tendency of excluding disabled students like him. 28 C.F.R. §35.130(b)(3).

The phrase "criteria or methods of administration" refers to official written policies and to the actual practices of the public entity, and thus extends beyond formal policies to widespread

customs and usage.  (Motion at 17); see 28 C.F.R. pt. 35 app. B, § 35.130 (2018); see also Oviatt
v. Pearce, 954 F.2d 1470, 1477 (9th Cir. 1992) (defining policy as a "deliberate choice to follow a
course of action made from among various alternatives by the official or officials responsible for
establishing final policy with respect to the subject matter in question.")

It is undisputed that Plaintiff is a qualified individual with a disability.  (PSUF ¶ 1.)
Under the ADA and Section 504, a "disability" is "a physical or mental impairment that
substantially limits" a "major life activity."  42 U.S.C. § 12102(a)(A); 29 U.S.C. § 794.  Here, at
all relevant times, Plaintiff's ADHD and ODD have substantially limited the major life activities
of thinking, learning, and concentrating.  (PSUD ¶ 3-4); see 42 U.S.C.  12102(2)(A).

Plaintiff argues that MVUSD utilizes "methods of administration" under
28 C.F.R. § 35.130(b)(3) and 28 C.F.R. § 41.51(b)(3), which "have the effect of subjecting
qualified individuals with disabilities to discrimination on the basis of disability" under 28 C.F.R.
§ 35.130(b)(8) and 28 C.F.R. § 41.51(b)(3)(1) because they cause disproportionate restraints of
disabled students.  (Motion at 16-17.)  Plaintiff argues that MVUSD unlawfully applies the
following policies, practices, and customs to the CSOs and the SROs: (1) MVUSD authorizes
CSOs to remove and restrain students but neither directs not authorizes CSOs or SROs to
account for students with disabilities or otherwise require accommodations; (2) MVUSD fails to
train its CSOs and SROs about the needs of students with disabilities and appropriate
accommodations or behavioral interventions; and (3) MVUSD directs its classroom and other
school staff to refer students with disabilities to unqualified CSOs and SROs for disability-related
behaviors.  (Motion at 19.)

Plaintiff provides sufficient evidence to support his claim that MVUSD utilizes methods
of administration that have resulted in the disproportionate and discriminatory use of removal
and physical restraints as well as law enforcement referrals as a response to disability-related
behaviors.  (Motion at 19.)  Defendants fail to adequately dispute any of Plaintiff's material facts
or provide any relevant evidence that would lead a reasonable jury to return a verdict for
Defendants.  (See D. Opp. PSUF); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).

### 1.  MVUSD Methods of Administration

MVUSD policy requires CSOs to treat all students the same and to make no exceptions
for disability-related behavior in their enforcement of school rules and regulations.  (PSUF ¶ 51,
81.)  CSOs do not investigate the reasons behind a student's behavior, and therefore do not
ascertain whether the behavior is disability related.  (PSUF ¶ 52.)  MVUSD does not train CSOs
about the rights of students with disabilities, even though CSOs regularly interact with disabled
students.  (PSUF ¶¶ 50-50(a).)  Although MVUSD provides CSOs with training through a third-
party contractor, the training programs do not cover disability-specific accommodations or
behavioral interventions.  (PSUF ¶¶ 67-69; 75-79(d).)  The CSV Handbook, CSO Handbook,
and MVUSD's Board Policies do not contain policies requiring CSOs to provide
accommodations to students with disabilities or written procedures on how to provide

accommodations.  (PSUF ¶¶ 20, 48, 82–84.)  Aside from an employee handbook that applies to all MVUSD employees and imposes a general requirement to provide accommodations under the ADA, no MVUSD policy requires or outlines how CSOs should provide disability-specific accommodations or de-escalation strategies to prevent removal and restraints of disabled students.  (PSUF ¶¶ 67–69; 75–77(d).)

MVUSD policy does not prohibit classroom and school administrative staff from referring students with disabilities to CSOs for removal from the classroom.  (PSUF ¶¶ 58-58(d).)  As such, teachers can request CSO assistance whenever they "fe[el] they need[] support," such as when a disabled students' behavior is "disrupting the educational process for students," even if the behavior is disability-related.  (PSUF ¶¶ 59-59(a).)  Since the position of CSO was created in 2016, MVUSD has not trained CSOs on how to identify disabled students, understand disability-related behavior, and/or provide disability-specific accommodations.  (PSUF ¶¶ 34-34(c), 43, 50-50(a), 73-73(c).)  MVUSD does not maintain a policy that CSOs should be informed about a student's disability or the accommodations and supports identified in the student's IEP, Section 504 Plan, or behavior plans.  (PSUF ¶¶ 74-74(c), 75-75(c).)  MVUSD provides no training to SROs, and MVUSD's contract with the Sheriff's Department does not inform SROs about its students with disabilities or the accommodations to which those students are entitled pursuant to their IEPs, 504 Plans, or BSPs.  (PSUF ¶¶ 95-95(c).)  Department does not require SROs be trained on special education laws or on accommodating students with disabilities.  (PSUF ¶¶ 94-94(b); 95.)  As with its CSOs, MVUSD does not inform SROs about its students with disabilities or the accommodations to which those students are entitled pursuant to their IEPs, 504 Plans, or BSPs.  (PSUF ¶¶ 95-95(c).)

## 2. Discriminatory Effect on the Basis of Disability

MVUSD's data shows that students with disabilities and Black students with disabilities are disproportionately restrained and referred to law enforcement.  (PSUF ¶¶ 97, 99-99(d).)  In 2018-19, students with disabilities were 2.6 times more likely to be restrained than their non-disabled peers and Black students with disabilities were 3.26 times more likely to be restrained.  (PSUF ¶¶ 98-98(a).)  During the 2019-2020 school year, the rates increased significantly with students with disabilities being 8.90 times more likely to be restrained than their non-disabled peers and Black students with disabilities being 3.81 more likely to be restrained.  (PSUF ¶¶ 98(b)-(c).)  MVUSD data also shows students with disabilities are disproportionately referred to law enforcement.  (PSUF ¶¶ 99-99(d).)  During the 2018–2019 school year, students with disabilities were 8.97 times more likely to be referred to law enforcement than their nondisabled peers and Black students with disabilities were more than 3.48 times more likely to be referred.  (PSUF ¶¶ 99(a)-(b).)  The statistics did not improve for the 2019–2020 school year. (PSUF ¶¶ 99(c)-(d).)

Plaintiff contends that based on these facts, as well as those outlined above, there is no dispute that MVUSD's policies and trainings, along with the absence of necessary policies and trainings, subject qualified individuals with disabilities to discrimination on the basis of disability

through disproportionate use of restraints and referrals of disabled students to CSOs and SROs. (Reply at 149-50.)  The Court agrees.

For the reasons above, the Court finds that there is no genuine dispute as to any material facts and that Plaintiff is entitled to judgment under the ADA.  The Court **GRANTS** Plaintiff's Motion as to Claim Three.[4]

### C.   Section 504 (Claim Four)

Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act.  Duvall, 260 F.3d, at 1135.  Plaintiff must show (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance.  Id.

Defendants do not dispute that MVUSD receives federal funding.  (D. Opp. PSUF ¶ 13.) MVUSD is a covered entity under Section 504 of the Rehabilitation Act because it receives "federal financial assistance."  (Reply at 149); 29 U.S.C. ¶ 794(a).  For this reason and the undisputed facts established above, the Court finds that Defendants violated Section 504 of the Rehabilitation Act and **GRANTS** Plaintiff's Motion as to Claim Four.

## V.   CONCLUSION

For the reasons above, the Court **GRANTS** Plaintiff's Motion and **VACATES** the October 23, 2023 hearing.

Finding that Defendants' methods of administration amount to a violation of students with disabilities' right to meaningful access under the ADA and Section 504, the Court **ORDERS** the parties to design a remedy to bring MVUSD into compliance.

**IT IS SO ORDERED.**

---

[4] The Court reaches this decision before applying the adverse inference pursuant to the R&R which only solidifies the Court's finding.  (See R&R at 18; Dkt. No. 181 at 3-12.)